**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICARDO BENJAMIN SALINAS PLIEGO and CORPORACIÓN RBS S.A. DE C.V., <br><br> Plaintiffs, <br><br> - against - <br><br> JAITEGH SINGH; JURIST IQ CORP.; SINGH LAW FIRM, P.A.; MAIA SKLAROV; SASHA SKLAROV; PKP INDUSTRIES; LARISA LANE LLC; BACKETT WOOD, LLC; ABCPHABW62STXYZ LLC; and JOHN DOE ENTITIES 1–20 (the names of which are presently unknown), <br><br> Defendants. | Case No. 1:26-cv-6055 <br><br><br><br> **COMPLAINT** <br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Ricardo Benjamin Salinas Pliego ("Salinas") and Corporación RBS S.A. de C.V. ("RBS," and together with Salinas, "Plaintiffs"), by and through their attorneys, respectfully allege as follows:

2.      This action seeks recovery from participants in a coordinated, multi-year fraudulent scheme to induce Plaintiffs to deliver valuable stock collateral in a stock-backed lending transaction, unlawfully divert and liquidate that collateral, generate more than $350 million in proceeds at an initial loss of more than $400 million to Plaintiffs, and then systematically transfer, conceal, and dissipate those proceeds through accounts, entities, family members, associates, real estate, and other assets in the United States and elsewhere.[1]

---

[1]      As explained and reiterated further herein and other pleadings filed contemporaneously with this complaint, in 2024 Plaintiffs filed previous litigation against Sklarov, Astor Asset Management 3 Limited ("Astor 3"), Weiser Capital Markets Ltd, Tavira Monaco SAM, Cornelius Vanderbilt Capital Management Ltd, and Astor Capital Fund Limited (the "English Action Respondents") in the High Court of Justice King's Bench Division Business and Property Courts of England and Wales Commercial Court (Case NO. CL-2024-000450) alleging claims arising from

3.      Relevant to this action, after stealing and liquidating Plaintiffs' shares, Defendants and their co-conspirators routed the proceeds through a network of accounts and entities controlled by or associated with Defendants in New York and elsewhere. The scheme followed a coordinated sequence. Plaintiffs delivered 7,204,296 Grupo Elektra shares as collateral. Beginning on or about October 5, 2021, parties affiliated with Defendants unlawfully diverted those shares. Once liquidated, the proceeds were transferred, layered, concealed, and redistributed through family members, related entities, third-party associates, real estate transactions, and other assets, thereby scattering the proceeds across numerous accounts and jurisdictions while obscuring their origin and ownership.[2]

4.      New York was a central operational hub for the conspiracy. These New York Defendants and related entities provided much of the financial, legal, and corporate infrastructure used to receive, transfer, layer, conceal, and dissipate proceeds traceable to Plaintiffs' stolen shares. While the underlying stock-loan transaction originated abroad, much of the conspiracy's domestic legwork fell to Defendants operating in and through New York.

5.      Jaitegh Singh, Sklarov's partner, personal attorney, and a central U.S. conduit for assets stolen through the network's assorted frauds, channeled millions of dollars in Plaintiffs'

---

the same stock-based lending fraud described here. On August 2, 2024, the Court entered a Freezing and Proprietary Order that included the following "Undertaking":

> *The Applicants will not without the permission of the Court seek to enforce this order in any country outside England and Wales or seek an order of a similar nature including orders conferring a charge or other security against the Respondents or the Respondents' assets.*

(the "Undertaking").

Plaintiffs state from the outset and definitively that they file this action in full compliance with the Undertaking and do not and will not seek to enjoin or encumber any assets known to be under Val Sklarov or the other listed Respondents' control, or make any attempt to separately enforce the Freezing Order.

[2]      Plaintiffs are filing contemporaneous claims in Illinois against other parties arising from the same conspiracy, which served as the other central base of U.S. operations and money-laundering network for the underlying scheme.

4920-7502-6878 v.1

assets through his law firms—including Defendants Jurist IQ Corp. and Singh Law Firm—to himself, and to properties, shell companies, and entities belonging to him, his family, and his associates. Upon successfully consolidating substantial proceeds under his control in the United States, Singh coordinated with members of the conspiracy to establish and utilize entities, trusts, and accounts that served as conduits to transfer, layer, and conceal those funds. Singh also founded and incorporated certain entities within months of the fraud alleged here, supporting the inference that they were created to help receive, transfer, and conceal proceeds from the scheme.

6.      These Singh-affiliated Defendants acted as knowing participants and co-conspirators from the inception of the scheme. They helped establish the U.S.-based financial infrastructure used to receive, route, and dissipate the proceeds of the fraud and played a central role in consolidating and distributing funds derived from the unlawful liquidation of Plaintiffs' collateral.

7.      Maia Sklarov and Sasha Sklarov, together with Singh, directly assisted the scheme and accepted funds traceable to the fraud without providing reasonably equivalent value. They helped establish and use accounts, shell entities, and properties necessary to sustain the conspiracy's financial network and to transfer, layer, and conceal proceeds traceable to Plaintiffs' stolen shares. They personally benefited from those proceeds while helping preserve the infrastructure necessary for the broader conspiracy to operate.

8.      The corporate Defendants including PKP Industries ("PKP"), Larisa Lane LLC ("Larisa Lane"), Backett Wood LLC ("Backett Wood"), and ABCPHABW62STXYZ LLC ("ABC LLC"), together with other Doe defendants operating similar trust or holding entities in or through New York, received and laundered proceeds traceable to Plaintiffs' stolen assets. Defendants used these entities as conduits to hold, transfer, layer, and conceal funds, including through real estate

and related transactions in New York, Texas, Illinois, Colorado, and elsewhere. These entities served little legitimate business purpose and instead functioned as components of a broader network designed to obscure ownership and impede recovery efforts.

9.      Defendants are the target of this action for their own wrongs, not merely their association with Val Sklarov or other members of the broader conspiracy. They formed entities, opened accounts, accepted transfers, routed funds, acquired assets, and helped conceal proceeds that they knew, or consciously avoided knowing, were traceable to fraud. Defendants accepted tens of millions of dollars in transfers while providing no reasonably equivalent value in exchange and personally benefited from the diverted proceeds. In doing so, they helped establish and maintain the financial and legal infrastructure necessary to misappropriate, conceal, and dissipate Plaintiffs' property.

10.     Defendants accelerated and continued their conduct after Plaintiffs uncovered the underlying fraud, commenced litigation in England, and obtained worldwide freezing and proprietary injunctions. After those proceedings began, and after Plaintiffs started investigating U.S. accounts, law firms, and real-estate transactions, Defendants and their co-conspirators continued to move, spend, and dissipate proceeds through additional transfers, real-estate purchases, home-improvement expenditures, and account withdrawals.

11.     Indeed, Defendants continued their activity with actual knowledge of the allegations arising from the underlying fraud, judicial findings indicating that the conduct was facially fraudulent, and court orders designed to prevent further dissipation of assets. The timing and pattern of the transactions that followed support the inference that Defendants acted with knowledge of the fraudulent origin of the proceeds and with intent to place those assets beyond Plaintiffs' reach. The continued movement of assets after investigations began and court-ordered

4

4920-7502-6878 v.1

restraints were entered further demonstrates Defendants' role in concealing proceeds and impairing Plaintiffs' recovery.

12. The need for relief is immediate. The walls are only now beginning to close in on this conspiracy. In May 2026, Val Sklarov was indicted in the Southern District of New York for wire fraud, money laundering, and conspiracy arising from the same stock-loan scheme and is now in federal custody. Defendants, however, have continued to hold, transfer, spend, conceal, and dissipate assets traceable to Plaintiffs' stolen collateral. Absent intervention from this Court, there is an imminent risk that Defendants' actions will impair or destroy equitable relief that otherwise could be obtained against Defendants and other further transferees and will further obscure property over which this Court may exercise equitable jurisdiction.

13. Plaintiffs assert claims arising under the Racketeering Influenced Organizations Act (18 U.S.C. § 1964), aiding and abetting and conspiracy to commit fraud, fraudulent conveyance, unjust enrichment and other state-law claims arising from Defendants' participation in the fraudulent scheme and money laundering activities. They seek to recover property and proceeds traceable to the fraud; unwind fraudulent transfers; impose constructive trusts and other equitable remedies on traceable assets; obtain preliminary and permanent injunctive relief; and recover damages, restitution, disgorgement, prejudgment interest, attorney fees, and all other relief available under law and equity.

## **PARTIES**

14. Plaintiff Salinas is a Mexican businessman and the founder and chairman of Grupo Salinas, a multi-billion dollar conglomerate operating across various industries, including the banking, media, and retail sectors, whose shares in a Grupo Salinas entity named Grupo Elektra

4920-7502-6878 v.1

S.A.B. de C.V. served as collateral in a loan agreement negotiated with Sklarov-affiliated fake businesses, who was injured and is being actively injured by Defendants' wrongful conduct.

15.    Plaintiff RBS is a corporation organized under the laws of Mexico with its headquarters and registered address at Ave. Ferrocarril de Rio Frio 419 A99, Chuchilla del Moral 1Iztapalapa, Ciudad de Mexico, Mexico.

16.    Defendant Singh, a licensed attorney, is an individual who registered corporate entities in New York and transacted business in New York and elsewhere and acted as a knowing participant, architect, and co-conspirator in the scheme described herein.

17.    Defendant Jurist IQ is a domestic business corporation organized under the laws of the State of New York, with its principal address located at 530 Fifth Ave, 9th Floor, New York, NY 10036 that Singh formed on or about January 7, 2021.

18.    Defendant Singh Law Firm, which Singh registered in New York in 2021, is an entity and putative law firm whose attorney trust account (IOLTA) and related accounts were used to transmit funds among the conspirators' various sham entities, family recipients, and other downstream entities.

19.    Defendants Maia Sklarov and Sasha Sklarov are individuals domiciled in New York, New York, who, upon information and belief and review of available, unrestricted records, acted as knowing participants and co-conspirators in the scheme described herein, and received, controlled, transferred, and/or benefited from proceeds derived from the unlawful liquidation of Plaintiffs' collateral shares.

20.    Defendant PKP Industries, Inc. is domestic business corporation organized under the laws of New York with its principal address located at 225 East 39th Street, 32E, New York, New York 10516.

21. Upon information and belief, ABC LLC, Larisa Lane, and Backett Wood are limited liability companies whose members are all domiciled in New York.

22. The Entity Defendants, upon information and belief and review of available, unrestricted records, acted as knowing participants and co-conspirators in the scheme described herein, and received, transferred, held, converted, or otherwise participated in the movement of proceeds derived from the fraud.

23. The John Doe Entities are entities presently unknown to Plaintiffs that participated in, benefited from, or received assets traceable to the fraud. Plaintiffs will amend this Complaint to assert their true names and capacities when ascertained.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this Complaint asserts claims arising under 18 U.S.C. § 1964. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the action is between Defendants, who are citizens of New York State and Plaintiffs who are citizens of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

25. This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business in New York, and Plaintiffs' claims arise out of and relate to Defendants' New York-based conduct. Personal jurisdiction is proper as to the Individual Defendants because they are domiciled in New York and have engaged in conduct within New York giving rise to the claims asserted herein, including controlling and directing the transfer, disposition, and use of Plaintiffs' property through New York-based accounts and entities. Personal jurisdiction is proper as to the Entity Defendants because they are incorporated, organized, or otherwise subject to personal jurisdiction in New

4920-7502-6878 v.1

York, and have transacted business in New York by establishing, maintaining, and using New York-based accounts and entities in furtherance of the conduct alleged herein. To the extent an Entity Defendant is a limited liability company, it is subject to personal jurisdiction because its members are domiciled in New York and directed and controlled the conduct at issue from New York. In all events, Defendants used New York-based financial institutions, accounts, and entities to receive, transfer, and conceal proceeds derived from the misconduct alleged herein, and Plaintiffs' claims arise directly from such conduct, including tortious acts committed in and from New York.

26.    Venue is proper as to the Individual Defendants because they are domiciled in New York County. Venue is proper as to the Entity Defendants because they are subject to personal jurisdiction in this District. Venue in this District is likewise proper because a substantial part of the acts and omissions giving rise to the claims occurred in this District, including the establishment and use of New York-based bank accounts and entities, the routing and transfer of funds through those accounts, and the acquisition and management of assets located in New York.

## FACTUAL BACKGROUND

### Defendant-Affiliated Parties Fraudulently Induce Plaintiffs into the SLA

27.    Stock-based lending, wherein high net worth individuals, shareholder groups, or corporations can secure financing by borrowing against their own stock, is hardly uncommon and remains an attractive and well-known method for individuals and entities whose access to wealth or capital is otherwise encumbered or limited by their holdings. Among other tax benefits, this structure provides flexibility by allowing parties to negotiate security for a loan on a readily available asset.

8

4920-7502-6878 v.1

28.     Because share values vary widely between certain holdings and companies and are subject to external market forces, the common format is for the borrower to secure the desired financing with stock valued at multiple times the loan principal, thus protecting the lender if the collateral stock plunges in value. These transactions invariably include terms restricting each party's access to the collateral unless the usual events allowing a lender's redemption of the pledged collateral are triggered, which preserves the obvious purpose and understanding of the initial loan transaction.

29.     In or about early 2021, Plaintiffs sought refinancing of a substantial loan obligation. Plaintiffs' banking representatives worked through intermediaries to locate lenders.

30.     One such intermediary was one Zara Akbar, then Head of Securities Based Lending of Enness Global, a Jersey-based credit broker.

31.     Ms. Akbar introduced Plaintiffs' representatives to entities holding themselves out as the "Astor Group," who purported to be a legitimate, well-capitalized securities finance operation backed by the famous Astor family's dynastic fortune.

32.     During the period from approximately March 2021 through July 2021, individuals using the aliases "Gregory Mitchell" and "Thomas Mellon" made oral and written representations on behalf of the Astor Group, leading Plaintiffs' representatives to believe those entities were legitimate counterparties capable of extending the desired loan, secured by Plaintiffs' shares in one of their holdings as collateral.

33.     Through oral and written communications, marketing decks, public-facing press releases and Internet materials, the Astor Group affirmed its longstanding operating history and tradition, affirming its integrity and stewardship, and that of Mellon (a purported Astor heir) and Mitchell. Astor Group's communications described a business model in which Astor Group would

9

safeguard Plaintiffs' collateral shares in independent third-party financial institutions for the duration of the loan term. These communications were collectively intended to build Plaintiffs' confidence in Astor Group, Mellon and Mitchell as potential loan counterparties, and reassured Plaintiffs that their collateral would remain segregated and protected.

34.    On March 29, 2021, the Astor Parties authored a Term Sheet that they circulated to Plaintiffs' banking representatives in April 2021, including Eduardo Gonzalez Salceda, Grupo Salinas' Vice President, Financial Investment & Analysis. The first term sheet included the following, as later excerpted in an Approved Judgment by an English Court:

[Figure 1]

**Restrictions on Lender**

During the loan term and while the loan remains in full force and effect, Lender shall not engage in short selling or selling of the Securities.

**Loan Termination and Return of Collateral**

Within three (3) business days after the end of the Loan Term and upon Borrower's payment in full of the Principal Balance and any outstanding Interest Payments and any other costs and fees, Lender shall return the Collateral to the Borrower in the same format as the collateral was originally delivered to Lender." (emphasis added)

35.    The April 8, 2021 Term Sheet delivered to Plaintiffs included an updated "Restrictions on Lender" term, adding "lending" to the list of restrictions:

[Figure 2]

**Restrictions on Lender:** During the Loan term and while the Loan remains in full force and effect, Lender shall not engage in short selling, lending or selling of the Securities.

36.    Plaintiffs relied on these terms and representations in proceeding with negotiations of the ultimate transaction.

37.    In reliance upon these representations, Plaintiffs entered into initial versions of the Stock Lending Agreement on May 11, 2021, executed its final version on July 28, 2021, and

4920-7502-6878 v.1

subsequently negotiated and executed related addenda between approximately July 28, 2021 and July 19, 2022 (collectively, the "SLA").

38.     The SLA provided for Plaintiffs to deliver approximately 7,204,296 Elektra shares as collateral (the "Collateral Shares") for lending totaling approximately MXN 2.15 billion (approximately $108–115 million USD at then-prevailing exchange rates).

39.     The SLA also prohibited the Astor Group lending entity from selling, transferring, short-selling, or otherwise disposing of the Collateral Shares except in the event of a contractually defined and uncured event of default, and represented that the collateral would be held by an independent custodian  responsible for enforcing the applicable sales restrictions on the collateral and other lockup terms. The Astor Group conditioned the loan and execution of the SLA on their ability to appoint and assign the custodian.

40.     The Astor Group first appointed Weiser Capital Global Markets, Ltd. ("Weiser") as custodian.

41.     Shortly after the initial lending tranches, on September 10, 2021, a third-party broker for Plaintiffs, Alexandre Torti, received an alert related to Weiser's custody of the Collateral Shares, indicating that some of the Collateral Shares were subject to disposition. He emailed the Astor Group asking for an update. Hours later, "Gregory Mitchell" of Astor Asset Group replied with a technical, legalistic response regarding "rehypothecation" processes common to the lending industry, but stated in all events, "If you log into the account at Weiser, you will see that all the stock is there. We have not sold any of it, which is in accordance with the loan agreement." Mr. Salceda did not see these emails but received Mr. Torti's reassurances that the shares were not moved.

11

42.     On October 5, 2021, Weiser alerted Mr. Salceda that the initial tranche of Collateral Shares were transferred from Plaintiffs' Weiser account to an account belonging to an entity called "Astor Capital."

43.     After Plaintiffs voiced concerns and in the coming weeks, through Ms. Akbar and others, Astor Group assured Plaintiffs that the Collateral Shares were safe and were returned to Plaintiffs' account. After agreeing to appoint a new custodian, the Astor Group entities reaffirmed the restrictive terms governing the Collateral Shares. These communications were intended to and did satisfy Plaintiffs that their Collateral Shares had not been and would not be disposed during the term of the SLA.

44.     Following this incident, the Astor Group entities elected Tavira Monaco SAM ("Tavira") as the new custodian, and a substantial majority of the Collateral Shares were thereafter transferred to Tavira's custody.

45.     As further reassurance, the Astor Group entities and Tavira supplied Plaintiffs with monthly account statements purporting to show that the Collateral Shares remained in Tavira's custody.

46.     Until late July 2024, Plaintiffs believed that the Collateral Shares remained intact, in the custody of Weiser and Tavira, and that none of the Collateral Shares had been disposed, sold, or liquidated.

**Defendants and Their Co-Conspirators Put Their Years-Long Fraud in Motion**

47.     In truth, and unbeknownst to Plaintiffs, the "Astor Group" was a front for a fraudulent enterprise controlled by Val Sklarov, Singh, and their associates, including Aleksei Skachkov ("Skachkov"), Julian Orik ("Orik"), Sklarov's wife Tetyana Sklarov, his adult children Asher Sklarov, Hannah Sklarov, Maia Sklarov, and Sasha Sklarov (referred herein as the "Sklarov

12

siblings"), and multiple entities and trusts within the foregoing individuals' control or set up for their benefit to effectuate fraudulent schemes and launder the proceeds to syndicate members. From the outset this syndicate intended to obtain control over Plaintiffs' Collateral Shares and liquidate them for their own benefit.

**Sklarov and Singh's Business and Legal History**

48.    After further investigation of the Astor entities in late July 2024, Plaintiffs discovered and ultimately confirmed Val Sklarov and Singh's connection, and gradually began to understand their extensive legal history.

*Sklarov Criminal Convictions, Family Real Estate Concerns, and Public Legal Matters*

49.    For example, in 1997, the U.S. Government charged Sklarov with felony Medicare fraud, alleging illegal billing practices by Sklarov and several associates through a company called Omega Reimbursement Concepts, Inc. He pled guilty to Medicare fraud and money laundering, and in 1998 he was sentenced to approximately one year of imprisonment and ordered to pay approximately $14 million in restitution. See *USA v. Sklarov, et al.*, 97-cr-00176 (DJL) (W.D. Pa.)

50.    Sklarov owned and operated a public housing complex, SLS Management, which in 2006 pled guilty to felony welfare fraud in Indiana. Sklarov was arrested in 2005 in Indiana, apparently in connection with his role in this fraud.

51.    According to court documents, in 2007, SLS Management and Kidz Real Estate Group, LLC, evidently through Sklarov, filed lawsuits against contractors for work at the site. After those plaintiffs were defeated through summary judgment and a defense verdict, Sklarov, through SLS Management, appealed. The appellate order affirming the earlier judgments evidences Sklarov's shady business practices at the time.

13

52.     In 2014, an Ohio court issued arrest warrants against a real estate group owned by Sklarov and his then estranged first wife, Sharon Sklarov. Facing criminal charges, including for failure to appear in court, the Sklarovs attempted to avoid liability by denying ownership. Sharon Sklarov ultimately pled guilty and agreed to pay a sizable fine.

*Sklarov and Singh's Foray into Stock-Based Lending Fraud, America 2030, and Use of Family Members, Shell Companies, and Other Collaborators*

53.     Following his repeated legal troubles and two arrests managing real estate and medical supply schemes, Sklarov joined forces with Singh, who together perpetrated financial scams involving stock-based lending, against multiple victims.

54.     In early 2018, a Dr. Brent Satterfield negotiated a loan agreement with a shell company associated with Singh and Sklarov, America 2030 Capital, Ltd. ("America 2030"), for a $3.5 million loan, secured over $7 million in stock owned by Dr. Satterfield. In 2019, Dr. Satterfield sued America 2030 after it provided only $67,000 of the loan but sold $1 million of the Collateral Shares. In 2021 an AAA tribunal held that Sklarov fraudulently induced Satterfield into the transaction through false representations. Sklarov failed to return the Collateral Shares, ignoring multiple court orders over the next three years, ultimately resulting in an eventual arrest warrant against Sklarov. Sklarov appealed the warrant. Singh filed an appearance in this matter in February 2022. *See Satterfield v. Vstock Transfer, LLC*, No. 650311/2019, 2022 WL 1302355 (N.Y. Sup. Ct. Apr. 30, 2022).

55.     In May 2018, a Georgia-based America 2030 entity induced Hong Kong-based Prescient Investment Limited ("Prescient") to execute a loan agreement for $117 million in exchange for £200 million in collateral shares. Prescient sued America 2030 in Hong Kong shortly thereafter when it proceeded to sell the shares. A Hong Kong court issued a corresponding injunction. Sklarov, through America 2030, responded by suing Prescient in the United States District Court for the

14

Northern District of Georgia. There, he argued that parties' agreement permitted immediate sale of the shares before America 2030 had even supplied any of the loan principal. The Court dismissed America 2030's claims with prejudice, sanctioned Sklarov, and issued an injunction against him and his shell companies.[3]

56.    In 2018, America 2030 entered a similar stock-based lending agreement with an entity called Fortunate Drift Limited ("Fortunate Drift") for an $8 million loan. America 2030 failed to deliver that loan amount and refused to return the shares to Fortunate Drift. Fortunate Drift filed suit in Hong Kong and secured injunctions against Sklarov and America 2030.[4]

57.    On or around 2018, a Colorado company sued Sklarov for stock-based lending fraud. On June 13, 2019, the U.S. District Court for the District of Colorado issued a temporary restraining order enjoining Sklarov's entities from selling pledged collateral shares, finding a substantial likelihood that the agreements at issue were procured through fraud. Singh appeared as counsel in that action for defendants Bentley Rothschild Capital Limited ("BRC") and America 2030 Capital Limited ("America 2030"). *See Two Rivers Water & Farming Co. v. Am. 2030 Cap. Ltd.*, No. 19-CV-01640-CMA, 2019 WL 10301526 (D. Colo. June 13, 2019).

58.    At some point in 2018, according to media reports, the chairman of a U.K.-based oil and gas company resigned after shares in the company plunged by double-digit percentages following his personal transfer of nearly 40 million shares to America 2030 in connection with a possible loan. Media reports examining the resignation and the company's subsequent investor relations efforts questioned the involvement of one Yelyzaveta "Elizabeta" Lata, a "20-year-old Hungarian who lives in Poland," who appeared in registration materials as America 2030's only

---

[3]    Compl., *America 2030 Capital Limited v. Prescient Investment Limited Maximum Success Capital Partners Ltd.*, 1:18-cv-04875-AT (N.D. Ga. Oct. 22, 2018).

[4]    *Fortunate Drift Limited, et al v. America 2030 Capital, LLC, et al*, No. 652158/2018 (N.Y. Sup. Ct. 2018).

15

director and officer.[5] Upon information and belief, Lata is Sklarov's stepdaughter, via his marriage to her mother Tetyana Sklarov (née Vasziliv).

59.     In 2020, Sklarov engaged a group of shareholders with holdings in Sunpower Group ("Sunpower"), a Singapore company. Sklarov offered a loan through his Nevis-based America 2030 affiliate, using the other party's Sunpower shares as collateral. America 2030 appointed Weiser as custodian. After learning Weiser sold the shares on Sklarov's orders, the shareholders filed legal claims in Nevis against Sklarov, asserting fraud, and obtained a worldwide freezing order against him. After the Nevis Court rejected Sklarov's attempts to strike the claim, he abandoned those proceedings and the court issued a default judgment, which Sklarov then failed to set aside after an attempted appeal. The court further determined that Sklarov's stock-backed lending fraud negated the terms of the underlying loan agreements. Sklarov filed his third appeal after that, which the courts also rejected, and enforcement orders were renewed beginning in 2023.

*Sklarov and Singh Expand Lending Operation Through Widespread Impersonation of Established Financial Institutions and Families*

60.     Sklarov and Singh separately began to perfect their scheme through the simple idea that they would incorporate companies that aspiring borrowers—primarily those outside the U.S. and Europe—could easily confuse with established and familiar financial institutions and families in the U.S. and Western Europe.

61.     In or around 2019, Rothschild & Co. sued Sklarov for his use of the Rothschild brand name, arguing he used it to engage stock-backed lending fraud, which harmed the company's reputation. *Rothschild & Co. Continuation Holdings A.G. v. Sklarov*, 440 F. Supp. 3d

---

[5]     Proactive Investors, *Angus Energy chairman steps down amid investigation into "potential violation" over shares transfer*, https://www.proactiveinvestors.co.uk/companies/news/200274/angus-energy-chairman-steps-down-amid-investigation-into-potential-violation-over-shares-transfer-200274.html (last accessed July 15, 2026); Share Talk, *Angus Energy PLC (AIM:ANGS) what exactly is going on within Angus Energy?*, https://www.share-talk.com/angus-energy-plc-aimangs-what-exactly-is-going-on-within-angus-energy/ last accessed July 15, 2026).

1385 (N.D. Ga. 2020). The U.S. District Court for the Northern District of Georgia found Sklarov liable for trademark infringement and enjoined his use of the "Bentley Rothschild" name. The order noted Singh's active role in Sklarov's efforts, describing his attempts to register the trademark.

62.     On October 9, 2020, Barclays PLC sued Singh and Sklarov directly, alleging they engaged in a scheme to mislead third parties by using well-known financial names, including Lehman Brothers. *Barclays PLC filed Barclays PLC et al. v. Sklarov*, No. 20-cv-8437 (S.D.N.Y. Oct. 9, 2020). The *Barclays* plaintiffs credibly asserted that Singh signed several of the attempted applications to trademark names like Astor Capital as "General Counsel" and other Sklarov-related entities applying for these marks. *Id*., ¶ 242. There, Judge Kaplan entered a permanent injunction against both Sklarov and Singh, each of whom signed a related consent order.

63.     In 2020, Sklarov, via an "Astor"-named entity incorporated in Nevis, faced similar defeat at arbitration following claims by ZS Capital Fund SPC ("ZS") and its successful injunction. ZS discovered the Astor Nevis entity wrongfully sold nearly one million collateral shares within the first two months the parties' agreement was in operation. Sklarov unsuccessfully pressed legal challenges to the arbitration awards in other jurisdictions as late as 2024, including in Hong Kong courts.[6]

64.     In 2021, 51 plaintiffs, mostly entities now known to be Singh and Sklarov-created entities and carrying their hallmark collection of fake brands mimicking household finance names, filed a lawsuit in New York federal court against Weiser Capital Global Markets, Ltd. and related

---

[6]     Decision of the Court of First Instance of the High Court of Hong Kong, *Astor Asset Management Limited and Zundiao Securities Limited v. ZS Capital Fund SPC, Zhang Ningning*, [2024] HKCFI 1535 (C.F.I. H.K. Aug. 27, 2024), *available at* https://jusmundi.com/en/document/decision/en-astor-asset-management-limited-and-zundiao-securities-limited-v-zs-capital-fund-spc-zhang-ningning-zhou-yihui-and-ma-danyu-decision-of-the-court-of-first-instance-of-the-high-court-of-hong-kong-2024-hkcfi-1535-tuesday-27th-august-2024.

17

individuals, alleging Weiser misappropriated $450 million in shares and other funds. *Hryn v. Weiser Global Capital Markets, Ltd, et al.*, No. 1:21-cv-08437 (S.D.N.Y Oct. 13, 2021).  Among the plaintiffs were several individuals, including Yelyzaveta Lata, Oksana Hryn, and Ihor Yushenko. On page 37 of that complaint, Yelyzaveta Lata verified that she was a principal of various organizations that include, "Astor Asset Management Ltd," "Astor Asset Management 3 Ltd" (i.e. Astor 3), "Astor Capital Fund Ltd.," various entities including "America 2030 Capital Limited," and "Bentley Rothschild Capital Limited," "Blackrock Capital LLC" and "Sal Oppenheim Ltd." Upon Plaintiffs' information and belief, Lata, Hryn, and Yushenko are each family members of the Sklarovs or otherwise close relations. The lawsuit was withdrawn within five days. As described below, the genesis of the lawsuit likely connected to the underlying dispute.

65.     In June 2024, Chenming Holdings, an entity based in Hong Kong, amended a prior complaint to sue Sklarov, Singh, Sierra Universal, Tetyana Sklarov, and various other Astor entities in New York federal court, alleging extensive stock-based lending fraud with terms in a scheme involving sham loan transactions and wrongful control of collateral shares. *Chenming Holdings (Hong Kong) Ltd. v. Sklarov et al.*, No. 1:24-cv-00935 (S.D.N.Y., June 28, 2024).

66.     Court records confirm Sklarov and Singh's partnership in other disputes and schemes and propensity to exploit the legal system to sustain their own operation. In 2020, for example, they filed defamation actions in Florida against individuals they accused of making harmful statements involving similar fraud accusations. See, e.g. *Sklarov v. Co-Diagnostics, Inc.*, No. 20-CIV-60461, 2020 WL 2513103 (S.D. Fla. May 13, 2020). From 2021 through at least July 2024, according to court and financial records, Singh prosecuted separate defamation lawsuits on Sklarov's behalf in Florida state courts.

18

4920-7502-6878 v.1

67. The extensive legal history just described demonstrates an ongoing pattern of Sklarov and Singh's use of the legal system to obstruct their lending counterparties' efforts to prevent the dissipation of applicable collateral shares, repeated noncompliance with or disregard for court orders, and nearly universal agreement among various tribunals of the fraudulent and dubious nature of their operation.

**Singh and Other Defendants' Pre-Positioning of U.S.-Based Accounts**

68. A similar examination of Sklarov, Singh, and the corporate history of entities created by them in temporal proximity to the fraud scheme indicates a clear and deliberate timeline to build a network of shell companies, firms, trusts, accounts, and other real estate and asset portfolios to establish a lending fraud and money laundering operation.

69. Before Plaintiffs discovered this history or knew Sklarov and Singh were involved in the SLA, Sklarov and Singh quickly went to work building the infrastructure to maximize the scale of their harm against Plaintiffs.

70. In 2019, for example, Sklarov and Singh registered Astor Capital Fund Ltd. as a foreign corporation in Indiana. The initial registration listed Sklarov as the CEO.

71. By April 2020, the fictitious persona "Thomas Mellon" replaced Sklarov in the entity's corporate records and became the CEO, director, and registered agent of Astor Capital Fund.

72. Singh appears as the entity's legal representative and signed the document authorizing "Thomas Mellon" as head of Astor Capital Fund Ltd.

73. On or about June 2020, Singh registered the Singh Law Firm in New York, with a street address at 155 E. 44th Street, 6th Floor, New York, NY, 10017.

19

74.    On December 20, 2020, Singh created JP Morgan Chase Bank, N.A. ("JPMC") bank accounts for Sierra Universal, with a Wyoming address, designating himself as President (collectively, the "Sierra Accounts").

75.    On or about January 7, 2021, Singh formed Jurist IQ.

76.    On January 11, 2021, Singh opened an attorney trust account (IOLTA) at JPMC in New York for Jurist IQ (the "Jurist IQ Account" or "-5152 Account"), among others.

77.    In addition to the Jurist IQ accounts, Singh established, maintained, and controlled multiple additional accounts through Singh Law Firm, including at least one other attorney trust account identified in records as the "*Singh IOLTA 0210 Account*" (the "Singh Law Firm Account") or the "-0210 Account").

78.    This complaint collectively refers to the Jurist IQ Accounts, Sierra Universal Accounts, and Singh Law Firm Accounts as the "Singh-Affiliated Accounts."

79.    On or about April 22, 2021, around when Plaintiffs' representatives were negotiating the SLA, the corporate registry on a public government website in the U.K. indicates that a company called Luxfin Capital Ltd. appointed Singh as a director. *See* https://find-and-update.company-information.service.gov.uk/company/10285479/officers.    Another    Luxfin director is Albert Yuen ("Yuen"), who actively negotiated later addenda to the SLA on behalf of Astor Group.

80.    On or about June 2, 2021, Singh and Tetyana Sklarov opened additional JPMC accounts in the names of Kiev Equity Capital Ltd. and Lviv Estate Holdings Ltd., with Tetyana Sklarov listed as "President" on each account.

81.    On June 3, 2021, Singh designated Tetyana Sklarov as President of the Sierra Universal Account.

4920-7502-6878 v.1

82.    Singh opened or designated the Sierra, Kiev, and Lviv accounts contemporaneously with the final negotiations of the SLA, and weeks prior to the initial delivery of Collateral Shares.

83.    Singh continued to open new accounts and entities in the wake of the SLA.

84.    Following disbursement of the initial lending tranches, Singh and the Singh Law Firm wrote a $75,000 check to Tetyana Sklarov to open a separate HSBC account in her name.

85.    On November 11, 2021, Singh registered JPMC accounts for C. Vanderbilt Management, Ltd. ("Vanderbilt"). The same Vanderbilt entity caused the redemption of Collateral Shares which ultimately led to the transfers which are the subject of this action.

86.    Singh established these and other new accounts for the specific purpose of creating a diversified web of locations to dispose of the spoils of their fraud against Plaintiffs.

87.    Syndicate members also opened new personal accounts with Discover Bank close in time to the negotiation of the SLA and subsequent delivery of the Collateral Shares: Asher Sklarov opened an account on October 22, 2020 (with his mother Sharon), and a separate account on April 8, 2021.  Sasha Sklarov opened accounts on August 31, 2021 and January 25, 2022. And Tetyana Sklarov opened an account on January 6, 2022. Each of these accounts were ultimately used to deposit and layer millions in fraudulent transfers and illicit proceeds from the sale of Collateral Shares.

**Coordinated Transfers Through Singh Accounts at the Time of SLA Execution**

88.    With this infrastructure in place and concealed behind their web of false names and fake companies, Sklarov, Singh, and their collaborators quickly went to work funding and finalizing this updated fraud network for the purpose of gutting the SLA's underlying collateral and scattering the proceeds.

21

4920-7502-6878 v.1

89.     Even in the weeks before final execution of the SLA, Singh and Sklarov siblings worked in concert to transfer, on information and belief, the proceeds of prior schemes executed by the syndicate. In July 2021, Singh transferred $1.5 million into the Sierra Universal Account. From there, Singh re-distributed the funds to syndicate members, including multiple large payments to Sasha, Hannah, and Maia Sklarov (each receiving $125,000 on July 26, 2021 alone), and separate amounts to Asher Sklarov. Sierra Universal also made a transfer to Skachkov.

90.     The syndicate continued to use Sierra Universal for corrupt purposes after the execution of the SLA, as Singh transferred another $950,000 to Sierra in August 2021 and $250,000 per month in September through November 2021, then subsequently transferred these monies to syndicate members and to fund syndicate expenses. These accounts reflect no evidence that reasonably equivalent value was exchanged.

91.     On or about July 28, 2021, the same date on which the parties executed the SLA, Singh caused transfers of approximately $50,000 each from the Singh Law Firm Account to the Kiev and Lviv accounts, for a total of approximately $100,000.

92.     On or around August 9, 2021, Singh wired payments to Orik. Entries into the Sierra Account at this point evidence significant comingling of funds tied to the sale of the Collateral Shares, and starting in January 2022, payments of nearly $1.5 million by Singh, via the Sierra account to recipients at "Enness" regarding "Elektra" "consultancy expenses," which appeared to heavily exceed the arranged fee Enness would receive under the SLA.

93.     The Skachkov, Orik, and Enness payments were likely direct and extra-contractual remuneration for their respective roles in the SLA fraud scheme.

94.     Orik's direct involvement in the fraud is similarly evidenced from records to date. Orik, who various corporate and public records, payments, and cursory internet searches identify

22

as residing at Illinois and Georgia homes owned or occupied by and/or connected to Val, Tetyana, and Sasha Sklarov, was, upon information and belief, directly employed by the Astor Group. Orik appeared in emails in correspondence with Plaintiffs regarding the SLA with the address julian.orik@astorassetgroup.com, the same domain used by Astor Group representatives "Gregory Mitchell." And Albert Yuen.

95.     As alleged in more detail below, Orik received nearly $2 million in payments from the Singh-Affiliated Accounts. Consistent with Sklarov, Singh, and the other co-conspirators' usual methods, Orik received large portions of these payments through two companies he owns, each with obscure or questionable business records.

96.     All of these initial transfers occurred as Plaintiffs were expanding their exposure under the SLA—i.e. entrusting hundreds of millions in additional shares to the appointed custodians—and immediately before the large-scale unauthorized transfer and liquidation of the Collateral Shares.

97.     The synchronization of these transfers with the SLA's contractual milestones demonstrates that Singh's accounts were already integrated into and built for the mechanics of the overall fraud scheme.

**Unauthorized Transfer and Liquidation of Collateral Shares**

98.     With the Singh-Affiliated Accounts in place, Defendants' co-conspirators began taking steps to unlawfully divert Collateral Shares as soon as Plaintiffs entrusted them to the custody of Weiser.

99.     In or around July 2024, the syndicate transferred Collateral Shares to Astor Capital Fund Ltd. ("Astor Capital"), an undisclosed affiliated entity that had not been disclosed to Plaintiffs and had no authorized role in the transaction.

23

100.    Following this transfer, the syndicate systematically liquidated the Collateral Shares through controlled parties such as Vanderbilt, and intermediaries such as Tavira.

101.    Discovery is needed to determine each step of the syndicate's scheme to seize and sell the Collateral Shares, and the full nature and extent of the proceeds obtained and disbursed by the perpetrators. A September 16, 2024, witness statement filed by Sklarov in the English Action, however, admits to key details of the stock-based lending scam.

102.    In the statement, Sklarov admitted to selling Collateral Shares and generating $359.4 million in proceeds: "The equivalent of approximately US$359.4 million was received by Vanderbilt into its account at Tavira from sales of Elektra shares during the period 20 December to 29 July 2024 . . ."

103.    In his witness statement, Sklarov further admitted that he and the syndicate funded the loan to Plaintiffs by use of the proceeds of these sales: "The third, fourth and fifth loan tranches of the loan by Astor 3 to RBS were funded from the proceeds of those disposals, totalling [*sic*] approximately MXN 1.27 billion, which equates to around US$64.5 million."

104.    Sklarov further admitted that "US$271,685,472 million from those disposals was transferred from Tavira to client accounts controlled by JT Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm."

105.    On January 24, 2025, the Astor Group entity respondents and Sklarov admitted the same fact in their "Defence and Counterclaim", verified by Sklarov, Elizaveta Lata, and Oksana Hryn:

**[Figure 3]**

> 98.    Paragraph 49 is admitted. US $271,685,472 from disposals of Elektra Shares was transferred from accounts at Tavira to client accounts controlled by Mr Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm.

24

4920-7502-6878 v.1

106.    Sklarov further admitted that Singh re-transferred a significant portion of these funds to various accounts at Tavira: "I understand from bank information provided to DWF by Mr Singh that US$216,069,214 was transferred back from the Singh client accounts to Tavira . . ."

107.    Sklarov further stated that he received more than $13 million in proceeds traceable to the sale of the Collateral Shares, and that Jurist IQ and Singh Law Firm collectively were "paid" the sum of $4,534,752.64 traceable to such proceeds.

108.    Sklarov admitted that the remaining value of the Collateral Shares had been reduced to $16.5 million.

109.    In short, Sklarov's own sworn statements admit that he caused the sale of virtually all of the Collateral Shares, that the sale generated no less than $359.4 million, that no less than $271.6 million of these sale proceeds were transferred to Singh-Affiliated Accounts, and that Sklarov and Singh received personal remuneration for their roles in this conduct.

110.    Indeed, there was a close temporal link between Vanderbilt's redemption of the Collateral Shares, and subsequent transfers of cash to Jurist IQ. The following table is a non-exhaustive list of such transfers between 2022 and 2024:

| Vanderbilt Share Redemption Date | Redemption Amount | Jurist IQ Transfer Date | Amount | JPMC Cite |
|---|---|---|---|---|
| 1/31/2022 | $16,580,424 | 2/1/2022 | $16,580,424 | 453 |
| 1/31/2022 | $23,229,156 | 3/2/2022 | $1,398,200.24 | 457 |
| -- | -- | 3/3/2022 | $1,654,794 | 457 |
| -- | -- | 3/24/2022 | $5,418,942.60 | 457 |
| -- | -- | 3/28/2022 | $2,214,458.43 | 458 |
| -- | -- | 3/30/2022 | $3,507,298 | 458 |
| -- | -- | 3/31/2022 | $4,000,000 | 458 |

4920-7502-6878 v.1

| 5/12/2022 | $35,000,000 | 5/13/2022 | $35,000,000 | 463 |
|---|---|---|---|---|
| -- | -- | 6/23/2022 | $5,250,724.11 | 465 |
| 7/15/2022 | $9,000,000 | 7/18/2022 | $9,000,000 | 467 |
| 8/10/2022 | $6,280,000 | 8/10/2022 | $6,280,000 | 471 |
| 11/22/2022 | $22,000,000 | 11/23/2022 | $22,000,000 | 477 |
| 12/14/2022 | $7,000,000 | 12/16/2022 | $7,000,000 | 480 |
| 3/23/2023 | $25,000,000 | 3/24/2023 | $25,000,000 | 492 |
| -- | -- | 6/16/2023 | $3,400,000 | 499 |
| 7/6/2023 | $15,300,000 | 7/6/2023 | $15,300,000 | 504 |
| 7/11/2023 | $1,800,000 | 7/11/2023 | $1,800,000 | 504 |
| 11/1/2023 | $9,000,000 | 11/1/2023 | $9,000,000 | 519 |
| 12/8/2023 | $18,000,000 | 12/8/2023 | $18,000,000 | 523 |
| -- | -- | 1/23/2024 | $3,100,000 | 527 |
| -- | -- | 2/22/2024 | $2,500,000 | 531 |
| 3/21/2024 | $33,500,000 | 3/22/2024 | $33,500,000 | 536 |
| 4/29/2024 | $17,000,000 | 5/1/2024 | $17,000,000 | 545 |
| 7/5/2024 | $15,000,000 | 7/8/2024 | $15,000,000 | 559 |

**Defendants' Early and Ongoing Culpability in the Underlying Fraud**

111.    After consolidating nearly 75% of the admitted illicit proceeds within the Singh-Affiliated Accounts, Singh and his syndicate collaborators cycled these proceeds through multiple artifices to conceal and layer the illicit source of the funds. In general, these transfers were made to directly or indirectly benefit syndicate members, including Singh and entities controlled by Singh; the Sklarov siblings: Maia, Sasha, Hannah, and Asher; trusts and entities controlled by them or designating them as beneficiaries; other foreign accounts and shell companies directly or indirectly controlled by Sklarov, and co-conspirators including Orik.

26

112.    There is significant direct and circumstantial evidence that the U.S. persons and entities who deposited and withdrew funds to and from the Singh-Affiliated Accounts, including each of the Defendants, were knowing, active participants in a money laundering scheme and were at least generally aware that the monies they transacted in were the fruits of fraud or theft.  Plaintiffs outline specific examples of these transfers as they relate to each Defendant and other related entities and properties in the sections below.

113.    Singh, Singh Law Firm, and Jurist IQ primarily through Jurist IQ and Sierra Universal, actively built the infrastructure, putative legal framework, and preliminary networks to immediately launch proceeds generated by the unlawful sale of Plaintiffs' Collateral Shares into the broader money laundering operation. Each entity similarly was the direct and primary conduit to launder the illicit proceeds of the fraud operation to other collaborators in the United States and internationally, or to themselves as end points and simple beneficiaries.

114.    By 2021, the Singh Law Firm and Jurist IQ's only apparent purpose was to service the syndicate's ongoing fraud schemes.

115.    Stated otherwise, the timing, recipients, and intermediary use of attorney trust accounts show that Singh's accounts were used contemporaneously with the unlawful transfer and monetization of Plaintiffs' collateral.

116.    Singh himself created a host of other shell companies, including those variously styled as within the Astor Group, such as Astor Asset Management, Astor 3, and Vanderbilt, and oversaw nearly the entire circulation of stolen proceeds. He directly sent himself millions in the process through firm accounts meant for client funds, while similarly creating new accounts to evacuate nearly everything left undisposed upon Plaintiffs' commencement of litigation and other investigations.

117.    The Entity Defendants were each established for or existed entirely to channel the operation's illicit proceeds for the Singh and Sklarov family's direct benefit, primarily to launder funds into luxury real estate purchases that each family then personally used and occupied. These entities were run entirely and directly by at least Singh, with additional ownership and apparent operational roles by other Singh, the Sklarov siblings, Orik, and other Sklarov family members.

118.    The Sklarov siblings (Asher, Hannah, Maia, and Sasha Sklarov) were equally purposeful in their role in the operation. Each of the Sklarov siblings were young adults at the time of the transfers.  These individuals needed to collaborate with Singh to establish overseas entities and provide account details and authorization necessary to complete transfers of funds. With knowledge that they provided no services to Singh Law Firm or Jurist IQ and provided no reasonably equivalent value in exchange, they each deposited millions in funds from Singh-Affiliated Accounts and accepted payments from Singh-Affiliated Accounts across multiple domestic accounts, and accepted for personal expenses, travel, tuition, luxury cars, and real estate acquisitions and improvements. In response to civil freezing orders in Monaco in which they appeared as parties directly and indirectly through entities they control, and even after learning of Val Sklarov's indictment for fraud and conspiracy to commit money laundering, they have not forfeited the proceeds of these transfers to authorities, nor returned them to Plaintiffs.

119.    The Sklarov siblings Asher, Hannah, Maia, and Sasha Sklarov were not unwitting participants or recipients through some account takeover or money-muling machinations by their father and his associates operating from afar, they appear to have taken an active role helping establish some of the core entities in the international operation, as alleged below.

120.    Upon information and belief, Maia Sklarov is an authorized signatory for foreign accounts related to Oppenheim Limited, Luxfin Asset Group Limited, AC Capital Limited and

28

Credit One Equity Holdings Limited, and is the authorized signatory for French Asset Acquisition LLC (of which she is also an ultimate beneficial owner).  The unrestricted JPMC Records alone indicated Jurist IQ and Singh Law Firm transmitted at least $68,000,000 back to these entities.

121.    Asher Sklarov is an authorized signatory for foreign accounts related to Napoelean Hill Capital Resources, and is a beneficiary of French Asset Acquisition LLC.  Hannah Sklarov is an authorized signatory for foreign accounts related to Larisa Lane and Polo Molo Shmolo Capital Limited, and is a beneficiary of French Asset Acquisition LLC.  Sasha Sklarov is the sole beneficial owner and authorized signatory of Rising Sun Glory Capital Limited and is also a beneficial owner of French Asset Acquisition LLC.  Jurist IQ and Singh Law Firm transmitted $32 million to these entities.

**The Syndicate's Fraudulent Concealment, Eventual Discovery in Late July 2024, Proceedings in England, and Continued Asset Dissipation**

122.    Following the 2021 transition of SLA custodians from Weiser to Tavira, the parties negotiated and executed Addendum 2 to the SLA, designed to clarify the SLA's original term that restricted the appointed custodian from selling or permitting access to the Collateral Shares unless or until the loan's maturity or in the event of default.

123.    In April 2024, Plaintiffs conducted a shareholders' meeting for Elektra, which revealed certain discrepancies in the amount of existing shares under Plaintiffs' ownership. Plaintiffs eventually circulated letters to all banks and other custodians with access to Plaintiffs' shares to confirm whether applicable Elektra shares were being validly held. In June 2024, letters went out to Weiser and Tavira requesting similar information and reiterating the operative terms in the SLA and related addenda restricting the disposal or release of any Collateral Shares.

29

124.    Weiser and Tavira did not initially respond and apparently forwarded these correspondence to Astor 3, who issued vague correspondence warning Plaintiffs not to "interfere" with the designated custodians.

125.    Over the next month, Plaintiffs' banking representative and the Astor parties exchanged correspondence to address this issue, including phone conversations with Gregory Mitchell (aka Sklarov), and Albert Yuen, a U.S.-based businessman and putative Astor representative. Yuen's latest response, after July 15, 2024 emails from Plaintiffs' representatives, was that Astor 3 was assessing the issue. Orik was copied on these emails via his Astor email address.

126.    Between July 25 and July 31, 2024, after enlisting forensic accountants, investigators, and in privileged consultation with Plaintiffs' legal advisors, Plaintiffs first learned about Sklarov and discovered the possibility he was involved.

127.    On July 26, 2024, after Plaintiffs reviewed Sklarov's legal history and realized they were victims of a possible fraud, they issued press releases and took other action to suspend trading of Elektra shares on the Mexican Stock Exchange.

128.    On the same day, Plaintiffs' banking representative emailed Weiser and Tavira asking them for a meeting. Each responded with suspicious emails mirroring the tone and style used in recent Astor correspondence, refusing any meeting or further discussion.

129.    On July 27 and 30, 2024, Mr. Yuen and Astor 3 wrote to Plaintiffs' banking representative inquiring about the share freeze, rejecting any attempts by Plaintiffs to prepay the loan, and subsequently issuing a sparse and dubiously phrased "Notice of Default."

30

130.    On August 1, 2024, Tavira finally responded via email and shared new account statements that, for the first time, confirmed Tavira removed the entirety of Plaintiffs' remaining shares into Astor's Tavira account, "as per Astor's instructions."

131.    Upon this discovery, beginning on August 2, 2024, Plaintiffs initiated proceedings in the High Court of Justice in England and obtained worldwide freezing and proprietary injunctions, prohibiting the transfer or dissipation of assets derived from the scheme (the "Freezing Order").

132.    On August 2, 2024, the initial Freezing Order, which included a penal notice for non-compliance, was served on Astor 3, Weiser, Tavira, and Sklarov, seeking information by certain deadlines on the status of the Collateral Shares and any related proceeds.

133.    The English Court thereafter issued similar injunctions against two new entities, Vanderbilt and Astor Capital.

134.    In the wake of the injunctions, the movement and dissipation of funds continued, including certain transactions throughout August and September 2024. Records confirm this urgent disposal to outrace the courts is ongoing, with transactions as late as January 2025, where Sasha Sklarov cleared out approximately $2 million in downstream transfers or withdrawals.

135.    Moreover, after months of litigation, Sklarov faces contempt proceedings for ongoing noncompliance with the Freezing Order, namely his failure to identify assets in compliance with the same orders. These were undoubtedly purposeful nondisclosures.

**Sklarov Admits Key Details of the Fraud as Plaintiffs Launch U.S. Discovery Efforts**

136.    On August 23, 2024, Plaintiffs filed an Application for an Order pursuant to 18 U.S.C. § 1782 in the United States District for the Southern District of New York seeking discovery in aid of the English Action (the "New York Application").

31

137. On September 9, 2024, U.S. District Judge Lewis A. Kaplan granted the New York Application, and Applicants promptly served subpoenas on Singh, the Singh Law Firm, Jurist IQ Corp., and JP Morgan Chase Bank N.A. ("JPMC").

138. On September 16, 2024, shortly after Judge Kaplan granted Plaintiffs' application to subpoena Singh's banking records, Sklarov filed a witness statement in the English Action which admits to key details of the stock-based lending scam.

139. Sklarov admitted to selling Collateral Shares and generating $359.4 million in proceeds: "The equivalent of approximately US$359.4 million was received by Vanderbilt into its account at Tavira from sales of Elektra shares during the period 20 December to 29 July 2024 . . . ."

140. Sklarov admitted that he funded the loan to Plaintiffs by use of the proceeds of these sales: "The third, fourth and fifth loan tranches of the loan by Astor 3 to RBS were funded from the proceeds of those disposals, totalling [*sic*] approximately MXN 1.27 billion, which equates to around US$64.5 million."

141. Sklarov admitted that "US$271,685,472 million from those disposals was transferred from Tavira to client accounts controlled by JT Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm."

142. On January 24, 2025, the Astor Group respondents and Sklarov admitted the same fact in their "Defence and Counterclaim", verified by Sklarov, Elizaveta Lata, and Oksana Hryn:

**[Figure 4]**

98. Paragraph 49 is admitted. US $271,685,472 from disposals of Elektra Shares was transferred from accounts at Tavira to client accounts controlled by Mr Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm.

32

143.   Sklarov further admitted that Singh re-transferred a significant portion of these funds to various accounts at Tavira: "I understand from bank information provided to DWF by Mr Singh that US$216,069,214 was transferred back from the Singh client accounts to Tavira . . ." These included four transfers on July 22, 2024 of $15,000,000 each.  These dates and amounts correspond to transfers to Tavira accounts held by entities that controlled by Asher, Hannah, Maia, and Sasha Sklarov.

144.   Sklarov further admits that he received more than $13m in proceeds traceable to the sale of the Collateral Shares, and that Jurist IQ and Singh Law Firm collectively were "paid" the sum of $ 4,534,752.64 traceable to such proceeds.

145.   Sklarov admitted that the remaining value of the Collateral Shares had been reduced to $16.5 million.

146.   Sklarov also admitted, through his statement, that he and Skachkov used the aliases Gregory Mitchell and Thomas Mellon to communicate with Plaintiffs in connection with the pitch and negotiation of the SLA.

147.   With respect to Skachkov use of a fictitious persona, Sklarov stated: "Thomas Mellon was first known to me as Aleksei Skachkov. He was (so I understood) of Russian origin but lived in Atlanta.  We started doing deals together in around 2019.  We discussed the name of the company that he would use – he wanted to use the name Astor. He used the name Thomas Mellon for his business activity."

148.   With respect to his own conduct, Sklarov stated: "Throughout the period in which I dealt with Mr Salinas's / RBS's representatives through Astor, I did so under an assumed name – Gregory Mitchell."  Sklarov further stated that he used an "assumed name" under the advice of Singh: "I took advice from Mr Singh who said it was not a problem so long as I did not sign

contracts in that name." The same paragraphs confirm that Sklarov discussed this with Singh before using these names, but that he initially lied about it to his own solicitors, who presumably helped draft the same witness statement. Shortly before the production deadline, Singh wrote to Plaintiffs' counsel in the U.S. asking for additional time to gather records, asserting attorney client privilege and that he had been traveling. He falsely referred to Sklarov as his "former client" and made no mention of his extensive production to Sklarov. Records since produced demonstrate that Singh was actively scattering hundreds of thousands in additional funds at this point, including at least $125,000 to outside personal accounts the day he sent this email.

149.    Through counsel, the Singh entities, to date, made six productions of documents between October and late November 2024. Singh and his counsel conditioned any of their productions on execution of a protective order and categorically labeled the entire production as confidential and subject to the same protective order.

150.    On October 18, 2024, JPMC produced nearly 3,000 pages of account records associated with Singh (the "JPMC Records"). The JPMC Records are not subject to any protective order. Upon review of the JPMC Records, Plaintiffs understood for the first time the lengths Singh went to layer and conceal the proceeds of the fraud scheme.

151.    On December 10, 2024, Plaintiffs filed another application pursuant to 18 U.S.C. § 1782 in the Northern District of Georgia (the "Georgia Application"), seeking discovery in aid of the English Action. The Georgia Application was granted on February 12, 2025, and on April 11, 2025, Discover produced a collection of redacted bank files for various Sklarov family members' accounts, including Val, Tetyana, Sasha, Asher, and Sharon Sklarov. These materials were also not subject to any protective order.

34

152.    The Georgia Application also approved discovery to Skachkov. Plaintiffs were unable to locate Skachkov, who upon information and belief, now lives in an undisclosed location in Southeast Asia.

153.    The records produced in compliance with Plaintiffs' 1782 Subpoenas similarly revealed Tavira accounts in the names of various companies to which Singh and the Sklarovs cycled funds back overseas. Upon investigation and information and belief, Sklarov's family, including the Sklarov siblings, appear in corporate documents as signatories to these materials.

**The Sklarov Siblings and Affiliated Entities Directly Intervene in Litigation in Monaco to Unfreeze Tavira Accounts**

154.    Pursuant to the Freezing Order and a further undertaking given by Tavira, Tavira ultimately froze 44 accounts in Monaco. In December 2024, a Monaco court granted an "Ordonnance" relating to the frozen accounts, allowing Plaintiffs to secure documents relating to those accounts. This invited almost immediate oppositions by Sklarov-affiliated companies. In a April 17, 2025 "Intervention," Maia, Sasha, Hannah, and Asher Sklarov appeared directly as intervenors, in addition to shell companies with which they are affiliated. The Monaco court since denied (at first instance) the applications by 41 account holders (including Sklarov and his family members) to set aside the Ordonnance. The Monaco court also accepted the Plaintiffs' application to intervene in separate proceedings through which 12 applicants are seeking to unfreeze their accounts.

155.    A contempt application against Sklarov remains pending in the English Action relating to his failure to disclose certain assets in breach of the Freezing Orders, as well as his failure to take steps to prevent breaches of the Freezing Orders by orchestrating collateral attacks in Monaco with a view to unfreezing and dissipating the assets.

4920-7502-6878 v.1

156.    During the intervening months, as litigation proceeded and the parties were permitted further analysis of the enormous sprawl of this fraud operation, the scale of Defendants' unlawful conduct and receipt of and enrichment through the stolen proceeds took additional shape, including efforts to dispose of funds after the other courts' orders.

**Singh, Singh Law Firm, and Jurist IQ's Direct Role in the Underlying Fraud and Efforts to Dissipate Related Proceeds**

157.    Singh's obvious role in the overall fraud operation is implied throughout these facts, the records subpoenaed to date, and other materials that form the objective basis for Plaintiffs' claims.

*Singh Establishment and Management of the Conspiracy's Shell Entities*

158.    Singh was the central operational figure to register or incorporate the network of shell companies throughout Defendants' and their collaborators' operation.

159.    Records indicate Singh's ownership, incorporation, and control over the "Astor" Group entities, Vanderbilt, and others. In addition to domestic and foreign corporate registration statements evidencing Singh's control, these records include JPMC account statements and checks to establish domestic accounts for the same companies or what may be other sham consideration payments to cycle additional funds through the same companies' channels.

**[Figures 5–8]**

**BUSINESS DEPOSITORY CERTIFICATE (Corporation)**

__X__ NEW _____ CHANGE

**CHASE ○**

ACCOUNT NO.
■■■9621

ACCOUNT TITLE (DBA(s) on the following page(s) if applicable)
C VANDERBILT MANAGEMENT LTD.

BUSINESS ADDRESS
225 E 39TH ST APT 32E

NEW YORK, NY 10016-2963

TAXPAYER ID NO.
PRODUCT TYPE
Chase Platinum Business Checking

BANK NAME/NUMBER
JPMorgan Chase Bank, N.A ( 802 )
BRANCH NAME AND NO.
Third and 41st - 937
DATE
06/13/2022
PREPARED BY
MELVIN HUANG

PHONE NO.
(212) 622-5177

Legal Name of Organization:    C VANDERBILT MANAGEMENT LTD.                                                        (the "Organization")

State of Organization: __NY__

The individual(s) signing this Certificate hereby certifies to JPMorgan Chase Bank, N.A. (the "Bank") as follows:

- the Organization is a corporation of the type identified above, duly organized under the laws of the state of organization listed above;
- the individual signing this Certificate is the Secretary, Assistant Secretary, Acting Secretary, or President, as listed below, of the Organization; and
- the Organization has authorized all actions and agreements described in this Certificate in accordance with all requirements of law and of Organization's organizational documents and bylaws, if any, and the authorizations are now in full force and effect.

**Account Opening and Contractual Authorization**

Any of the people listed below ("Authorized Persons"), acting alone, may:

- Open or close one or more accounts with the Bank at any time, subject to the Bank's deposit account agreement;
- Act on behalf of the Organization in any matter involving any of the Organization's depository accounts at the Bank;
- Sign all agreements or other documents relating to any depository accounts or other business of the Organization. These agreements and other documents include but are not limited to funds transfer agreements, agreements for automated clearinghouse services, agreements for online services, and safe deposit agreements.

**Deposit and Withdrawal Authorization**

Each Authorized Person may deposit or withdraw the Organization's funds. Each Authorized Person may sign any and all checks, drafts, and orders drawn against any account of the Organization at the Bank, and may give instructions for account transactions without a signature,  such as those initiated via electronic debit, payment, wire transfer, or other withdrawal of funds by computer, electronic or other means. The Bank is authorized to pay any checks or other transactions authorized by the Organization, even if doing so causes or increases an overdraft. Each Authorized Person may endorse for cash, collection, deposit, or negotiation any checks, drafts, notes, bills of exchange, or certificates of deposit, and order the payment or transfer of money between accounts at the Bank and other banks. Endorsements "for deposit" may be written or stamped. The Bank may accept any instrument for deposit to any depository account of the Organization without endorsement or may supply the endorsement of the Organization. The Bank is authorized to pay all checks, drafts, and orders when signed, endorsed, or authorized by any Authorized Person without inquiry as to the circumstances of issue or disposition of the proceeds and regardless of to whom such instruments are payable or endorsed, including those payable to or endorsed to the  Authorized Person.

| Print Name | Title | Facsimile Signatures |
|---|---|---|
| JAITEGH SINGH | President | |



4920-7502-6878 v.1



*Singh's Ongoing Direction of the Fraudulent SLA Negotiations*

160.    Singh also seems to have a business relationship with Albert Yuen, who, with Orik, was one of only two apparently real human names used by representatives of the Astor Group in their dealings with Plaintiffs. In addition to the July 2024 communications, in 2023, Yuen appeared in person as an Astor 3 representative at a meeting in New York.

161.    Further investigation revealed the extent of Singh's connection to Yuen. For example, the Singh -0210 Account wired six payments to Yuen's firm Desvoeux Guilford LLC between July and October 2021. Other connections include their respective positions as board members for the Luxfin Capital entities which cycled millions through Singh's accounts. On information and belief, including the content and tone of communications and Sklarov's modus operandi of working with Singh to draft and effectuate fraudulent instruments in his stock-based lending schemes, Singh's direct financial connections with scheme participants, and Sklarov's own admissions that Singh advised he could use fictitious names to conduct business with Plaintiffs, Singh, Singh Law Firm, and Jurist IQ directly participated in the fraudulent scheme to induce Plaintiffs to sign the SLA and deliver their Collateral Shares, and the fraudulent scheme to liquidate the shares.

38

162.    Singh, individually and through his firms, orchestrated payments to other initial collaborators or third parties who facilitated the SLA, including, but not limited to, further payments to Enness, Skachkov, Orik, and Lata, plus a host of foreign and U.S. actors assisting the operation, thus enabling the entire scheme.

*Singh's Direct, Non-Entity Efforts to Steal Traceable Proceeds*

163.    While Singh was a central cog in the overall money laundering scheme through sham law firm mechanics and various accounts, firms, shell companies, family contacts, and other purchases, records also demonstrate how Singh proceeded to *directly* enrich himself in a variety of ways.

164.    At this time, Plaintiffs' best understanding of the JPMC records show transfers in excess of $20 million from Singh-Affiliated Accounts to Singh's personal use or benefit.

165.    Singh's payments to himself do not resemble patterns typical of fee for service businesses.  Instead, the bank records show significant direct wires to Singh's personal accounts. In August 2023, Singh transferred over $600,000 directly to a personal American Express account. Between July 13, 2021 and September 27, 2024, over 113 transactions, Singh ultimately sent or made payments to this account totaling $10,239,563.81, in addition to smaller deposits including thousands in funds he placed into Apple Card accounts.  A list of the transfers to Singh's American Express account is attached as **Exhibit G**.

166.    In November and December 2023, over five transactions, Singh wired $1,312,066.62 to Apmex accounts, where each instance listed Singh's name in the transaction reference. Apmex is an online retailer for coins and precious metals.

167.    The timing of Singh's Apmex purchases aligns with the most frenzied period for Singh and the Sklarov family's efforts to sequester illicit proceeds into real estate and precious

39

4920-7502-6878 v.1

metals purchases. Importantly, the rush to repose so much of the Astor Parties' putative capital in these less exchangeable and/or movable asset classes entirely belie assertions by central figures like Sklarov that Defendants' collaborators were managing an actual lending operation, or that Singh was simply maintaining client accounts.

168.    Indeed, Singh eventually made $8,121,709.50 in coin and metals purchases during the same time period—mostly for Sklarov and not counting the Apmex purchases just described. In the same two months, Singh engineered more than $4,000,000 in real estate payments for the Sklarov family—not counting rent, fees, or other sizable home improvement expenditures. These included luxury property purchases in Illinois where, upon Plaintiffs' information and belief, Asher and Hannah Sklarov maintain homes, and sizable payments towards Val Sklarov's purchases of one or more chateaus in France.

**[Figure 9]**



December 01, 2023 through December 29, 2023

Account Number: ██████████0210

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/13 | 12/13 Online Domestic Wire Transfer Via: Lake Forest Bk████5334 A/C: City of Lake Forest Lake Forest IL 60045 US Ref: Relt Stamp 50 South Sheridan Road, Lake Forest, IL 60045 - Closing 12/15/23 Imad: 1213Mmqfmp2K030172 Trn: 3554413347Es | 7,600.00 |
| 12/15 | 12/15 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org: ████████0210 Singh Law Firm, P.A. IOTA Trust Ben:████████9582 Zundiac Securities Limited Ref: Consultancy Expenses/Ocmt/Hkd3500000,00/Exch/7.7076/Cntr/62245531/ Trn: 6397700349Re | 454,097.25 |
| 12/15 | 12/15 Domestic Wire Transfer Via: Bmo Bank NA/07·000288 A/C: Chicago Title And Trust Company Ref: 23Gnd378·76Vh/50 S Sheridan, Lake Forest/Time/11:26 Imad: 1215Mmqfmp2LC20724 Trn: 3372103349Es | 1,760,000.00 |
| 12/15 | 12/15 Domestic Wire Transfer Via: Bok Tulsa/████0036 A/C: Apmex Ref: Jt Singh/████1024 Imad: 1215Mmqfmp2M021350 Trn: 3358463349Es | 655,67·.00 |
| 12/18 | 12/18 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De | 7,726.18 |

169.    Plaintiffs explain these other purchases in more detail below.

4920-7502-6878 v.1

170.    The funds in the -0210 Account used to complete these purchases included $15.9 million in Vanderbilt redemptions transferred from Jurist IQ, with less than $1 million in funds from potentially alternative sources.

171.    Other transactions highlight similar payments of Singh funneling significant amounts for his own benefit. For example, March 2023 records show Singh funneling $61,000 to his own retirement accounts.

**[Figure 10]**



172.    Setting aside his other luxury purchases, as detailed below, Singh's personal accounts evidence his use of illicit funds for various other expenditures for himself, such as $169,727.24 in student loans, $40,000 in car payments, and various large bills for healthcare and other daily expenses.

*Facing Litigation, Singh, Singh Law Firm, and Jurist IQ Race to Disappear Remaining Assets*

173.    In some of the most revealing transactions, as Plaintiffs' litigation efforts increased against Singh and the Sklarov family, in the months between May and September 2024, Singh actively worked to evacuate nearly all funds from the JPMC accounts that he managed, moving funds elsewhere.

41

174.    As noted above, Singh channeled over $10 million in illicit funds to a personal American Express account, $738,763.61 taking place between July 8, 2024 and September 27, 2024, including as he corresponded with Plaintiffs' counsel about subpoenas he had been served.

175.    Another glaring example involves Mavus Law Corp. ("Mavus"), an entity Singh formed on November 9, 2022 in Colorado, for which he is the sole director.

176.    In 2024, Singh cycled $52 million through his Mavus accounts in what appears to be a panicked effort to conceal the path of these stolen funds, which likely trace back to emergency efforts by Singh and Sklarov and their other collaborators to sell remaining Collateral Shares in May through July of 2024.

177.    On May 17, 2024, Singh transferred $35 million from his Jurist IQ account to an account at M&T Bank for Mavus.

178.    On June 26, 2024, Singh created a "COLTAF Account" with Chase for Mavus. The account opening statement lists Singh as "President."

179.    On June 28, 2024, Singh received and deposited a nearly $52 million check, dated June 12, 2024, from Mavus' M&T Bank Account, into the Chase account.

**[Figure 11]**



4920-7502-6878 v.1

180.    On or about July 22–23, 2024, as Plaintiffs were continuing to press the Astor Parties for answers on their questions about the Collateral Shares, Singh moved the same funds back out of the Chase account and into the Singh Law Firm -0210 account.

181.    On or about July 22, 2024, Singh promptly sent $60 million from the -0210 account to four Tavira accounts for different shell companies, in addition to scattering nearly $2 million in other funds, nearly exhausting the account.

182.    Singh proceeded to open other accounts during this time, further evidencing Singh and his firms' deliberate intent to evade any disclosure requirements or further investigation by Plaintiffs. On July 31, 2024, for example, he opened an account with Main Street Bank for Singh Law Firm, with the evident intent to funnel assets and other proceeds to this new location.

**[Figure 12]**



183.    On August 1, 2024, Singh suspiciously amended the -0210 account to reflect a Miami, Florida address, days after Astor Group's deceptive "notice of default" letters, and the same day that Plaintiffs filed the English Action.

184.    Singh also made significant transfers following the August 2, 2024 Freezing Order. Between. August 1 and August 30, 2024, Singh scattered another $2 million or more to outside recipients. These payments included $600,000 of presumable advances or retainers wired to various law firms, $500,000 of which was paid to Sklarov's solicitors in the English Action.

43

185.    In September, after the filing of the New York Application in aid of the English Action, Singh scattered another $1 million, including over $300,000 in additional payment advances to outside law firms.

186.    Notably, these post-Freezing Order payments evidence an acceleration of home improvement expenditures, including $318,135.62 in payments to Dutchman Contracting—a design firm for which the Singh accounts wired, in total for 2023 and 2024, $1,072,902.73—to renovate Maia Sklarov's $6.5 million Manhattan penthouse, as detailed below.

187.    As late as September 24, 2024, after Singh was served with Plaintiffs' subpoenas, he suspiciously deposited $150,000 into a separate, practically unused IOLTA account from his address in New York, and two Main Street Bank payments from a business in Massachusetts affiliated with his father for which little other information exists.

**Sklarov Family Recipients' Circulation of Proceeds and Role in the Fraud Operation**

188.    Following the liquidation of Plaintiffs' Collateral Shares, the syndicate systematically distributed the proceeds to its members, both directly and through a network of accounts and other entities.

189.    Upon information and belief, syndicate member accounts were used to receive, hold, and further transfer proceeds derived from the unauthorized sale of Plaintiffs' Collateral Shares.

190.    Between 2022 and 2023, Singh-Affiliated Accounts transferred over $35 million to domestic accounts or other investment vehicles specifically in Val and Tetyana Sklarov's names.

191.    The Sklarov siblings Asher Sklarov, Hannah Sklarov, Maia Sklarov, and Sasha Sklarov also received millions in cash and in-kind transfers from Singh-Affiliated Accounts, without returning value in exchange.

44

4920-7502-6878 v.1

192.   JP Morgan and Chase bank records ("JPMC Records") reflect that between the period July 2021 to September 2024, approximately 60 transfers were made from the Singh-Affiliated Accounts to accounts personally held by Asher Sklarov, or where the memo line expressly references Asher Sklarov.   A list of such transfers is attached as **Exhibit A**.

193.   The transfers identified on Exhibit A show aggregate transfers by the Singh-Affiliated Accounts of $7,257,910.99 to Asher Sklarov or referencing him in the memo line.

194.   The JPMC Records reflect that between the period July 2021 to August 2024, approximately 62 transfers were made from the Singh-Affiliated Accounts to accounts personally held by Hannah Sklarov, or where the memo line expressly references Hannah Sklarov.  A list of such transfers is attached as **Exhibit B**.

195.   The transfers identified on Exhibit B show aggregate transfers by the Singh-Affiliated Accounts of $8,492,315 to Hannah Sklarov or referencing her in the memo line.

196.   The JPMC Records reflect that between the period July 2021 to August 2024, approximately 82 transfers were made from the Singh-Affiliated Accounts to accounts personally held by Maia Sklarov, or where the memo line expressly references Maia Sklarov. A list of such transfers is attached as **Exhibit C**.

197.   The transfers identified on Exhibit C show aggregate transfers by the Singh-Affiliated Accounts of $8,540,975.60 to Maia Sklarov or referencing her in the memo line.

198.   The JPMC Records reflect that between the period July 2021 to August 2024, approximately 64 transfers were made from the Singh-Affiliated Accounts to accounts personally held by Sasha Sklarov, or where the memo line expressly references Sasha Sklarov.  A list of such transfers is attached as **Exhibit D**.

4920-7502-6878 v.1

199.    The transfers identified on Exhibit D show aggregate transfers by the Singh-Affiliated Accounts of $8,380,406.73 to Sasha Sklarov or referencing him in the memo line.

200.    The JPMC Records reflect that between the period August 2021 to July 2024, approximately 137 transfers were made from the Singh-Affiliated Accounts to accounts personally held by Julian Orik, or where the memo line expressly references Julian Orik.  A list of such transfers is attached as **Exhibit E** hereto.

201.    The transfers identified on Exhibit E show aggregate transfers by the Singh-Affiliated Accounts of $1,255,020.56 to Julian Orik or referencing him in the memo line.

202.    Several examples demonstrate the nature of these transfers and the operational purpose and assistance that Defendants held and provided to Singh and Sklarov's scheme.

203.    In April 2023, Singh transferred over $21 million from the Jurist IQ account and other sources to the -0210 Singh IOTA Trust Account, which at the start of the month held a comparatively nominal $156,383.55. This was following a $60 million transfer in the prior weeks from a Sklarov Tavira account and a separate Jurist IQ account Singh apparently maintains with another financial institution. Singh, via Jurist IQ, immediately offloaded over $35 million in other funds to a separate "Astor Asset Management 2" account at a Spanish bank. The remaining funds composing the $21 million April 2023 transfer were sourced directly from the disposal of Plaintiffs' Collateral Shares.

204.    Of the $21 million in the -0210 account, in addition to hundreds of thousands in payments to home renovation and design vendors for the family's homes, luxury car purchases, and among other transfers to parties like Julian Orik, Defendant PKP Industries, and the usual suspicious offshore accounts, millions went to each of the adult Sklarov children. Maia and Sasha

46

Sklarov both collected just over $1,000,000 each over multiple transactions into different personal accounts, as did their siblings, Hannah and Asher.

205. In another stark example, on June 13, 2022, Sierra Universal wired $5 million to each of the Tavira accounts of Asher, Maia, and Sasha Sklarov, and Jurist IQ completed an identical transaction for Hannah Sklarov.

**[Figure 13]**

| | | |
|---|---|---|
| 06/13 | 06/13 Online Payment 14568455293 To David Gonzalez | 500.00 |
| 06/13 | 06/13 International Wire Transfer Via: Barclays Bank Plc/0257 A/C: Barclays Bank Plc London Ec3 Nhj, England Ben: Tavira Ref: Memo: Tmc-106 Sasha Sklarov Ssn: ███8424 Tm: 3359292164Es | 5,000,000.00 |
| 06/13 | 06/13 International Wire Transfer Via: Barclays Bank Plc/0257 A/C: Barclays Bank Plc London Ec3 Nhj, England Ben: Tavira Ref: Memo: Tmc-104 Asher Sklarov Ssn:███0299 Trn: 3404982164Es | 5,000,000.00 |
| 06/13 | 06/13 International Wire Transfer Via: Barclays Bank Plc/0257 A/C: Barclays Bank Plc London Ec3 Nhj, England Ben: Tavira Ref: Memo: Tmc-105 Maia Sklarov Ssn: ███5405 Tm: 3403012164Es | 5,000,000.00 |
| 06/16 | 06/16 Domestic Wire Transfer Via: Royal Bus Bk LA CA███5037 A/C: Prime Trust LLC Las Vegas NV 89145 US Ref: Qccust4Nx Crossbarlx Cb002505 Re 1556- Tetyana Vasziliv Imad: ███1929 Trn: 3253782167Es | 2,500,000.00 |
| 06/17 | 06/17 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De ███2107 US Crg: ███9672 Sierra Universal Corp Ben:/███ ████3893 Tod Anstee Property Consultants Ltd Ref: Rent Expensebusiness Expenses/Ocmt/Gbp1627,50/Exch/0.7892/Cntr/4024860 3/ Tm: 4508600168Re | 2,062.21 |
| 06/17 | 06/17 Online International Wire Transfer A/C: Santander Uk Plc London United Kingdom Nw1 3-An Gb Ref: None Consultancy Expenses/Bnf/None Trn: 3119202168Es | 12,000.00 |
| 06/21 | 06/21 Online Domestic Wire Transfer Via: Bk Amer Nyc███9593 A/C: Julian Orik Highland Park IL 60035 US Ref: Reimbursements Imad: 0621B1Qgc06C011307 Tm: 3519622172Es | 10,835.73 |
| 06/22 | 06/22 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De | 2,901.51 |

206. Sasha Sklarov dissipated millions in proceeds deposited to her Discover Bank account, including extravagant travel expenses, luxury goods, and Apple Card deposits, and spending at restaurants and on her college campus.

207. In January 2025, Sasha Sklarov transferred approximately $2 million out of her Discover Bank accounts, after Plaintiffs filed the Georgia Application to investigate activity on such accounts.

**Singh and Sklarov Family Fund Personal Expenditures, Luxury Items, Tuition, and Living Expenses Paid Through Traceable Proceeds**

208. In addition to significant cash transfers, the syndicate members accepted substantial in-kind transfers from the Singh-Affiliated Accounts, which dissipated funds by purchasing

47

purchased jets, yachts, luxury vehicles, travel expenses, and real estate for the personal benefit of syndicate members.

*Private Jets, Yachts, and Luxury Vehicles*

209. In February 2024, Jurist IQ made large deposits to Singh Law Firm's putative IOLTA account. Following these deposits, Singh Law Firm transferred over $10.3 million to purchase a 141-foot yacht named "Only Eighty," and related expenses.

[Figure 14]

210. Public records indicate that Val Sklarov now owns or possesses this yacht. Based on internet search for "M Y" or "Motor Yacht Enchantment,", the "Only Eighty" was refit and renamed the "Enchantment" at some point in 2024. On September 13, 2024, the Singh-Affiliated

48

Accounts paid $100,000 to Sklarov's primary bank accounts in Greece with the memo line "M Y Enchantment Consultancy Expenses."

211.    Between July 2021 and July 2022, the Singh Accounts made at least $1,035,411.31 across multiple large payments to a Florida-based business with the memo line in each reading "Vessel Funds Request," indicating Singh or the Sklarov family's additional boat or yacht purchases.

[Figure 15]

**ELECTRONIC WITHDRAWALS** *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/13 | 12/13 Online Domestic Wire Transfer Via: Bk Amer Nyc███9593 A/C: Ocean Supply LLC Pompano Beach FL 33062 US Ref: Vessel Funds Request Imad: 1213B1Qgc08C010841 Trn: 3235711347Es | 110,398.76 |
| 04/01 | 04/01 Online Domestic Wire Transfer A/C: Pkp Industries, Inc. New York NY 100¹6-2963 US Ref: Monthly Trn: 36200¹2091Es | 10,000.00 |
| 04/04 | 04/04 Online Transfer To Chk ...1608 Transaction#: ¹4036043372 | 29,166.67 |
| 04/05 | 04/05 International Wire Transfer Via: Barclays Bank Plc/0257 A/C: Barclays Bank Plc London Ec3 Nhj, England Ben: Tavira Monaco Sam Rel: Credit To Tetyana Sklarov Tmc - 50 Ssn: 0418594 Trn: 3663572094Es | 40,000,000.00 |
| 04/06 | 04/06 Online Domestic Wire Transfer Via: Bk Amer Nyc███9593 A/C: Ocean International Management LLC Pompano Beach FL 3306255¹0 US Ref: Obsession April 3 Funds Request Imad: 0406B1Qgc03C00798¹ Trn: 3322702096Es | 131,860.84 |
| 04/13 | 04/13 Online Transfer To Chk ...1608 Transaction#: ¹4102117935 | 16,918.05 |
| 04/13 | 04/13 Online International Wire Transfer Via: Bank of America, N.A./0959 A/C: The Toronto Dominion Bank Toronto ¹, Canada Ben: Emerging Growth Opportunities Toronto CA Ref: Invoice 2022 U02 Consultancy Expenses Ssn: 0405334 Trn: 3310452103Es | 20,000.00 |
| 04/15 | 04/15 Online Transfer To Chk ...5152 Transaction#: ¹4122206762 | 450,000.00 |
| 04/18 | 04/18 Online Domestic Wire Transfer Via: Discover Bank███0649 A/C: Asher Sklarov Lake Forest IL 60045 US Ref: Client Funds Imad: 0418B1Qgc05C003343 Trn: 3195462¹08Es | 250,000.00 |
| 04/18 | 04/18 Online Domestic Wire Transfer A/C: Hannah Sklarov Argyle TX ███2183 US Ref: Client Funds Trn: 3195722108Es | 250,000.00 |
| 04/18 | 04/18 Online Transfer To Chk ...1608 Transaction#: ¹4143041841 | 14,669.54 |
| 04/19 | 04/19 Online Domestic Wire Transfer A/C: Maia A Sklarov Ithaca NY 14850-8921 US Ref: Client Funds/Acc/███3195 Maia Sklarov 114 Larisa Lane Ithaca NY 1485 0 US Trn: 3092532109Es | 250,000.00 |
| 04/19 | 04/19 Online Domestic Wire Transfer Via: Discover Bank███0649 A/C: Sasha Sklarov Lake Forest IL 60045 US Ref: Client Funds Imad: 0419B1Qgc08C002383 Trn: 3092522¹09Es | 250,000.00 |

212.    Other transactions evidence the Singh-Affiliated Accounts use of illicit proceeds to purchase a private jet.

213.    For example, in March 2024, the Singh-Affiliated Accounts paid $500,000 to Aerotitle, an Oklahoma City-based aircraft title and escrow company, with the memo line "US Ref: Bombardier Challenger," corresponding to the make and model of a business jet platform.

49

**[Figure 16]**

| 03/20 | 03/20 Online Domestic Wire Transfer Via: Tompkins Cmty Bk████2648 A/C: Dutchman Contracting Inc Mahopac NY 1054· US Ref: Sklarov 62 W 62ND Phab Imad: C320Mmqfmp2M024149 Trn: 3418564080Es | 229,863.63 |
| 03/21 | 03/21 Online Domestic Wire Transfer A/C: Julian A Orik Canton GA████6333 US Ref:/Acc████9691 Julian Orik 142 Gold Springs CT Canton GA 30114 US Trn: 3156634081Es | 2,000.00 |
| 03/22 | 03/22 Online Payment ████6146 To Fairfax Square LLC | 6,953.33 |
| 03/22 | 03/22 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De ████2107 US Org ████0210 Singh Law Firm, P.A. IOTA Trust Ben:/Ae4C026C001014· 956885C1 AL Safar Partners Advocates Legal Ref: Initial Deposit For Property Purchase/Ocmt/Aec570000,00/Exch/3.5969/Cn Tr/15548941/ Trn: 81C750C082Re | 158,38·.73 |
| 03/25 | 03/25 Online Payment ████·626 To Capital One | 1,944.52 |
| 03/25 | 03/25 Online Domestic Wire Transfer A/C: Julian A Orik Canton GA ████6333 US Ref:/Acc████9691 Julian Orik 142 Gold Springs CT Canton GA 30114 US Trn: 3674614085Es | 6,750.00 |
| 03/28 | 03/28 Online Domestic Wire Transfer Via: First Citz Raleigh/C53100300 A/C: Aerctitle Oklahoma City OK 73108 US Ref: Bombardier Challenger 350 Serial No20508 Reg Sp Khi·Time/1··32 Imad: 0328Mmqfmp2K048580 Trn: 3324094C88Es | 500,000.00 |
| 03/29 | 03/29 Online Domestic Wire Transfer Via: Ew Bk Smrino████8796 A/C: The Tang Feng 20·3 Family Trust Manhasset NY 11030 US Ref: 3A 14th St Imad: 0329Mmqfmp2M0074C1 Trn: 321722408SEs | 6,350.00 |

SB1631274-F3    Page 3 of 6    2306

214. Since 2021, Asher Sklarov acquired at least four luxury cars, each registered to the 375 Oakdale Property (as defined below) including:

    a. A 2010 Ferrari (VIN ZFF65LJA3A0170649) acquired in or around April 15, 2021;

    b. A 2020 Audi RS Q8 4.0T Quattro (VIN WU1ARBF11LD027441) acquired in or around August 9, 2021;

    c. A 2023 BMW S 1000 RR (VIN WB10E6304P6H63758) acquired in or around August 3, 2023; and

    d. A 2023 Harley Davidson Sportster S (VIN 1HD1ZC410PB310712) acquired in or around May 31, 2025.

215. On July 7, 2022, Singh sent a $189,329.38 payment to Munson Ski and Marine, an Illinois boat dealer, "[o]n behalf of Asher Sklarov."

216. Several transactions include the memo line "Obsession." The JPMC Records further indicate that Singh continued to administer other payments for the maintenance or management of other "Obsession" expenses.

50

4920-7502-6878 v.1

217.    Upon information and belief, "Obsession" is a 79-foot Hatteras 80 motor yacht.

218.    For example, in November 2022, Singh bought himself a $95,000 BMW from a Florida dealership. In the following years, Singh paid thousands in recurring auto loan payments from his firm's putative IOLTA account, using funds that included proceeds traceable to fraudulent transfers or the liquidation of the Collateral Shares..

219.    In 2023 and 2024, Singh spent nearly $100,000 down payments to BMW and Audi dealerships in Virginia for car purchases.

**[Figures 17–19]**



4920-7502-6878 v.1

52



220.    In December 2023, the Singh-Affiliated Accounts bought a $107,367.08 vehicle from a Dallas-area Cadillac dealership for, on information and belief, use by Hannah Sklarov.

221.    Syndicate members overseas also received luxury cars following their participation in the scheme. For example, in April 2024, the Singh-Affiliated Accounts purchased a $625,680 vehicle for Tetyana Sklarov from Edus Autogalerie, an ultra-luxury dealership in Germany.

*Personal Real Estate Purchases and Improvements*

222.    As detailed below, Defendants purchased and benefitted from millions of dollars in real estate purchases and millions in related improvements, which they separately used to further launder, hide, or dispose of Plaintiffs' assets.

223.    For example, between March and May 2024, the Singh Accounts made four payments totaling $715,197.02 to a pair of notary firms in France, each with memo lines referencing investments in or "purchase of" multiple "Chateau" names, including "Chateau De Launay."

224.    On April 16, 2024, Singh Law Firm paid the same firms $5,927,714.19 with the memo line "*Partenaires Chateau Lavande - Chateau De Launay.*"

52

**[Figure 20]**



CHASE ❖

March 30, 2024 through April 30, 2024
Account Number: ███████████0210

**ELECTRONIC WITHDRAWALS** *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 04/16 | 04/16 Foreign Exchange Debit A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Crg:███████████0210 Singh Law Firm, P.A. IOTA Trust Ben:/Fr034003100001000139854P33 Etudes Moreau Notaires Ref: Partenaires Chateau Lavande - Chateau De Launay/Ccmt/Eur5506253,71/Exc H/0.9289/Cntr/44026696/ Tm: 6424200107Re | 5,927,714.19 |

225.    The syndicate also routed stolen funds through the Singh-Affiliated Accounts to acquire a $6.5 million Manhattan penthouse for Maia Sklarov's occupation and benefit.  The Singh-Affiliated Accounts thereafter transferred over $1 million to renovate, improve, and furnish the penthouse, and pay over $10,000 a month in related condominium fees.

226.    Beginning in September 2023, the Singh-Affiliated Accounts began wiring monthly $6350 payments to "The Tang Feng 2013 Family Trust" in Manhasset, NY, with the memo lined "3A 14th St." Upon Plaintiffs' information and belief, these are rent payments for 245 W. 14th St. Apt 3A, New York, NY, 10011, what Plaintiffs believe is and remains Sasha Sklarov's primary residence in New York City, where she now lives to study for an MFA degree. Barring an increase in rent and other related costs, the Singh-Affiliated Accounts have transferred $209,550 to date on this rental.

227.    The Singh-Affiliated Accounts have made multiple renovations and improvements to at least four other current properties in Illinois, Georgia, and Colorado, for the benefit, use, and enjoyment of the Sklarov siblings and other Sklarov family members.

228.    Plaintiffs detail the operational import of these properties in the underlying scheme below, in addition to each Defendants' respective connections to each property.

4920-7502-6878 v.1

*Luxury Travel, Clothing, and Parties*

229.    Syndicate members used proceeds routed through the Singh-Affiliated Accounts to bankroll their extravagant lifestyle expenses.

230.    Sasha Sklarov used funds withdrawn from the Singh-Affiliated Accounts and deposited into her Discover Bank account to spend thousands per month over several years, often well over $10,000, on designer clothing and apparel brands.

231.    Sasha Sklarov's Discover accounts similarly indicate almost monthly airfare, despite at most relevant times being a college student.

232.    The Singh-Affiliated Accounts separately underwrote what appear to be Sasha Sklarov's travel and luxury vacations. In one example, Singh Law Firm's putative IOLTA account sent Sasha Sklarov nearly $5000 for flight reimbursements for another apparent vacation.

**[Figure 21]**



233.    The Singh-Affiliated Accounts separately funded another apparent Sasha Sklarov vacation, wiring nearly $10,000 to pay for what appears to be a weeklong house rental in the U.S. Virgin Islands.

4920-7502-6878 v.1

**[Figure 22]**

| | | | |
|---|---|---|---|
| | CT 06360 US Imad: 0404B·Qgc01C0C1118 Trn: 32185·2094Es | | |
| 04/06 | 04/06 Online Domestic Wire Transfer Via: Firstbank PR▮▮▮▮1473 A/C: Palm Horizons Mgmt Btn Catered To St John VI 00830 US Ref: 12/19/22-12/26/22 Sasha Sklarov Imad: 0406B·Qgc07C009283 Tm: 3282552096Es | | 9,999.88 |

234.    On December 6, 2023, Singh spent $30,000 for a country club initiation fee to Trump National Golf Club in Virginia.

235.    In 2023, Singh used Singh Law Firm funds to pay for a $30,000 baby shower at the same club in 2023.  The following checks are illustrative of these payments:

**[Figures 23-24]**



4920-7502-6878 v.1

236.    In September 2023, Singh used proceeds in the Singh-Affiliated Accounts to buy himself a $50,915 Tourneau Watch.

*Use of Illicit Proceeds to Pay Sklarov Family Tuitions*

237.    Various other payments indicate that the Sklarovs were using traceable proceeds, via the Singh accounts, to pay college tuition. Two checks evidence Singh's use of the Singh Law Firm Account to pay Sasha Sklarov's tuition, including one reimbursement to Sharon Sklarov. A separate January 2024 payment through PKP Industries was used to pay Asher Sklarov's tuition.

**[Figures 25–27]**





| 01/09 | 01/09 Online Domestic Wire Transfer Via: Bank of America, N.A./0959 A/C: Bank of America National Assoc New Haven CT 06510-3319 US Ben: Han Zhu New Haven CT 06510 US Ref: December Ssn: ███7535 Tm: 3194214009Es | 2,000.00 |
|---|---|---|
| 01/09 | 01/09 Online Domestic Wire Transfer A/C: Pkp Industries, Inc. New York NY 10016-2963 US Ref: Asher's Tuition Trn: 3235224009Es | 34,893.87 |
| 01/09 | 01/09 Online Domestic Wire Transfer A/C: Pkp Industries, Inc. New York NY 10016-2963 US Ref: One Ibc Trn: 3275254009Es | 8,585.85 |
| 01/09 | 01/09 Online International Wire Transfer A/C: Industrial And Commercial Bank Central Hong Kong Hk Ref: Invoice Number 1245340 Consultancy Expenses Tm: 3346994009Es | 1,080.00 |
| 01/09 | 01/09 Foreign Exchange Debit A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org: ███5152 Jurist Iq Corp Attorney Trust Ben:/Tr8400064000001138600238669 Birol Basaran Ref: Astor Asset Management 3/Ocml/Try28390945,00/Exch/29.5640/Cntr/2013132 4/ Tm: 4641700009Re | 960,327.51 |

4920-7502-6878 v.1

**Other Entity-Based Transfers and Use of Proceeds; Circulation into Real Estate Purchases**

238.   The proceeds of Defendants' fraud were not distributed solely to individual recipients. They were also routed through a network of entities, including PKP Industries, Backett Wood LLC, Larisa Lane LLC, the ABC LLC, French Asset Acquisition LLC, Polo Molo Shmolo Capital Limited, Napolean Hill Capital Resources, and JNM Management LLC. Singh and syndicate members created these vehicles to funnel illicit proceeds, as detailed below.

*PKP Industries*

239.   Upon Plaintiffs' information and belief and according to unrestricted banking records located to date, through late 2024, the Singh-Affiliated Accounts made at least 67 transfers to PKP Industries, totaling $1,426,068.70. The transaction references do not show that any value was received in exchange.

240.   Upon information and belief and upon review of publicly available corporate registry records accessed through the New York Secretary of State's website, PKP Industries is a shell company directly or indirectly controlled by Singh. Singh's wife is listed on the registry as the company Chief Executive Officer. The company's registered address via a separate Virginia license is a home owned by Singh at 7402 Backett Wood Terrace in McLean Virginia.

*Backett Wood, LLC*

241.   Backett Wood is a New York corporation that until July 30, 2024, maintained a JPMC account at the Singh Law Firm's Madison Avenue address.

242.   On or around March 23, 2023, the Singh Law Firm Account wired Backett Wood $1,124,631.79 with the memo line "7402 Backett Woodterr," which connects to an apartment in McLean, Virginia. According to online sources, the home sold for $1,170,950 on March 28, 2023.

57

**[Figure 28]**

| | | | |
|---|---|---|---|
| | 3370853076Es | | |
| 03/21 | 03/21 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org: [redacted] 0210 Singh Law Firm, P.A. IOTA Trust Ben:/Gr58017203500050350180I1863 Ioannis Pagiaslis Aebe Ref: Zambx24B000405968 Vasziliv Tetyana Consultancy Expenses/Ocml/Eur197000 ,00/Exch/0.9102/Cntr/70438923/ Tm: 4536900080Re | | 216,435.95 |
| 03/22 | 03/22 Online Domestic Wire Transfer Via: Hsbc USA [redacted] 088 A/C: Tetyana Sklarov New York NY 10016 US Imad: 0322B1Qgc06C008612 Trn: 317043308'Es | | 104,987.00 |
| 03/22 | 03/22 Online Domestic Wire Transfer Via: Capital One NA [redacted] 761'0 A/C: Val Sklarov Canton GA 30114 US Imad: 0322B1Qgc06C008705 Trn: 3171683081Es | | 5,000.00 |
| 03/22 | 03/22 Online Domestic Wire Transfer Via: Axos Bank/ [redacted] 7251 A/C: Val Sklarov Canton GA 30114 US Imad: 0322B1Qgc07C007760 Trn: 3173323081Es | | 35,965.00 |
| 03/22 | 03/22 Online Domestic Wire Transfer Via: Nbkc Bank [redacted] 4869 A/C: Val Sklarov Canton GA 30114 US Imad: 0322B1Qgc07C007776 Trn: 3174223081Es | | 5,000.00 |
| 03/22 | 03/22 Online Domestic Wire Transfer A/C: Sharon Sklarov Lake Forest IL 60045-3941 US Trn: 3218773081Es | | 27,946.00 |
| 03/23 | 03/23 Online International Wire Transfer Via: Hsbc Bank USA, N.A./0108 A/C: Hongkong And Shanghai Banking Corp.Hong Kong Ben: The Wittgensteins Advisory Limited North Point Hk Ref: Payment On Behalf of Finvis Limitedbusiness Expenses Ssn: [redacted] 0106 Trn: 3061663082Es | | 10,159.00 |
| 03/23 | 03/23 Domestic Wire Transfer Via: Citibank Nyc [redacted] 0089 A/C: Gilmarlin, Poster & Shaflo Llp Ref: Purchase of 62W 62 Street Phab/Time/11:46 Imad: 0323B1Qgc06C00781' Trn: 3195033082Es | | 5,543,278.10 |
| 03/23 | 03/23 Online Domestic Wire Transfer Via: Tiaa Bank/ [redacted] 0225 A/C: Aba/063092110 Jacksonville FL 32256 US Ben: Val Sklarov Canton GA 30114 US Imad: 0323B'Qgc06C008428 Trn: 3251673082Es | | 1,000.00 |
| 03/23 | 03/23 Domestic Wire Transfer Via: Forbright Bank [redacted] 3418 A/C: Kvs Title, LLC Ref: Backett Wood LLC- 7402 Backett Woodterr Imad: 0323B1Qgc04C006153 Trn: 3385543082Es | | 1,124,631.79 |
| 03/27 | 03/27 Online International Wire Transfer Via: Barclays Bank Plc/0257 A/C: Barclays Bank (Schweiz) S.A. 1211 Geneva 3, Switzerland Ben: Amicorp Shared Service Center Gmbh Zurich | | 618.13 |

243.     Upon information and belief, Backett Wood, by and through Singh, continues to own and operate this home as a rental property.

*The Foxhall Road Property*

244.     Between July 15, 2024 and July 31, 2024, Singh transferred nearly $800,000 between a personal JPMC savings account and other third-party brokerage accounts held by he and his wife to a separate checking account that was registered at several addresses connected to Singh, including the Singh Law Firm.

245.     On July 15, 2024, Singh transferred $100,000 into the account before promptly wiring $100,000 to "KVS Title Company" with "1952 Foxhall Road" listed in the memo line. On July 24, 2024, he transferred over $600,000 into the account before promptly wiring $608,938.49 to "KVS Title Company (VA Escrow)" with "Jaitegh Singh 1952 Foxhall Road" listed in the

memo line. A cursory internet search indicates a home at that address was purchased for $2,675,000 on July 29, 2024.

246.    Starting on August 1, 2024, Singh added the Foxhall Road address to the same personal checking and savings account. By September 2024, where the subpoenaed JPMC records end, Singh cleared out nearly all funds from these accounts.

*Larisa Lane*

247.    Larisa Lane LLC is a limited liability company owned by Hannah Sklarov.  Maia Sklarov, upon information and belief, is a direct or indirect beneficiary of Larisa Lane, given her residence in New York properties tied to this entity.

248.    Singh Law Firm records confirm that Singh is involved in the administration of this company.  Singh is also an authorized signatory on the accounts of this entity.

**[Figure 29]**



249.    Larisa Lane appears to have been initially incorporated in connection with a property purchase at 114 Larisa Lane, Ithaca, NY 14850-8921, where upon information and belief, Maia Sklarov lived, presumably while studying for an MBA degree at Cornell University. JPMC and publicly available records confirm Maia Sklarov's residence at this address, in connection with transfers of illicit proceeds from the Singh- Affiliated Accounts.

4920-7502-6878 v.1

**[Figure 30]**



CHASE

March 01, 2023 through March 31, 2023
Account Number: ███████0210

| | ELECTRONIC WITHDRAWALS *(continued)* | |
|---|---|---|
| **DATE** | **DESCRIPTION** | **AMOUNT** |
| 03/31 | 03/31 Online Domestic Wire Transfer A/C: Maia A Sklarov New York NY 10017-4467 US Ref:/Acc█8323·95 Maia Sklarov 1·4 Larisa Lane Ithaca NY 14850 US Trn: 3302553090Es | 10,000.00 |
| 03/31 | 03/31 Online Domestic Wire Transfer Via: Discover Bank█0649 A/C: Asher Sklarov Lake Forest IL 60045 US Imad: 0331B1Qgc02C004957 Trn: 3302533090Es | 10,000.00 |

250.    In late October 2022, amidst a slew of other sizable payments to the Sklarov family's offshore and domestic accounts and sham "consultancy" entities, among other recipients, the Singh Law Firm Account wired $1,062,738.81 to "*First American Title Insurance Comp…File Number 2684947-1534.*". The second of these two payments includes "*7121 Woodside DR, Argyle, TX 76226*" in the memo line.

**[Figure 31]**

| 10/18 | 10/18 Online International Wire Transfer A/C: Alpha Bank Ae Athens Greece Gr Ref: Client Funds Trn: 337332229·Es | 300,000.00 |
|---|---|---|
| 10/19 | 10/19 Online International Wire Transfer A/C: Alpha Bank Ae Athens Greece Gr Ref: Fee For Service Consultancy Expenses Trn: 3158562292Es | 47,400.00 |
| 10/19 | 10/19 Online Domestic Wire Transfer Via: Nbkc Bank█4869 A/C: Val Sklarov Canton GA 30114 US Imad: 1019B1Qgc05C010311 Trn: 3429602292Es | 10,000.00 |
| 10/20 | 10/20 Domestic Wire Transfer Via: Fst Am Tr CO Sana█1255 A/C: First American Title Insurance Comprel;/Bnf/File Number. 2684947-1534 Imad: 1020B1Qgc08C031664 Trn: 3270332293Es | 1,013,126.93 |
| 10/20 | 10/20 Online Domestic Wire Transfer Via: Bk Amer Nyc█9593 A/C: Arw Maritime Inc FT Lauderdale FL 33316 US Ref: Invoice 24748 Imad: 1020B1Qgc07C0·2803 Trn: 3416232293Es | 12,435.47 |

SB1631274-F3

Page 2 of 4                2168

CHASE

October 01, 2022 through October 31, 2022
Account Number: ███████0210

| | ELECTRONIC WITHDRAWALS *(continued)* | |
|---|---|---|
| **DATE** | **DESCRIPTION** | **AMOUNT** |
| 10/20 | 10/20 International Wire Transfer Via: Barclays Bank Plc/0257 A/C: Barclays Bank Plc London Ec3 Nhj, England Ben: Tavira Ref:/Bnf/Credit One Equity Holdings Tmo-·21 Ssn: 0499737 Trn: 3365992293Es | 20,000,000.00 |
| 10/21 | 10/21 Online Domestic Wire Transfer Via: Fst Am Tr CO Sana█1255 A/C: First American Title Insurance Compmckinney TX 75070 US Ref: File 2684947-1534, 7·21 Woodside DR, Argyle, TX 76226 Imad: 1021B1Qgc07C009327 Trn: 3182742294Es | 49,611.88 |
| 10/21 | 10/21 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org█0210 Singh Law Firm, P.A. IOTA Trust Ben:/Gb98Nwbk60173·10397248 Field Law Limited Ref: Consultancy Expenses/Dcmt/Chn5006·00/Exch:0·8649/Cntr/38730266/ Trn: 5837002294Es | 5,785.70 |

4920-7502-6878 v.1

251.    Upon Plaintiffs' information and belief, this property, at 7121 Woodside Dr, Argyle, TX 76226 (The "Woodside Drive Property"), was purchased by Larisa Lane LLC on October 7, 2022 for approximately $1.3 million. The house deed transfer of the Woodside Drive Property confirmed Hannah Sklarov as a member of Larisa Lane LLC and as the signatory of the deed transfer, and she was also linked to the address in the US phonebook.

252.    On information and belief, Hannah Sklarov re-transferred or commingled significant portions of the $2,656,234 transferred to Hannah Sklarov from the Singh-Affiliated Accounts, for the use of Larisa Lane's real estate acquisitions, improvements, and operations.

253.    At some point in 2025, Larisa Lane sold the Woodside Drive Property and purchased additional homes.

254.    For example, in late September 2025, according to the Colorado property registry, Larisa Lane LLC bought a home at 13658 Kitty Joe Ct, Colorado Springs, CO 80921 (the "Kitty Joe Property"). On information and belief, Larisa Lane used proceeds from the Singh-Affiliated Accounts to purchase the Woodside Drive Property, and thereafter used the $1.3 million in proceeds of the sale of the Woodside Drive Property to fund the $1.2 million purchase price of the Kitty Joe Property.

*ABCPHABW62STXYZ LLC*

255.    Singh incorporated the ABCPHABW62STXYZ LLC. The registered officer of this company is Alphasierra Holdings. Sandwiched within the alphabet soup of this entity's name is the phrase "W62ST," which as indicated below refers to Maia Sklarov's penthouse apartment in Manhattan at 62 West 62nd Street.

256.    On February 2023, Singh Law Firm transferred $967,500 with "*Gilmartin Poster & Shafto Llp Ref: Deposit For 62 West 62ND Street*" included in the memo. The next month, Singh

Law Firm wired a separate $5,543,278.10 payment with the reference including "*Purchase of 62W 62 Street*." (*See* Figure 28, supra.)

257.    Further, in 2024, the Singh-Affiliated Accounts made significant payments to Dutchman Contracting Inc, for the apparent refurbishment of the 62nd Street Property, including the following sums:

  a)  March 20, 2024—$229,863.63

  b)  May 15, 2024—$124,180.34

  c)  June 6, 2024—$129,895.14

  d)  July 23, 2024, $270,828.10

  e)  August 15, 2024—$103,004.50 and $90,693.39

  f)  September 23, 2024—$124,437.63

258.    Other transactions evidence similar payments in New York for home design expenses, including, for example, $84,743.11 across five transactions to William Suk Architecture PLLC and Suk Design Group LLP, a luxury design studio for high end residential and commercial properties.

259.    The syndicate continues to use illicit proceeds to pay expenses related to this property, to "Allegro Condominium", the building name at 62 W 62nd Street. The following checks are informative examples of these expenditures:

**[Figures 32–36]**





*French Asset Acquisition LLC*

260.    French Asset Acquisition LLC ("French Asset") is a company organized in the

Cook Islands, and its corporate records list Asher, Maia, Hannah, and Sasha Sklarov as beneficial

owners.  Prior to October 25, 2022, each was an authorized signatory for the company.

4920-7502-6878 v.1

261.    In a document dated October 25, 2022, Asher, Maia, Hannah, and Sasha Sklarov jointly agreed to allocate signatory authority to Maia Sklarov.

262.    French Asset holds an account at Tavira identified as account number TMC139.

263.    JPMC unrestricted records reflect that on March 28, 2024, $2,000,000 was transferred to French Asset from Jurist IQ.

264.    JPMC unrestricted records reflect that on July 22, 2024, $15,000,000 was transferred to French Asset from Singh Law.

*Polo Molo Shmolo Capital Limited*

265.    Polo Molo Shmolo Capital Limited ("Polo Molo") is a Belize company.

266.    Hannah Sklarov is the is the director, sole authorized signatory, and sole beneficial owner of Polo Molo.

267.    Polo Molo holds an account at Tavira identified as account number TMC143.

268.    JPMC unrestricted records reflect that on July 22, 2024, $15,000,000 was transferred to Polo Molo from Singh Law.

*Napolean Hill Capital Resources*

269.    Napolean Hill Capital Resources ("Napolean Hill") is a company with an unknown place of incorporation.

270.    Asher Sklarov is the director, sole authorized signatory, and sole beneficial owner of Napolean Hill.

271.    Napolean Hill holds an account at Tavira identified as account number TMC140.

272.    JPMC unrestricted records reflect that on July 22, 2024, $15,000,000 was transferred to Napolean Hill from Singh Law.

4920-7502-6878 v.1

*JNM Management LLC*

273.    JNM Management LLC ("JNM") is an Illinois company formed in October 2023.

274.    In its registration with the Illinois Secretary of State, JNM reported to have a principal address at 221 S. Ridge Road, Lake Forest, IL, which is the former home of Vlad Sklarov and Sharon Sklarov.  The registration lists Orik as the manager of the company.

275.    Throughout 2024, the Singh-Affiliated Accounts transferred approximately $116,000 to JNM, across eight transactions.

*Other Singh and Sklarov Family Real Estate Havens*

276.    On November 29, 2023, a property at 50 S Sheridan Road, Lake Forest, IL 60045 (the "Sheridan Property") was purchased by Chicago Trust TR #8002393145 for $1.9 million. Property records show that the care of address for Chicago Title Trust is at one of the Singh Law Firm addresses listed on their website - 8045 Leesburg Pike #510, Vienna, VA 22188. A motor vehicle registration links Hannah Sklarov to the Sheridan Property.

277.    Payments from the Singh-Affiliated Accounts to purchase the Sheridan Property are evidenced in the following transfers, among other examples:

a.    On October 27, 2023, Singh Law Firm transferred $95,000 with the reference including "*At World Properties LLC Escrow Chicago IL 60611 US Ref: 50 S. Sheridan Road, Hannah Sklarov…*"

b.    On December 15, 2023, Singh Law Firm transferred $1,760,000 was transferred with the reference including "*Chicago Title And Trust Company Ref: 23Gnd378176Vh/50 S Sheridan, Lake Forest.*"

278.    As of April 2024, Singh was actively managing this property.

65

**[Figure 37]**



279.    Other payments from the Singh Accounts evidence over $50,000 in landscaping and masonry payments for improvements to this property in June and September 2024, most of which was after Plaintiffs initiated litigation in the U.K. and New York.

280.    The unrestricted JPMC Records evidence other luxury real estate purchases in Illinois by the Sklarovs.

281.    For example, on October 31, 2023, the Singh accounts transferred $515,000 with the reference including "*Property: 401 N Wabash Ave Unit 81D Chicagobuyer: Sklarov Family*."

282.    On November 13, 2023, according to property records, a separate Chicago-area trust entity purchased a unit at 81D, 401 North Wabash Avenue, Chicago, IL 60611 (the "Trump Tower Property") and a separate parcel together for $2,060,000 on November 13, 2023. The same records indicate these properties are held by "*Chicago Title Land Trust Company, as Trustee under Trust Agreement dated December 1, 2023 known as Trust No. 8002392146.*"

283.    On November 14, 2023, the Singh Accounts transferred $103,000 with the reference including "*401 N Wabashave Unit 81D Chicago Sklarov Family Trust*." On December 6, 2023, Singh wired $1,416,334.75 additional funds with the reference "*401 North Wabash Avenue, #81D*," and another $46,000 payment concerning the same address.

4920-7502-6878 v.1

284.    The foregoing Sklarov-affiliated trusts did not provide reasonably equivalent value in exchange for these transfers.

**[Figure 38]**

| | | |
|---|---|---|
| 08/01 | 08/01 Online Domestic Wire Transfer Via: Discover Bank████0649 A/C: Sasha Sklarov Lake Forest IL 60045 US Imad: 0801B1Qgc01C003040 Trn: 3292033213Es | 10,000.00 |
| 08/01 | 08/01 Online Domestic Wire Transfer A/C: Maia A Sklarov New York NY 10023-7000 US Ref:/Acc█████3·95 Maia Sklarov 1·4 Larisa Lane Ithaca NY 14850 US Trn: 3298093213Es | 10,000.00 |
| 08/01 | 08/01 Online Domestic Wire Transfer Via: Discover Bank/031·00649 A/C: Asher Sklarov Lake Forest IL 60045 US Imad: ████02570 Trn: 3298083213Es | 10,000.00 |
| 08/01 | 08/01 Online Domestic Wire Transfer Via: Bmo Harris Bank NA████5661 A/C: Home Build Window And Door Hoffman Estates IL 60192 US Ref: 375 Oakdale Ave Deposit Imad: 0801B·Qgc03C009272 Trn: 3732263213Es | 30,063.00 |
| 08/01 | 08/01 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org:████0210 Singh Law Firm, P.A. IOTA Trust Ben:████9001 Yan Lawyers Ref: Consultancy Expenses/Ocmt/Hkd120000,00/Exch/7.5796/Cntr/52490525/ Trn: 4611100213Re | 15,831.97 |
| 08/02 | 08/02 Online Transfer To Chk ...1608 Transaction#: ·8056499603 | 200,000.00 |
| 08/04 | 08/04 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org:████0210 Singh Law Firm, P.A. IOTA Trust Ben:/Gr84011C139000001390035565 Triplis And Associates Ref: Bx7009/Inv/4 Business Expenses/Ocmt/Eur4268,00/Exch/0.88·8/Cntr/585142 13/ Trn: 8627700216Re | 4,840.10 |
| 08/07 | 08/06 Online Transfer To Chk ...1608 Transaction#: ·8096851339 | 200,000.00 |
| 08/09 | 08/09 Online Payment ·8119860703 To Capital One | 2,349.37 |
| 08/09 | 08/09 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org:████0210 Singh Law Firm, P.A. IOTA Trust Ben:████9001 Yan Lawyers Ref: Invoice ID 105353 Business Expenses/Ocmt/Hkd8820,00/Exch/7,5852/Cntr/6 67416·2/ Trn: 640500C221Re | 1,162.79 |

**SB1631274-F3**   Page 2 of 4   **2248**

| | | |
|---|---|---|
| 03/15 | 03/15 Online International Wire Transfer A/C: Dbs Bank Ltd Singapore Singapore 01898-2 Sg Ref: Consultancy Expenses Trn: 3361924075Es | 5,000.00 |
| 03/18 | 03/18 Online Domestic Wire Transfer Via: Northern Chg████0152 A/C: Someday Interiors LLC Lake Forest IL 60045 US Imad: 0318Mmqfmp2M023718 Trn: 3517394078Es | 35,460.18 |
| 03/19 | 03/19 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org:████0210 Singh Law Firm, P.A. IOTA Trust Ben:/Gb35Bukb20320653688216 Bogdan Stefan Barbu Ref: Consultancy Expenses/Ocmt/Eur2000,00/Exch/0.8941/Cntr/70640055/ Trn: 3752400079Re | 2,236.89 |
| 03/19 | 03/19 Online International Wire Transfer A/C: Foreign Cur Bus Acct Bk 1 Columbus Newark De 197132107 US Org:████0210 Singh Law Firm, P.A. IOTA Trust Ben:/Gb35Bukb20320653688216 Bogdan Stefan Barbu Ref: Consultancy Expenses/Ocmt/Gbp2620,00/Exch/0.7635/Cntr/126952·1/ Trn: 3666800079Re | 3,431.57 |
| 03/20 | 03/20 Online Domestic Wire Transfer Via: Pncbank Pitt/████0096 A/C: Fred W Freitag IV Gibsonia PA 15044 US Imad: 0320Mmqfmp2K011415 Trn: 3184754080Es | 3,500.00 |
| 03/20 | 03/20 Online International Wire Transfer A/C: Maybank/Menara Maybank Kuala Lumpur Malaysia 50050 My Ref: Noc/2400·82/24/108/Iz/Amm Consultancy Expenses Trn: 3347904080Es | 4,868.00 |
| 03/20 | 03/20 Online Domestic Wire Transfer Via: Tompkins Cmty Bk████2648 A/C: Dutchman Contracting Inc Mahopac NY 1054· US Ref: Sklarov 62 W 62ND Phab Imad: 0320Mmqfmp2M024149 Trn: 3418564080Es | 229,863.63 |
| 03/21 | 03/21 Online Domestic Wire Transfer A/C: Julian A Orik Canton GA 30114-6333 US Ref:/Acc████9691 Julian Orik 142 Gold Springs CT Canton GA 30114 US Trn: 3156634081Es | 2,000.00 |
| 03/22 | 03/22 Online Payment ·9936316146 To Fairfax Square LLC | 6,953.33 |

**The Syndicate Accelerates Laundering Activity in Response to Litigation Activity**

285.    On or about June 28, 2024, Singh, Jurist IQ, among other entities and individuals including Val and Tetyana Sklarov, were named in an amended complaint alleging stock based lending fraud and seeking damages and injunctive relief for the same. *Chenming Holdings (Hong*

67

*Kong) Limited v. Val Sklarov et al.*, 1:24-cv-00935-KPF (S.D.N.Y.). The *Chenming* plaintiffs served Singh and Jurist IQ with subpoenas the same day.

286.   On May 17, 2024, Singh sent $35 million from the Jurist IQ account to his Mavus Law entity, shuffling added amounts over next month before restoring the same funds back to the Singh-Affiliated Accounts.

287.   On May 17, 2024 Jurist IQ directly sent Maia Sklarov over $100,000.

288.   Between June 2024 and July 29, 2024, Plaintiffs representatives were actively corresponding with the Astor Group to assess possible unauthorized trading activity relating to the Collateral Shares.

289.   On July 22, 2024, after restoring the Mavus funds to the -0210 Account, Singh sent $60 million to outside Tavira Accounts. Those transfers are reflected at **Exhibit F.** $15 million went to French Asset Acquisition LLC, at Tavira Account No. TMC 139, a company for which Maia, Sasha, Hannah, and Asher Sklarov are board members and beneficial owners. Maia Sklarov is the account's authorized signatory. $15 million went to Rising Sun Glory Capital Ltd., at Tavira Account No. TMC 144. *Id*. Sasha Sklarov is those accounts' sole beneficial owner and authorized signatory.

290.   On July 29, 2024, Singh completed the $2,675,000 cash purchase of the Foxhall Road Property.

291.   Between May 15 and September 23, 2024, Singh's -0210 Account wired at least $872,218 to design contractors and engineers to improve Maia Sklarov's Manhattan penthouse. Between August 6 and September 13, 2024, The Singh-Affiliated Accounts wired over $900,000 in illicit funds to outside law firms.

68

292.    Between July and September 2024, Singh sent over $130,000 to PKP, sent nearly $400,000 to his personal American Express accounts, made a cash purchase of the Foxhall Road Property, attempted to buy a second home, purchased a new BMW, and wired at least $45,000 to other Sklarov family members for home improvement projects.

293.    By September 30, 2024, the Jurist IQ account balance was $1000. Singh Law Firm's balance was $1,178,006.73. Singh's Sierra Universal account reflected a balance of $0 by June 8, 2023. Since July 2, 2021 and until September 30, 2024, the same three accounts received at least $752,492,860 in deposits.

294.    Between May 15, 2024 and September 30, 2024, Singh transferred over $1.2 million from Jurist IQ and the -0210 Account into his -1608 Operating Account. By September 30, 2024, after sending hundreds of thousands to recipients like his personal American Express accounts, only $68,760.70 remained. The -1608 account did not transfer any funds back into the Jurist IQ or -0210 Account.

295.    In January 2025, after Plaintiffs filed the Georgia Application, Sasha Sklarov emptied her Discover savings account and scattered over $2 million among five other accounts.

296.    On March 17, 2025, Maia, Sasha, Hannah, and Asher appeared as intervenors in the Monaco proceedings to unfreeze accounts that Tavira froze pursuant to the Freezing Orders in the English Action.

297.    On May 4, 2026, following an April 30, 2026, grand jury indictment now unsealed in this District, federal authorities arrested Sklarov when he was briefly in the United States. The indictment, in the Plaintiffs' opinion, clearly describes Singh's role as Sklarov's co-conspirator, albeit concealing his name.

69

298.    At Sklarov's May 8, 2026 detention hearing, through his attorney, Sklarov asserted that he was in the United States for a second time this year to oversee renovations to the family's home in Lake Forest, Illinois, "where Mr. Sklarov raised his four adult children" that "they've been renovating for the purpose of returning to it." *See, USA v. Sklarov*, No. 26 CR 199-1 (N.D. Ill. May 8, 2026), Tr. at 18:2–14; (*see also id.* at 25:3–6 ("[t]he Lake Forest Home has enormous sentimental value to the family, as it is where Mr. Sklarov raised his first four children and hopes to raise his three minor children."))

299.    The Illinois Court denied Sklarov's release given his history and noted Sklarov's apparent rise from self-described indigency as recently as 2018 and possibility that his children could supply him with financial resources to flee the United States. The Court specifically described "the Government's evidence that family members have profited from the defendant's alleged illegal conduct [ ] coupled with the defendant's strong record of being dishonest with others as well as the Court…").

300.    Discovery is in preliminary stages. Plaintiffs have received only a slice of the account activity for the Defendants, and the Singh-Affiliated Account JPMC records contain numerous entries that do not expressly identify the transferee or purpose. In addition, Plaintiffs have not been afforded discovery into any U.S. accounts held by Hannah or Maia Sklarov, or Julian Orik, and do not know whether they have received an exhaustive list of all of their entities and accounts formed and held throughout the world. Further, Discover Bank records for Asher and Sasha Sklarov show significant account activity involving unknown banks and recipients, suggesting that these individuals have accounts unknown to Plaintiffs. Plaintiffs expect to uncover additional money laundering activity and fraudulent transfers after the opportunity for discovery.

70

***Defendants Operated Through a Racketeering Enterprise,
and Conspired with Its Members to Achieve Collective Aims***

301.    At all relevant times, Singh was employed by or associated with the enterprises of Singh Law Firm, Jurist IQ, Sierra Universal, and Mavus Law Corp. (the "Singh Enterprises"), and directly or indirectly conducted such enterprises' affairs through a pattern of racketeering acts as alleged herein. The Singh Enterprises purport to provide legal and professional services throughout the United States, and participated in interstate and international transfers as alleged herein.

302.    At all relevant times, Singh was employed by or associated with the enterprises America 2030, Astor Asset Management 2 Ltd., Astor 3, Astor Group, Astor Wealth Group, Astor Capital, and Vanderbilt (among others, all listed, for example, in the *Hryn v. Weiser* caption, *supra*. (the "Astor Enterprises"), and directly or indirectly conducted the Astor Enterprises' affairs through a pattern of racketeering acts as alleged herein. The Astor Enterprises purport to provide financial and lending services, and participated in international transfers as alleged herein.

303.    At all relevant times, there existed an enterprise associated-in-fact, comprised of Val Sklarov, Singh, Skachkov, Yuen, Orik, Asher Sklarov, Hannah Sklarov, Maia Sklarov, Sasha Sklarov, Sharon Sklarov, and Tetyana Sklarov, in addition to other as-yet identified persons and entities (such enterprise, the "Syndicate"). The foregoing members of the Syndicate operated this enterprise through a pattern of racketeering acts as alleged herein.

304.    The Syndicate had a common purpose: to induce Plaintiffs and other victims to deliver valuable shares as collateral for a sham loan transaction, to steal and liquidate the shares, route the proceeds through domestic and foreign accounts, and hold the proceeds beyond the reach of victims and law enforcement authorities and kept within the hands of the members of Syndicate.

305.    The Syndicate has close and ongoing relationships among its participants.

71

306. Val Sklarov, who faces litigation for his role in the underlying scheme in the English Action, is a principal at the head of the Syndicate.

307. Singh is Sklarov's attorney and the attorney for entities through which the Syndicate carried out its schemes, including the Astor Enterprises and the Singh Enterprises. As alleged above, Singh and Sklarov have jointly perpetrated similar stock-based lending schemes against other victims since no later than 2019. Singh actively concealed, layered, rerouted, and dissipated funds through the U.S. bank accounts of the Singh Enterprises to Syndicate members. Singh is also the promoter and/or registrant of various sham entities and trusts controlled by Syndicate members and used for money laundering purposes. Singh purports to serve as attorney for certain members of the Syndicate and entities under their control, including Sklarov and the Astor Enterprises.

308. Tetyana Sklarov, who is not a defendant here, is Val Sklarov's wife. She is associated with and/or employed by the Astor Enterprises and helped to carry out its fraudulent communications and schemes. Upon information and belief, Elizaveta Lata and Oksana Hryn are Tetyana Sklarov's daughters.

309. The Sklarov siblings Asher Sklarov, Hannah Sklarov, Maia Sklarov, and Sasha Sklarov are Val Sklarov's children through his first marriage. The Sklarov siblings each actively participated in money laundering and monetary transactions in criminal proceeds, in concert with Singh and Val Sklarov.

310. Additional participants Skachkov, Yuen, and Julian Orik are employees or associates of the Astor Enterprises, each of whom actively sent or participated in communications on behalf of the Astor Enterprises in concert with Val Sklarov, knowing their communications were made using false aliases and under false pretenses. These individuals knew that the Syndicate

72

and the entities through which it operated obtained control over victims' shares and did not have access to legitimate funds needed to lawfully disburse loan proceeds to these victims.

311. Each of the Syndicate members directly, or indirectly through their control or legal or beneficial ownership of sham entities or trusts, received, transferred, held, or converted the proceeds of the Syndicate's schemes.

312. The Syndicate had longevity sufficient to pursue its purpose. The Syndicate established operational, legal, and financial infrastructure in order to perpetrate fraud and money laundering against prior victims. The Syndicate established additional legal entities in early 2021 in preparation for carrying out the scheme that ultimately targeted Plaintiffs. The Syndicate has since continued to set up new entities, trusts, and carry out major financial transactions in stolen and fraudulently obtained funds in order to perpetuate its existence, avoid detection, hinder and delay creditors, and escape justice. The Syndicate's activities continued through the execution of the SLA in July 2021, the subsequent conversion and liquidation of the Collateral Shares, additional closing statements and purported loan disbursements, fraudulent communications and concealments that occurred from 2021 through 2024, and money laundering and transacting in criminal proceeds that occurred from 2021 through the present day. The Syndicate has continued its money laundering and transacting in criminal proceeds despite the entry of the Freezing Order and other litigation activity in the United States, Greece, and Monaco.

313. The members of the Syndicate each formed express agreements to perform otherwise lawful acts in furtherance of the Syndicate members' joint unlawful objective as alleged herein, including an express agreement among the Sklarov siblings Asher, Hannah, Maia, and Sasha to allocate and assign signatory authority for the French Asset entity.

4920-7502-6878 v.1

314.     The agreement among the Syndicate members is also apparent from circumstantial evidence, which shows that each of them, including the Defendants, knew of the general nature of the conspiracy and that the conspiracy extended beyond their individual roles.

315.     **Simultaneous Conduct.** Syndicate members participated in simultaneous coordinated multi-million dollar deposits from Singh-Affiliated Accounts with Sklarov family members and other Syndicate members. Entities used by Asher, Hannah, Maia, and Sasha Sklarov were organized at approximately the same time, in concert with the same attorney, Syndicate member Singh. The Sklarov siblings also formed, maintained, and received deposits in foreign Tavira accounts at roughly the same time.

316.     **Actual Agreements.** In addition to agreements referenced above, the RICO Defendants were also parties to trust instruments used to facilitate transfer and purchase of real property for their benefit.   On information and belief, Singh assisted in the creation of these instruments.

317.     **Continued Transfer with Knowledge of Lawsuits and Prosecutions.** The RICO Defendants continued to retain and transfer criminally derived proceeds after obtaining actual knowledge of lawsuits alleging the fraudulent scheme herein and discovery targeting their account activity. None of the RICO Defendants or Syndicate members returned the proceeds of their scheme after litigation was filed. Instead, for the subsequent account activity disclosed to date, Syndicate members responded to litigation activity by performing significant extraordinary transfers.

318.     **Knowledge Of Wrongdoing and/or Willful Ignorance of Conspicuous Red Flags.** The Sklarov siblings knew or were willfully ignorant of the fact that their activities were consistent with criminal behavior and concealment of assets, and inconsistent with legitimate

74

business activity. As twenty-something young adults, each of the Sklarov siblings knew that establishing foreign shell entities and accounts to do nothing other than receive massive seven- and eight-figure transfers of funds was suspicious and indicative of criminal behavior. They knew that these businesses had no meaningful operations, did not and do not perform services in the countries where they are organized, and that they were not qualified to manage and operate businesses managing millions of dollars in assets. They also knew that they and the entities they formed, roughly at the same time as other Sklarov siblings, provided no reasonably equivalent value in return for transfers received. Their immediate use of funds for luxury cars and other depreciating assets indicated they knew they had not received legitimate investments, and that the money was not legitimately earned.

319. **Relationship Among the Parties.** Singh is an attorney for Val Sklarov and used client IOLTA accounts to disburse funds to Sklarov family members and other members of the syndicate. He orchestrated misconduct perpetrated by Sklarov and other associates under aliases and pretenses that Singh knew to be false. The Sklarov siblings Asher, Hannah, Maia, and Sasha Sklarov are nuclear family members of Val Sklarov, who also perpetrated wire fraud for the Syndicate. This familial relationship provided frequent opportunities for coordination and communication.

320. Likewise, Orik lived in properties owned by the Sklarov family, held himself out as an Astor employee at various times, and observed Sklarov and Singh using false aliases and misrepresenting their familial connections to the Astor family when he knew that was not true. He also had multiple opportunities for observation, communication, and coordination with members of the conspiracy.

4920-7502-6878 v.1

321. For years prior to the scheme directed at Plaintiffs, and at least as far back as 2018, the Syndicate carried out or attempted to carry out similar schemes against other unwitting individuals and entities who wished to monetize their equity holdings through legitimate secured lending transactions. The Syndicate continues to perpetrate money laundering activity and monetary transactions in criminally derived proceeds to this day.

### *Discovery Rule and Timeliness of Plaintiffs' RICO Claims*

322. Plaintiffs' civil RICO claims are timely under the Second Circuit's injury-discovery rule because Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, their RICO injury—the unauthorized diversion and liquidation of the Collateral Shares and the loss or dissipation of proceeds derived from the Collateral Shares—until 2024. The SLA required that Plaintiffs' Collateral Shares remain with an independent custodian and not be traded, transferred, sold, shorted, or otherwise disposed of absent a contractually defined and uncured event of default, and Plaintiffs delivered approximately 7,204,296 Elektra shares in reliance on that custodial structure.

323. Before 2024, Plaintiffs had not discovered, and were not on inquiry notice of, any injury arising out of the stock lending transaction because they reasonably understood that their Collateral Shares remained subject to those custodial protections and transfer restrictions.

324. Plaintiffs did not ignore earlier issues. In September and October 2021, after an apparent issue arose regarding Weiser's handling of certain Collateral Shares, Plaintiffs raised concerns regarding the status and custody of those shares. The Astor Parties, directly and through their intermediaries, reassured Plaintiffs and their representatives that the issue had been corrected and that the Collateral Shares would be returned or had been returned to the proper custodial

76

account. The Astor Parties also reaffirmed that the Collateral Shares remained subject to the SLA's custodial protections and transfer restrictions.

325.    Based on those reassurances and the subsequent custodial statements, Plaintiffs reasonably understood the 2021 issue to have been resolved and did not know that the Collateral Shares were being diverted, liquidated, or routed through undisclosed entities and Singh-linked accounts.

326.    After the Astor Parties made those reassurances and reaffirmed the custodial restrictions, Plaintiffs continued receiving monthly account statements purportedly from Tavira. Those statements falsely represented that Tavira continued to keep the Collateral Shares in custody and in compliance with the SLA and related custodial restrictions. Plaintiffs reasonably relied on those statements in understanding that the Collateral Shares remained preserved in custody.

327.    Plaintiffs also had not yet discovered the core facts later alleged in support of their RICO claims, including the true identities behind the Astor aliases, Vanderbilt's role in the liquidation structure, or Singh and the Singh Entities' use of U.S.-based accounts to handle proceeds.

328.    The first storm warnings suggesting that the Collateral Shares may not have been preserved as represented arose in 2024, when an Elektra shareholders' meeting revealed discrepancies concerning the amount of existing Elektra shares. Plaintiffs then wrote to banks and custodians, including Weiser and Tavira, asking whether the Elektra shares were validly held and reiterating that the SLA and related addenda restricted any disposal or release of the Collateral Shares. Weiser and Tavira did not provide direct substantive answers; instead, Astor 3 sent vague correspondence warning Plaintiffs not to "interfere" with the designated custodians.

4920-7502-6878 v.1

329.    Plaintiffs responded diligently once those storm warnings arose. Plaintiffs' banking representative and Astor-related individuals, including "Gregory Mitchell" and Albert Yuen, exchanged communications concerning the status of the Collateral Shares, but those communications still did not disclose the core facts tying the missing shares to Plaintiffs' RICO injury.

330.    Between July 25 and July 31, 2024, after retaining forensic accountants and investigators and consulting with legal advisers, Plaintiffs first learned about Sklarov and discovered the possibility that he was involved. After reviewing Sklarov's legal history and realizing that they were victims of a possible fraud, Plaintiffs issued press releases and took steps to suspend trading of Elektra shares on the Mexican Stock Exchange.

331.    On August 1, 2024, Tavira finally provided account statements confirming that Tavira had moved the entirety of Plaintiffs' remaining shares into Astor's Tavira account. Plaintiffs immediately commenced emergency proceedings in England and obtained worldwide freezing and proprietary injunctions beginning on August 2, 2024.

332.    Plaintiffs then promptly pursued U.S. discovery to determine where the proceeds had gone and who had received them. On August 23, 2024, Plaintiffs filed an application under 28 U.S.C. § 1782 in the Southern District of New York, which Judge Kaplan granted on September 9, 2024, and Plaintiffs promptly served subpoenas on Singh, Singh Law Firm, Jurist IQ, and JPMC.

333.    On September 16, 2024, Sklarov filed a witness statement in the English Action admitting key facts, including the use of the "Gregory Mitchell" and "Thomas Mellon" aliases, the use of proceeds from the unlawful sale of Plaintiffs' Collateral Shares to fund at least the final loan tranches, and the transmission of more than $270 million in proceeds through Singh, Jurist IQ, and Singh Law Firm accounts.

4920-7502-6878 v.1

334.    On October 18, 2024, JPMC produced nearly 3,000 pages of account records associated with Singh. That production was the first time Plaintiffs could have discovered the detailed scope, structure, and mechanics of the enterprise, including the specific account structure, timing and sequence of the transfers, the routing of proceeds through Singh-linked accounts and entities, the use of attorney trust and operating accounts, the transfers to Maia Sklarov and Sasha Sklarov, and the use of entities including Jurist IQ, Singh Law Firm, Sierra Universal, PKP, ABC LLC, Larisa Lane, and Backett Wood to receive, route, layer, convert, and dissipate proceeds.

335.    Plaintiffs did not ignore storm warnings or sleep on their rights. Before 2024, Plaintiffs did not have inquiry notice of a RICO injury or a triggered duty to investigate the concealed racketeering and laundering structure. Once discrepancies arose in 2024, Plaintiffs promptly sought confirmation from custodians and banks, retained forensic investigators, consulted legal advisers, suspended trading, commenced emergency English proceedings, obtained freezing and proprietary injunctions, and pursued U.S. discovery.

336.    Accordingly, under the Second Circuit's injury-discovery rule, Plaintiffs did not discover, and with reasonable diligence could not have discovered, their RICO injury from the unauthorized liquidation and laundering of the Collateral Shares before late July and August 2024. The September and October 2024 disclosures confirmed the scope, mechanics, participants, account structure, and routing of proceeds through the RICO enterprise. Plaintiffs' RICO claims are therefore timely.

4920-7502-6878 v.1

**FIRST CAUSE OF ACTION—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(C))**

**Against Defendants Singh, Maia Sklarov, and Sasha Sklarov**

337.    Defendants Singh, Sasha Sklarov, and Maia Sklarov (collectively, the "RICO Defendants") conducted the affairs of multiple enterprises through a pattern of racketeering.

**Enterprise**

338.    As above, at all relevant times, Singh and Orik conducted the affairs of the Astor Enterprises.

339.    As above, at all relevant times, Singh conducted the affairs of the Singh Enterprises.

340.    At all relevant times, Defendants Maia Sklarov and Sasha Sklarov were employed by or associated with the enterprises of French Asset Acquisition LLC, Larisa Lane LLC, PKP Industries, Backett Wood LLC, and ABCPHABW62STXYZ LLC (the "Sibling Enterprises"), and directly or indirectly conducted such enterprises' affairs through a pattern of racketeering acts as alleged herein.

341.    At all relevant times, the RICO Defendants were each associated with the enterprise associated-in-fact defined above as the Syndicate.

342.    The Syndicate was separate from each RICO Defendant. Each Defendant was associated with the broader enterprise, but the enterprise itself operated through a larger continuing unit of persons, entities, accounts, aliases, custodians, and shell-company structures that existed and continues to exist apart from any RICO Defendant.

343.    The Syndicate affected interstate and foreign commerce. It used New York-based and other U.S.-based bank accounts, attorney trust accounts, shell entities, international custodians, interstate and foreign wire communications, and transfers throughout the United States, Europe, the Bahamas, Monaco, Mexico, Greece, Ukraine, Hungary, Poland, and other jurisdictions.

80

4920-7502-6878 v.1

**Pattern**

344.    The RICO Defendants conducted the affairs of the enterprises alleged above through a pattern of racketeering activity.

345.    The Syndicate is a long-term association formed among family members and close associates whose regular method and objective of doing business was to perpetrate stock-backed lending frauds and money laundering. The Syndicate's primary purpose is to perpetrate such criminal activity, enrich its members, and abscond with the proceeds. The Syndicate continues to exist for this purpose, and will continue to carry out its unlawful schemes absent relief from a court in the United States.

346.    The enterprises alleged above engaged in repeated acts of wire fraud, money laundering, and monetary transactions in criminal proceeds. The Syndicate carried out similar schemes against other victims prior to their dealings with Plaintiffs. As alleged below, the RICO Defendants operated the Syndicate through multiple interrelated acts of racketeering which shared the same participants, purpose, methods, and results over the course of seven (or more) years, and targeted each of its victims over a period of multiple years at a time. The scheme against Plaintiffs has persisted continuously from 2021 to the present.

### Wire Fraud to Induce the SLA and Obtain the Collateral Shares.

347.    Beginning no later than 2019, the Syndicate devised or intended to devise a scheme to fraudulently induce their victims, including the Plaintiffs, to execute documents granting a purported security interest in the victims' stock collateral. Through this scheme, the Syndicate intended to and did obtain control over such stock collateral by means of false or fraudulent pretenses, representations, and promises.

81

348.    As to the scheme against Plaintiffs, the Syndicate formed and held out the sham Astor Enterprises as a legitimate lending operation, capable of distributing loan proceeds sourced from institutional or family capital, and not Plaintiffs' own property or proceeds of other crimes or frauds. The scheme was designed to build trust in its intended victims by falsely associating the perpetrators with the reputation of the Astor family and the financial backing of the Astor family's celebrated fortune, and by concealing the identities of perpetrators Val Sklarov, Skachkov, and Singh.

349.    At the time of the transactions, Sklarov and Singh were targets of litigation alleging that they had carried out the very stock-based lending scam that they intended to and did carry out against future victims, including Plaintiffs. Plaintiffs would not have conducted business with the Astor Enterprises or any member of the Syndicate had they known that the true identities of the individuals carrying out the transaction.  Due to the scheme, Plaintiffs did not discover Val Sklarov or Singh's involvement until after their property had been delivered, stolen, liquidated, and laundered in the hands of the Syndicate and its members.

350.    In furtherance of this scheme, the Syndicate transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds, including via electronic mail, videoconferencing, telecommunication, websites on the Internet, and other Internet communications.

351.    In furtherance of the scheme, Val Sklarov and Singh formed the Astor Enterprises with the intent of duping victims into believing this entity was affiliated with the Astor family.

352.    Acting as representatives for these Astor Enterprises, the Syndicate expressly represented to Plaintiffs and their representatives that the Astor Enterprises were backed by Astor family wealth.

4920-7502-6878 v.1

353.    Via electronic mail, the Syndicate provided pitch materials containing assurances that the Astor Enterprises were part of a legitimate lending operation with legitimately sourced capital.

354.    Via electronic mail, the Syndicate provided pitch materials assuring Plaintiffs that the Astor Enterprises' business model and past practice was to keep loan collateral safe in the hands of independent financial institutions, such that it could not and would not be unilaterally transferred.

355.    Via electronic mail, the Syndicate provided a Term Sheet that contained false representations and promises as alleged above, including, but not limited to, not accessing, selling, or lending the Collateral Shares.

356.    The Syndicate concealed its past history of establishing sham lending operations to steal the collateral provided as security for the loan, and using the borrower's own property as the source of the "loaned" funds. The Syndicate further concealed that they planned to perpetrate this same scam against the Plaintiffs through the Astor Enterprises.

357.    One of the primary methods of concealment was the Syndicate's use of fictitious personas to obfuscate the true identities of the transacting parties. The Astor Enterprises sent emails and transaction documents that presented "Thomas Mellon" and "Gregory Mitchell" as Astor's representatives for the proposed loan transaction. The personas "Thomas Mellon" and "Gregory Mitchell" do not, in fact, exist. These aliases were used by Skachkov and Val Sklarov, respectively, to communicate with Plaintiffs under false pretenses, and to conceal their true identities. Skachkov and Val Sklarov, of course, knew that their names were not Thomas Mellon and Gregory Mitchell at all relevant times.

4920-7502-6878 v.1

358.    The Syndicate caused to be published press releases and online materials that falsely stated Thomas Mellon was a member of the Astor family. Though the Syndicate has covered its tracks, articles remain online which are illustrative of the false pretenses its members intentionally fostered in the Plaintiffs and other victims. Such articles included the following passage from an article published September 3, 2021:

> Astor Asset Management, in addition to being a top financial company in North America, Asia and Europe, also bears the heavy responsibility of carrying on the family name and legacy.  Thomas Mellon, CEO of Astor Asset Management, is a descendent of the famed Astor family, a fact not lost on the prestigious financier. As Mellon worked his way up to the top of the financial game, he never lost sight of the fact that he stood on the shoulders of giants before him. With a financial legacy dating back 200 years, the Astor name is legendary. That legend comes with privilege, but also carries a great responsibility. Thomas Mellon works tirelessly on behalf of his loyal clients and investors. But it is never far from his mind, that he has a duty also, to live up to the name and the legacy.

359.    The article goes on to trace Thomas Mellon's lineage back to John Jacob Astor, born 1763, and concludes:

> As the CEO of Astor Asset Management, Thomas Mellon has continued the bold legacy built by his ancestors over 200 years ago. In 2013, Mellon led the company through a significant expansion in China, Europe, and North America. Branded initially as Astor Capital Fund, the SEC objected to any abbreviation of the name, so Mellon launched a rebranding in 2020 after posting excellent send quarter growth even amid a pandemic. Today, Mellon is one of the decade's most influential financial leaders.

360.    Syndicate members even caused false public filings to obscure the true identities of its operators. On April 30, 2020, in concert with Sklarov, Singh used means of interstate wire communications to transmit false public filings to the Indiana Secretary of State, representing that the fictitious persona "Thomas Mellon" was the Chief Executive Officer for Astor Capital Fund. The Astor Capital Fund's public records had previously listed Val Sklarov as its Chief Executive Officer.  Singh and Sklarov knew that "Thomas Mellon" did not exist, and knew that Val Sklarov remained in control of the entity.

84

361.    Other members of the Syndicate, including Orik, Skachkov, and Yuen, participated in communications sent to and from the "Thomas Mellon" and "Gregory Mitchell" personas and transmitted documents purportedly authored or signed by these personas, with full knowledge that these individuals did not exist, and that the true identity of the sender and/or recipients were in fact Skachkov and Val Sklarov.

362.    The Syndicate's direct and indirect marketing and public communications to Plaintiffs, in totem, represented that the Astor Enterprises were a legitimate, well-capitalized lending operation, that the Collateral Shares would remain protected by independent custodians, and that the shares would not be sold, transferred, short-sold, or otherwise disposed of absent a defined and uncured event of default. Those representations were false when made. The Syndicate and its members intended to use the Astor Enterprises and their appointed custodians to (i) obtain control over the Collateral Shares, (ii) sell and liquidate the shares, and (iii) use proceeds from the liquidation to fund the purported loan disbursements and ultimately enrich the Syndicate and its members.

363.    In reliance upon the false statements, promises, and representations, Plaintiffs entered into the SLA, delivered the Collateral Shares as security, and performed under the loan facilities.

364.    Singh conducted the affairs of the Syndicate by multiple acts of wire fraud. Singh assisted in establishing the Astor Enterprises, including filing formation documents for the Astor Enterprises and making false representations to governmental authorities regarding the true identities of their owners and operators. Singh drafted legal documents on behalf of the Astor Enterprises with knowledge that the Syndicate had induced Plaintiffs to agree to such document by fraud and false pretenses, and were intended to perpetrate theft. As above, Singh transmitted

85

false statements and filings representing that the fictitious persona "Thomas Mellon" was the legal representative for Astor Capital Fund, when he knew that "Thomas Mellon" did not exist.

365.    Singh further acted as an accomplice to the wire fraud of the Astor Enterprises and the Syndicate by depositing criminal proceeds from these and other crimes into accounts held by law firms under his control. Singh caused the Singh Enterprises to participate in the scheme by depositing the proceeds of the fraud into their accounts, and transferring such proceeds to himself and other Syndicate members.

366.    Julian Orik conducted the affairs of the Astor Enterprises and the Syndicate by directly sending and receiving electronic communications through his Astor email account, holding out Gregory Mitchell as a real person when he was not, holding out Thomas Mellon as a real person when he was not, and holding himself out as an employee of a legitimate lending operation when he knew that this was not the case.

**Wire Fraud and Money Laundering to Effectuate and Conceal the Unauthorized Transfer and Liquidation of the Collateral Shares.**

367.    Beginning no later than 2019, by means of false or fraudulent pretenses, representations, and promises, the Syndicate devised or intended to devise a scheme to fraudulently obtain control over and liquidate property, including Plaintiffs' stock.

368.    The Syndicate used wire communications, custodial instructions, and account transfers to misappropriate the Collateral Shares away from the accounts where the Astor Enterprises represented they were held.

369.    In October 2021, the Syndicate caused Astor 3 to issue an unlawful entitlement order for the transfer of 935,913 shares held by Weiser to Astor Capital, an entity controlled by one or more members of the Syndicate.  Astor Capital was not disclosed to Plaintiffs as an entity with any authorized role in the transaction.

86

370.    On September 10 and October 5, 2021, Plaintiffs received an alert from the custodian of the account, Weiser, that it had received an order to transfer such shares to Astor Capital. In response to Plaintiffs' inquiry to Weiser and the Astor Enterprises, the Syndicate caused the Astor Enterprises to transmit emails stating that the collateral was not sold, that the alert was made in error, and indicating that collateral would not be transferred or sold in the future. The intent of these communications was to avoid detection and defray legal action which could have prevented the liquidation of the shares.

371.    From 2021 to 2024, the Syndicate used the artifice of multiple foreign and domestic entities to transfer and liquidate the Collateral Shares, without the knowledge or consent of the Plaintiffs. The unauthorized transfers generated nearly $360 million in proceeds for the Syndicate.

372.    Egregiously, the Syndicate used at least some of the proceeds obtained from the unlawful disposition of the Collateral Shares to fund loan disbursements to Plaintiffs, despite Astor 3's representations that loan proceeds would be funded from Astor 3's own assets.

373.    Acting through the Astor Enterprises, the Syndicate induced Plaintiffs to authorize additional disbursements on the fraudulently induced loan facility, under the false pretenses that the monies disbursed to Plaintiffs would come from capital legitimately belonging to the Astor Enterprises, and that the Collateral Shares remained intact.

374.    By doing so, the Syndicate generated additional receivables by "loaning" Plaintiffs proceeds from the unauthorized sale of Plaintiffs' own property, in order to obtain additional sums from Plaintiffs. At the time, the Syndicate knew that it had sold the collateral to fund the "loan," that the monies disbursed by the Astor Enterprises were really just proceeds of property stolen from the Plaintiffs and not properly rightfully belonging to the Astor Enterprises, and that the Astor

87

Enterprises would not, and would not be able to, return the Collateral Shares whether or not Plaintiffs "repaid" this sham "loan."

375.    In order to maintain the ruse that the loan facility was legitimate and continue extracting payments from Plaintiffs, these facts were intentionally concealed, and not disclosed to Plaintiffs at any time prior to late July 2024.

376.    Singh engaged in multiple acts of wire fraud to carry out this scheme through the Astor Enterprises, Singh Enterprises, and the Syndicate. Singh prepared documents intended to cause Tavira, the financial institution in custody of the Collateral Shares, to relinquish control over this property and transfer it to the Astor Enterprises, as evidenced by, among other materials, instruction sheets to wire funds to Jurist IQ located by Plaintiffs' representatives and seen in exhibits submitted in similar litigation against Singh and Sklarov. Singh helped establish Vanderbilt in anticipation of facilitating the liquidation of the shares, and concealing that this had occurred. Singh also orchestrated and directed a complicated web of transactions intended to rapidly liquidate the Collateral Shares among the Astor Enterprises without the knowledge or consent of the Plaintiffs, the rightful owner of such shares.

377.    In June and July 2024, after Plaintiffs pressed Weiser, Tavira, and Astor for information about the Collateral Shares, the Astor Enterprises and the Syndicate used wire communications to deflect Plaintiffs' questions and maintain control over the proceeds.

378.    On July 26, 2024, in response to inquiries regarding the status of the Collateral Shares, Weiser and Tavira sent suspicious email responses refusing meetings and directing Plaintiffs to communicate concerns to the Astor Enterprises the lender.  On information and belief, Singh authored, edited, or sent those communications.

88

379.    On July 27, 2024, Yuen and Astor 3 sent further wire communications rejecting Plaintiffs' attempt to prepay the purported balance under the SLA.

380.    On July 30, 2024, Astor 3 issued a purported notice of default which falsely accused Plaintiffs of breaching the SLA, asserted the right to accelerate the debt, demanded default interest, and threatened litigation in England, concealing the nature and extent of the liquidation that had occurred years prior to these notices.

381.    Singh participated in this predicate act, on information and belief, by authoring, editing, or sending the above communications on behalf of the Astor Enterprises and in furtherance of the Syndicate's fraud and money laundering scheme.

382.    Julian Orik participated in the foregoing email communications in concert with Sklarov and Singh.

### Money Laundering from Foreign Accounts To US-Based JP Morgan Chase Accounts

383.    After obtaining funds from the fraudulent sale of Plaintiffs' Collateral Shares, the Syndicate, acting through the Singh Enterprises, in an operation orchestrated by Singh and the active participation of Val Sklarov and the Sklarov siblings Asher Sklarov, Hannah Sklarov, Maia Sklarov, and Sasha Sklarov, laundered more than $271 million in proceeds to various members of the Syndicate and engaged in multiple monetary transactions in criminal proceeds over $10,000.

384.    From 2021 to 2024, across 16 individual transactions, the Syndicate transferred approximately $271 million to JP Morgan Chase Accounts in the United States held by the Singh Law Firm and Jurist IQ. Each of these transactions represented a withdrawal from a financial institution and corresponding deposit to a financial institution in an amount greater than $10,000.00.

4920-7502-6878 v.1

385.    Singh caused these funds to be deposited into the accounts of Singh Law Firm and Jurist IQ, including client IOLTA accounts, with knowledge that the funds were the proceeds of a criminal wire fraud scheme, as he perpetrated that scheme with other members of the Syndicate.

386.    Singh deposited these criminally derived proceeds with Jurist IQ and Singh Law Firm with the intent to thereafter transfer these proceeds to accounts held personally in the names of members of the Syndicate, accounts in the names of entities which Syndicate members controlled, and accounts controlled by trusts or other entities naming the Syndicate members as beneficiaries.

387.    The Singh Enterprises were a key mechanism by which the Syndicate converted the Collateral Shares into cash, layered the proceeds through controlled accounts, concealed the source of the monies, and impaired Plaintiffs' ability to trace and recover their property and related claims.

388.    With the intent to use the entity and account as a conduit for criminal activity, Singh formed Jurist IQ on January 7, 2021, and opened a Jurist IQ attorney trust account at J.P. Morgan Chase in New York on January 11, 2021.

389.    With the intent to use the entity and account as a conduit for criminal activity, Singh maintained the Singh Law Firm account at J.P. Morgan Chase in New York.

390.    With the intent to use the entity and account as a conduit for criminal activity, Singh opened an account for Sierra Universal at J.P. Morgan Chase in New York on December 20, 2020.

391.    Singh maintained and controlled multiple accounts through the Singh Enterprises, and transferred funds among these accounts before ultimately transferring the funds to Syndicate members. Singh had signatory authority over these accounts and actively orchestrated and participated in the deposit of these funds with the intent to thereafter distribute them to members

90

of the Syndicate. These transfers lacked a legitimate business purpose, and were intended to delay or impair the detection, source, and tracing of the criminal proceeds of the Syndicate's wire fraud schemes.

**Money Laundering From US Accounts to US Syndicate Members and Their Domestic and Foreign Fictitious Shell Entities and Trusts.**

392.    RICO Defendants conducted the affairs of the enterprises identified herein, including the Syndicate, by using wires and financial accounts to create, operate, and hold out fictitious or controlled entities as legitimate commercial entities, when in reality they operated primarily for the purpose of receiving, concealing, and disbursing criminal proceeds for the benefit of the Syndicate and its members.

393.    By the time Plaintiffs were negotiating and performing under the SLA, the Syndicate collectively built a complex financial infrastructure ready to receive and conceal proceeds of the anticipated liquidation. That infrastructure included (1) establishing an account for Singh Law Firm in 2019 at or around the time Val Sklarov and Singh were sued by another victim for theft of stock collateral, (2) opening the Sierra Universal account, (3) forming Vanderbilt, and (4) forming Jurist IQ and opening the Jurist IQ account in January 2021.

394.    Due to the conduct of the RICO Defendants and Syndicate members, the Syndicate came to form and control shell entities and Sklarov family linked shell companies, including the Sibling Enterprises, to deposit proceeds of the fraudulent scheme and convert proceeds into real estate and other assets. The RICO Defendants caused these entities to open new accounts which were spread all over the world, and across dozens of domestic and foreign accounts, entities, and trusts.

91

395.    Singh assisted in the formation of these entities, including corporate records and filings to install members of the Syndicate as managers, directors, or authorized representatives, with knowledge and intent to use these entities to transact in and conceal criminal proceeds.

396.    The Sklarov siblings Asher, Hannah, Maia, and Sasha Sklarov each signed documents and granted Singh authority to establish these entities, install them as directors and authorized signatories, and provided or granted access to information needed to transfer funds to these accounts.

397.    The Sklarov siblings Asher, Hannah, Maia, and Sasha Sklarov also coordinated their activities, and expressly agreed to allocate authority and control over jointly owned entities and trusts to facilitate the money laundering scheme.

398.    Having acted in concert to establish this complex web of entities and accounts, the RICO Defendants caused the Singh Enterprises to transfer substantially all of the approximately $271.7 million in funds initially transferred to the Singh-Affiliated Accounts on to dozens of persons, entities, and accounts, across more than 1,200 individual transactions.

399.    Singh caused the Singh Enterprises to withdraw these proceeds, and deposit the funds to the personal bank accounts of Singh, Val Sklarov, Asher Sklarov, Hannah Sklarov, Maia Sklarov, Sasha Sklarov, Julian Orik, Tetyana Sklarov, and other Syndicate members.

400.    As an intended result of his participation in the scheme, Singh also laundered money held in the Singh-Affiliated Accounts to himself and other entities under his control.

401.    Singh also transferred approximately $38.89 million held in Jurist IQ's accounts to Mavus Law Corp., a Colorado legal services firm. Singh formed this entity in or around 2022, after the commencement of the stock lending fraud scheme against the Plaintiffs. Public records show

92

4920-7502-6878 v.1

that Singh served as the sole initial director of Mavus Law Corp., and permitted the state law reporting requirements for Mavus to lapse in 2023.

402.    On June 17, 2024, Singh caused Mavus to file a statement curing such delinquency, in order to reinstate the entity as a business in good standing. On June 26, 2024, Singh then opened an account in the name of Mavus Law Corp. In the following months, Singh caused Jurist IQ and Singh Law Firm to deposit criminal proceeds in the newly formed Mavus Law Corp. account. According to public records, Singh filed articles of dissolution for Mavus Law Corp. in December 2024, just months after consummating these deposits and withdrawals. There was no legitimate business purpose for these transfers, which did not return reasonably equivalent value to Jurist IQ.

403.    Maia Sklarov conducted the affairs of the Syndicate by repeated money laundering activity from at least 2021 through the present day, including by setting up sham entities with the assistance of Singh, agreeing to accept criminally derived proceeds withdrawn from the Jurist IQ and Singh Law Firm accounts, and depositing such proceeds to her personal accounts and the accounts held by sham entities she controlled legally or beneficially, and acquiring property or paying debts by use of funds held in the Singh-Affiliated Accounts, knowing that no reasonably equivalent value was exchanged.

404.    These deposits included the transfers over period 2021 to 2024 shown on Exhibit C.

405.    Sasha Sklarov conducted the affairs of the Syndicate by repeated money laundering activity from at least 2021 through the present day, including by setting up sham entities with the assistance of Singh, agreeing to accept criminally derived proceeds withdrawn from the Jurist IQ and Singh Law Firm accounts, and depositing such proceeds to her personal accounts and the accounts held by sham entities she controlled legally or beneficially, and acquiring property or

93

paying debts by use of funds held in the Singh-Affiliated Accounts, knowing that no reasonably equivalent value was exchanged.

406. These deposits included the transfers over period 2021 to 2024 shown on Exhibit D.

407. Hannah Sklarov conducted the affairs of the Syndicate by repeated money laundering activity from at least 2021 through the present day, including by setting up sham entities with the assistance of Singh, agreeing to accept criminally derived proceeds withdrawn from the Singh-Affiliated Accounts, depositing such proceeds to her personal accounts and the accounts held by sham entities she controlled legally or beneficially, and acquiring property or paying debts by use of funds held in the Singh-Affiliated Accounts, knowing that no reasonably equivalent value was exchanged.

408. These deposits included the transfers over period 2021 to 2024 shown on Exhibit B.

409. Asher Sklarov conducted the affairs of the Syndicate by repeated money laundering activity from at least 2021 through the present day, including by setting up sham entities with the assistance of Singh, agreeing to accept criminally derived proceeds withdrawn from the Jurist IQ and Singh Law Firm accounts, and depositing such proceeds to his personal accounts and the accounts held by sham entities he controlled legally or beneficially, and acquiring property or paying debts by use of funds held in the Singh-Affiliated Accounts, knowing that no reasonably equivalent value was exchanged.

410. These deposits included the transfers over period 2021 to 2024 shown on Exhibit A.

94

411.    Julian Orik conducted the affairs of the Syndicate by repeated money laundering activity from at least 2021 through the present day, including by setting up sham entities with the assistance of Singh, agreeing to accept criminally derived proceeds withdrawn from the Jurist IQ and Singh Law Firm accounts, and depositing such proceeds to his personal accounts and the accounts held by sham entities he controlled legally or beneficially, and acquiring property or paying debts by use of funds held in the Singh-Affiliated Accounts, knowing that no reasonably equivalent value was exchanged.

412.    These deposits included the transfers over period 2021 to 2024 shown on Exhibit E.

413.    The RICO Defendants' transfers were intended to and did conceal ownership and control of the proceeds, impair tracing, frustrate enforcement of Plaintiffs' claims, impair and/or destroy the value of state and federal claims against the initial transferees of the criminal proceeds, Jurist IQ and Singh Law Firm, and preserved the benefits of the scheme for the Syndicate, including the RICO Defendants themselves.

<u>**Monetary Transactions Involving Property Derived from Criminal Activity.**</u>

414.    Under 18 U.S. Code § 1957, "[w]hoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)." This section applies where the offense "takes place in the United States" or "takes place outside the United States . . . but the defendant is a United States person." 18 U.S.C. § 1957(d). A "monetary transaction" means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . ."

4920-7502-6878 v.1

415.    JP Morgan Chase is a domestic, federally chartered bank.

416.    Discover Bank is a domestic, federally chartered bank.

417.    Tavira is a foreign bank which is engaged in the business of banking.

418.    Weiser is a foreign bank which is engaged in the business of banking.

419.    On information and belief, each of the personal bank accounts of the members of the Syndicate are institutions that engage in the business of banking in the United States or overseas.

420.    Each of the RICO Defendants is a citizen of the United States. Each of the RICO Defendants conducted the affairs of the Syndicate through multiple violations of section 1957.

421.    From 2021 to 2025, RICO Defendant Singh caused the Singh Enterprises to perform hundreds withdrawals exceeding $10,000 from the Singh-Affiliated Accounts. From 2021 to 2024, Singh caused the Singh Enterprises to perform dozens of deposits exceeding $10,000 from the Singh-Affiliated Accounts into other Singh-Affiliated Accounts, his personal accounts, and the accounts of Mavus Law Corp. Singh conducted these transfers in concert with Val Sklarov, the Sklarov siblings Asher, Hannah, Maia, and Sasha Sklarov, and other Syndicate members.

422.    From at least 2021 to 2025, RICO Defendant Sasha Sklarov knowingly engaged in multiple monetary transactions in criminally derived property. Sasha Sklarov was an active participant in these transactions, as she provided personal and business account details, set up foreign and domestic entities with no legitimate business operations, managed and operated those entities, signed documents and granted authority necessary to open accounts for the purpose of receiving criminal funds.

4920-7502-6878 v.1

423.    Sasha Sklarov's pattern of illegal depository transactions included each of the deposits alleged above.

424.    According to Plaintiffs' investigation to date, Sasha Sklarov thereafter caused repeated withdrawals of more than $10,000.00 in monies traceable to these criminal proceeds. Between January 13 and 21, 2025, Sasha Sklarov withdrew and transferred at least $2 million out of her Discover account over the course of five separate transactions, to as-yet-unknown recipients, each of which exceeded $10,000.00.

425.    On information and belief, Sasha Sklarov continues to withdraw known criminal proceeds from accounts under her control, and will continue to do so unless otherwise ordered by a court in the United States.  Discovery is necessary to determine the full nature and extent of Sasha Sklarov's subsequent withdrawal of criminally derived proceeds.

426.    From at least 2021 to 2024, RICO Defendant Maia Sklarov knowingly engaged in multiple monetary transactions in criminally derived property. Maia Sklarov was an active participant in these transactions, as she provided personal and business account details, set up foreign and domestic entities with no legitimate business operations, managed and operated those entities, signed documents and granted authority necessary to open accounts for the purpose of receiving criminal funds.

427.    Maia Sklarov's pattern of illegal depository transactions included each of the deposits alleged above. These transactions included each of the deposits alleged above.

428.    On information and belief, Maia Sklarov continues to withdraw known criminal proceeds from accounts under her control, and will continue to do so unless otherwise ordered by a court in the United States. Discovery is necessary to determine the full nature and extent of Maia Sklarov's subsequent withdrawal of criminally derived proceeds.

4920-7502-6878 v.1

429. From at least 2021 to 2024, Hannah Sklarov knowingly engaged in multiple monetary transactions in criminally derived property. Hannah Sklarov was an active participant in these transactions, as she provided personal and business account details, set up foreign and domestic entities with no legitimate business operations, managed and operated those entities, signed documents and granted authority necessary to open accounts for the purpose of receiving criminal funds.

430. Hannah Sklarov's pattern of illegal depository transactions included each of the deposits alleged above. On information and belief, Hannah Sklarov continues to withdraw known criminal proceeds from accounts under her control, and will continue to do so unless otherwise ordered by a court in the United States. Discovery is necessary to determine the full nature and extent of Hannah Sklarov's subsequent withdrawal of criminally derived proceeds.

431. From at least 2021 to 2024, Asher Sklarov knowingly engaged in multiple monetary transactions in criminally derived property. Sklarov was an active participant in these transactions, as he provided personal and business account details, set up foreign and domestic entities with no legitimate business operations, managed and operated those entities, signed documents and granted authority necessary to open accounts for the purpose of receiving criminal funds.

432. Asher Sklarov's pattern of illegal depository transactions included each of the deposits alleged above. He also subsequently withdrew these proceeds in or around the following dates and times:

      a. From January to March 2022, Asher Sklarov withdrew $107,000.

      b. From April to June 2022, Asher Sklarov withdrew $373,500.91.

      c. In July 2022, Asher Sklarov withdrew $27,000.

      d. In November 2022, Asher Sklarov withdrew $226,000.

4920-7502-6878 v.1

e.    In December 2022, Asher Sklarov withdrew $297,000.

f.    Also in December 2022, Asher Sklarov wired $500,000.00 to an unknown destination.

g.    Between January and March 2023, Asher Sklarov withdrew $344,363.37.

h.    In April 2023, Asher Sklarov withdrew $129,000.

i.    In February 2024, Asher Sklarov withdrew $106,000.

j.    In April 2024, Asher Sklarov withdrew $76,000.

k.    In July 2024, Asher Sklarov withdrew $11,000.

l.    In August 2024, Asher Sklarov withdrew $12,000.

m.    In October 2024, Asher Sklarov withdrew $22,000.

433.    On information and belief, Asher Sklarov continues to withdraw known criminal proceeds from accounts under his control, and will continue to do so unless otherwise ordered by a court in the United States. Discovery is necessary to determine the full nature and extent of Asher Sklarov's subsequent withdrawal of criminally derived proceeds.

434.    From at least 2021 to 2024, Julian Orik knowingly engaged in multiple monetary transactions in criminally derived property. Orik was an active participant in these transactions, as he provided personal and business account details and signed documents and granted authority necessary to open accounts for the purpose of receiving criminal funds. This pattern of unlawful depository transactions included each of the deposits alleged above. On information and belief, Julian Orik subsequently withdrew known criminal proceeds from accounts under his control, and will continue to do so unless otherwise ordered by a court in the United States. Discovery is necessary to determine the full nature and extent of Orik's subsequent withdrawal of criminally derived proceeds.

## RICO Injury

435.    Plaintiffs were injured in their business or property by reason of Defendants' violations of 18 U.S.C. § 1962. Plaintiffs' RICO injury includes the impairment of their state-law legal and equitable claims against Jurist IQ and the Singh Law Firm, including the pending state law claims against Jurist IQ and the Singh Law Firm for fraudulent transfer, constructive trust, equitable lien, equitable accounting, and unjust enrichment. RICO Defendants' racketeering conduct also directly impaired Plaintiffs' restitutionary interest in funds recoverable from Jurist IQ and Singh Law Firm. The RICO Defendants' conduct hindered, delayed, and impaired Plaintiffs' efforts to recover or restrain the transfer or dissipation of specific, identifiable proceeds which were held and subject to freezing and forfeiture in U.S.-based accounts.

436.    The RICO injury pled here concerns the impairment of claims and restitution interests in specific funds, accounts, and assets located in the United States, including New York-based accounts controlled by Jurist IQ and Singh Law Firm. The racketeering activity alleged herein damaged Plaintiffs' property interests in state-law claims and equitable rights directed at Jurist IQ and Singh Law Firm, and the identifiable U.S. accounts, assets, and properties through which they received, routed, layered, dissipated, and concealed traceable proceeds.

437.    The racketeering acts proximately caused Plaintiffs' injury. The predicate acts enabled Jurist IQ and Singh Law Firm to perform transfers that form the basis of Plaintiffs' impaired claims and equitable remedies, absent which Jurist IQ and Singh Law Firm would have retained $271.7 million in funds to satisfy U.S. judgments against them.

438.    The racketeering acts also caused Plaintiffs to incur significant litigation, investigation, and attorney fee expense in multiple proceedings in the United States, including in

4920-7502-6878 v.1

connection with a concurrent action being filed in another district against other Syndicate members.

439.    Plaintiffs are entitled to recover the damages caused by the RICO Defendants' misconduct, including without limitation the value of the impairment of Plaintiffs' legal and equitable claims against Jurist IQ and Singh Law Firm, and any amounts that could have been recovered in a legal or equitable action against those entities but for the RICO violations, and their investigation and litigation expenses, together with treble damages, costs, attorneys' fees, equitable relief, and all other relief permitted under law.

## SECOND CAUSE OF ACTION - RICO Conspiracy (18 USC § 1962(d))
### Against Singh, Maia Sklarov, and Sasha Sklarov

440.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

441.    Each of the RICO Defendants agreed among them and with other members of the Syndicate to conduct the affairs of multiple enterprises, including the Astor Enterprises, the Singh Enterprises, and the Syndicate, through a pattern of racketeering activity.

442.    The RICO Defendants each formed express agreements to perform otherwise lawful acts in furtherance of the Syndicate members' joint unlawful objective as alleged herein, including an express agreement among the Sklarov siblings Asher, Hannah, Maia, and Sasha to allocate and assign signatory authority for the French Asset entity.

443.    As described above, the unlawful agreement of the RICO Defendants is also apparent from circumstantial evidence, which shows that each RICO Defendant knew of the general nature of the conspiracy and that the conspiracy extended beyond their individual roles.

444.    Based on the above facts and Plaintiffs information and belief, the RICO Defendants knew of and agreed to the general criminal objective of the jointly undertaken schemes

perpetrated by the Syndicate, and the members thereof who conducted the affairs of the enterprises alleged herein through a pattern of racketeering activity. Further, on the same basis, there existed an affirmative or tacit agreement by and among the RICO Defendants and other members of the Syndicate to (1) collectively engage in a pattern of laundering funds and transact in criminal proceeds through the Syndicate, or (2) to perform otherwise lawful acts such as purchasing real estate, establishing trusts, opening and maintaining bank accounts, and organizing corporate entities in furtherance of Singh and Val Sklarov's unlawful pattern of racketeering through the Astor Enterprises, the Singh Enterprises, and the Syndicate.

445.    Each of the RICO Defendants performed an overt act in furtherance of their agreement to conduct the affairs of multiple RICO enterprises, including the Syndicate, in each case as alleged herein.

446.    Each of the RICO Defendants is joint and severally liable for the injuries caused by other defendants and non-parties in furtherance of their conspiracy to violate RICO.

447.    As a result of the RICO conspiracy alleged herein, Plaintiffs suffered injury to their business or property, including the impairment of Plaintiffs' United States legal and equitable claims and interests against Jurist IQ and Singh Law Firm and the accounts and property held by them, and have incurred litigation, investigation, and attorney fee expense in multiple proceedings in the United States, including a concurrent action being filed in another district against other Syndicate members.

448.    Plaintiffs are entitled to recover the damages caused by Syndicate's misconduct, including without limitation the value of the impairment of Plaintiffs' legal and equitable claims against Jurist IQ and Singh Law Firm, and any amounts that could have been recovered in a legal or equitable action against those entities but for the RICO violations, and their investigation and

102

litigation expenses, together with treble damages, costs, attorneys' fees, equitable relief, and all other relief permitted under law.

## THIRD CAUSE OF ACTION—AIDING AND ABETTING FRAUD
### All Defendants

449. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

450. An underlying fraud was committed against Plaintiffs, including the fraudulent inducement of Plaintiffs to enter the stock-backed lending transaction and deliver their Collateral Shares based on materially false representations regarding the custody, protection, and permitted the use and sale of those shares, before swiftly disposing of the proceeds through Defendants' network of collaborators.

451. Beginning no later than March 2021, and continuing through at least July 2024, Defendants' co-conspirators, led by Sklarov, knowingly participated in and furthered a scheme to induce Plaintiffs to enter into, continue performing under, and expand their obligations under the stock-backed lending transaction at issue (the "SLA"), by causing Plaintiffs to believe that they were dealing with a legitimate lending operation, legitimate counterparties, and legitimate supporting entities that would honor the restrictions governing Plaintiffs' Collateral Shares. Among other things, Defendants' co-conspirators, adopted, transmitted, or advanced material misrepresentations and omissions to Plaintiffs concerning: (i) the legitimacy and identity of the purported Astor lending entities and the individuals acting on their behalf, including the use of the false identities "Gregory Mitchell" and "Thomas Mellon"; (ii) the representation that Plaintiffs' 7,204,296 Elektra shares would remain segregated, protected, and not sold, transferred, or otherwise disposed of absent a contractually defined and uncured event of default; (iii) the representation that the collateral would be held by an independent custodian subject to the

103

governing restrictions; and (iv) the legitimacy and role of entities inserted into the transaction and its payment structure, including, but not limited to, Sierra Universal, as purportedly proper and lawful participants in the SLA process.

452. These representations and omissions were false when made. As alleged herein, the purported Astor entities were fronts for Sklarov's fraudulent enterprise; the identities "Gregory Mitchell" and "Thomas Mellon" were aliases used in the negotiations to create false legitimacy. Indeed, Sklarov admitted that Singh knew they were using these aliases before or during the course of the fraud. Further, before Plaintiffs delivered their Collateral Shares, Defendants had already begun establishing the domestic financial infrastructure used to receive, route, and conceal proceeds of the anticipated liquidation of shares stolen through their fraud operation, including by registering Singh Law Firm in New York in June 2020, creating Sierra Universal accounts in December 2020, forming Jurist IQ on January 7, 2021, and opening a Jurist IQ attorney trust account at J.P. Morgan Chase on January 11, 2021. Sasha Sklarov was among several family members to create new accounts around the same time, opening, for example, a Discover Bank account in September 2021 where her co-conspirators immediately transferred money that included Plaintiffs' stolen funds.

453. Plaintiffs reasonably relied on representations by Defendants' co-conspirators', including Sklarov, in entering into the SLA, delivering 7,204,296 Elektra shares as collateral, in continuing to perform under the SLA, and in refraining from taking earlier protective action based on their understanding that the SLA involved legitimate counterparties, legitimate custodial protections, and legitimate entities participating in the handling of loan-related funds. This included falsified account statements attesting to the location and preservation of the loan collateral.

104

454. Sklarov and Defendants' other co-conspirators—and Defendants themselves—knew these representations and omissions were false and acted with scienter. Their knowledge is evidenced by, among other things, Val Sklarov's later admission he and his associates were using fake names to induce Plaintiffs into entering the SLA. Downstream collaborators, like the Defendants here, similarly demonstrate through their contemporaneous conduct that the scheme was never meant to honor the SLA's custodial terms from the beginning. Defendants' pre-transaction creation of entities and accounts used to receive and conceal proceeds; their role in registering, and controlling shell entities associated with the Astor network; the later insertion of Sierra Universal into the payment information for the SLA by or before February 16, 2022; the use of Jurist IQ and Singh Law Firm accounts to process more than $270 million in proceeds generated from the unauthorized sale of Plaintiffs' Collateral Shares; and Sklarov's later admission that proceeds from those unlawful sales funded at least the final three tranches of the very loan principal for which Plaintiffs' shares were supposed to serve only as collateral.

455. Sklarov and Defendants' other co-conspirators, provided Plaintiffs with monthly account statements after October 2021 to falsely reassure Plaintiffs that Tavira was properly holding the Collateral Shares in the applicable custodial accounts, inducing their reliance on the same statements and damaging them as Defendants' co-conspirators methodically sold the Collateral Shares and scattered the proceeds—primarily to and through the Defendants.

456. Defendants' co-conspirators intended that Plaintiffs rely on these misrepresentations and omissions in entering into the SLA and delivering their Collateral Shares, thereby enabling Defendants and their co-conspirators to obtain control over and liquidate those shares and launder their proceeds.

4920-7502-6878 v.1

457. As a direct and proximate result of Plaintiffs' reliance on the foregoing misrepresentations and omissions, Plaintiffs were induced to part with valuable property and to expose themselves to massive loss. After Plaintiffs delivered their Collateral Shares, those shares were wrongfully diverted beginning on or about July 27, 2021, transferred through undisclosed affiliated entities, liquidated for more than $350 million in proceeds, and the resulting proceeds were routed through accounts associated with Defendants and other affiliated individuals and entities, rather than preserved in accordance with the SLA.

458. Plaintiffs suffered damages in an amount to be determined at trial, including, without limitation, loss of the proceeds derived from the unauthorized liquidation of the Collateral Shares and disposal of their proceeds, and the continued frustration of Plaintiffs' recovery efforts caused by Defendants' laundering, concealment, and dissipation of the proceeds through the network of accounts, expenditures, and other downstream locations.

459. Defendants Singh, Jurist IQ, Singh Law Firm, Maia Sklarov, Sasha Sklarov, PKP Industries, ABC LLC, Backett Wood, and Larisa Lane had actual knowledge of that underlying fraud and provided substantial assistance to advance, conceal, and prolong it.

460. Each Entity Defendant just listed was run and operated by Singh, with knowing assistance and participation by Defendants like Maia and Sasha Sklarov, and as such they cannot overcome the knowledge requirement here.

461. Singh, Jurist IQ, and Singh Law Firm had actual knowledge of the fraud because they established, controlled, and used the domestic financial infrastructure through which proceeds of the unauthorized liquidation of Plaintiffs' Collateral Shares were received, routed, layered, preserved, and dissipated; inserted Sierra Universal into the as a beneficiary to the SLA; and

106

processed more than $400 million in proceeds generated from the unlawful sale of the Collateral Shares.

462.    Upon information and belief, Maia Sklarov channeled substantial proceeds derived from the unlawful liquidation of Plaintiffs' Collateral Shares through multiple financial accounts in her name, including $3,085,500 transferred over fifty transactions to domestic accounts, as well as more than $5 million to international accounts in her name at Tavira. Maia Sklarov also received the benefit of, and participated in the management, improvement, and occupation of, the nearly $6.5 million Manhattan penthouse that she, with Singh and others, acquired and improved with substantial proceeds traceable to the Plaintiffs' stolen shares.

463.    Upon information and belief, Sasha Sklarov likewise received substantial proceeds derived from the unlawful liquidation of Plaintiffs' Collateral Shares through multiple accounts in her name, including at least $3,030,407 across over fifty domestic transactions, in addition to more than $5 million sent to foreign accounts associated with her name at Tavira.

464.    Upon information and belief, Sasha Sklarov was also the sole beneficial owner and authorized signatory of Rising Sun Glory Capital Limited and a beneficial owner of French Asset Acquisition LLC. These entities received approximately $32 million from Jurist IQ and Singh Law Firm.

465.    The volume, frequency, structure, and timing of these transfers—including the use of multiple accounts, repeated receipt of large sums from Singh-controlled channels, movement of funds into foreign entities, and the subsequent dissipation of funds into real estate, travel, luxury purchases, and additional accounts—support the allegation that Maia Sklarov and Sasha Sklarov had actual knowledge that the funds they received and controlled were proceeds of the underlying fraud. Account activity indicates both Maia and Sasha Sklarov maintained a purposeful role in the

money laundering operation to disperse and secret stolen funds, further evidencing their actual knowledge.

466. The Entity Defendants likewise had actual knowledge of the fraud through the knowledge of the persons who owned, controlled, operated, or used them, including Singh and members of the Sklarov family. Those entities did not merely exist in parallel to the fraud; they functioned as vehicles to receive, hold, transfer, improve, sell, and conceal traceable proceeds, including through title-holding arrangements, shell-company accounts, and real-estate ownership structures funded with proceeds of the Collateral Shares.

467. The Defendants provided substantial assistance to the fraud by creating and operating the account-and-entity infrastructure necessary to receive and distribute proceeds traceable to the theft of the Collateral Shares; routing millions through attorney trust and related accounts to confer an appearance of legitimacy and to obscure the source of funds; paying collaborators and participants who facilitated the transaction; transferring funds to insider recipients and shell entities; and converting traceable proceeds into real estate, precious metals, payment-card balances, and other assets, all of which materially advanced, concealed, and prolonged the fraud and hindered Plaintiffs' recovery efforts.

468. That infrastructure was used contemporaneously with key stages of the fraud, including to immediately distribute proceeds to the Defendants, who willingly processed and further laundered the funds, as evidenced by their conscious activity in bank accounts and real estate purchases, and to fund an army of expensive and, at times, dubious legal representatives to handle the inevitable reaction to the Syndicate's latest fraud, and appear to have managed the ongoing creation of new accounts and corporate registrations for the primary actors in the underlying theft and sale of the Collateral Shares.

4920-7502-6878 v.1

469.    Singh, Jurist IQ, and Singh Law Firm provided especially substantial assistance because, without their accounts, entities, payment mechanisms, and transaction management, the proceeds of the unauthorized liquidation of Plaintiffs' Collateral Shares could not have been received, layered, redistributed, and dissipated in the manner alleged herein. Their assistance included, among other things, routing funds to Sklarov family members and affiliates, paying participants such as Skachkov, Orik, and Enness, and transferring the proceeds into domestic and foreign accounts and assets outside the scope of the SLA.

470.    Maia Sklarov, Sasha Sklarov, and the Entity Defendants likewise provided substantial assistance by receiving, controlling, redistributing, and converting proceeds derived from the unlawful liquidation of Plaintiffs' Collateral Shares through accounts and assets under their names or control, thereby enabling further layering, concealment, and dissipation of those proceeds and frustrating Plaintiffs' ability to trace and recover their property.

471.    The Defendants' participation was a substantial factor in allowing the fraud to be executed, concealed, and prolonged in the manner alleged herein.

472.    As a direct and proximate result of Defendants' aiding and abetting the underlying fraud, Plaintiffs suffered hundreds of millions of dollars in damages, including the loss of their Collateral Shares, the proceeds derived therefrom, and the additional harm caused by the concealment, laundering, and dissipation of those proceeds through the defendants' accounts, entities, and assets.

## FOURTH CAUSE OF ACTION—CONSPIRACY TO COMMIT FRAUD
### All Defendants

473.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

4920-7502-6878 v.1

474.    An underlying fraud was committed against Plaintiffs, including the fraudulent inducement of Plaintiffs to enter into the SLA and deliver their Collateral Shares based on materially false representations and omissions regarding the identity and legitimacy of the purported lending parties, the custody and protection of the Collateral Shares, and the conditions under which those shares could be transferred, sold, or otherwise disposed.

475.    At all relevant times, there existed an enterprise associated-in-fact, comprised of the Val Sklarov, Singh, Skachkov, Yuen, Orik, Asher Sklarov, Hannah Sklarov, Maia Sklarov, Sasha Sklarov, Sharon Sklarov, and Tetyana Sklarov, in addition to other as-yet identified persons and entities (such enterprise, the "Syndicate"). The foregoing members of the Syndicate operated this enterprise through a pattern of racketeering acts as alleged herein.

476.    The Syndicate had a common purpose: to induce Plaintiffs and other victims to deliver valuable shares as collateral for a sham loan transaction, to steal and liquidate the shares, route the proceeds through domestic and foreign accounts, and hold the proceeds beyond the reach of victims and law enforcement authorities and kept within the hands of the members of Syndicate.

477.    Defendants Singh, Jurist IQ, Singh Law Firm, Maia Sklarov, Sasha Sklarov, ABC LLC, PKP Industries, Backett Wood, and Larisa Lane acted in concert and as the Syndicate in which Singh and his entities established and controlled the financial infrastructure used to receive and route proceeds; Maia Sklarov and Sasha Sklarov received, held, and transferred substantial traceable proceeds through accounts under their control; and ABC LLC, PKP Industries, Backett Wood, and Larisa Lane functioned as entity vehicles used to hold, transfer, and convert such proceeds, including into real property in New York, Virginia, Colorado, Texas, and Illinois, in addition to various international purchases.

110

478.    The object of the conspiracy was to induce Plaintiffs to deliver valuable stock collateral based on false representations regarding its custody and protection, thereafter unlawfully divert, liquidate, and monetize that collateral, and distribute and conceal the resulting proceeds through a network of accounts, family members, and affiliated entities.

479.    Each of the Defendants knowingly and intentionally joined this agreement with awareness of its essential nature and purpose and with the intent to advance its unlawful objectives.

480.    In furtherance of the conspiracy, the Defendants undertook coordinated overt acts, including, among others: (i) the formation of entities like Jurist IQ and various sham entities and accounts with dubious names like "Astor," "Vanderbilt," and "Rothschild;" (ii) the establishment and maintenance of attorney trust and related accounts used to receive and route funds; (iii) transfers of millions between and among the Defendants, as evidenced at length in records subpoenaed to date and admissions by individuals including Sklarov himself; (iv) use of precious metal accounts and investments (Singh), payment cards (Singh, Singh Law Firm, Sasha Sklarov) and real estate purchases and improvements (all Defendants) to launder illicit proceeds and prevent their recovery; and (v) the rushed disposal of assets upon legal action by Plaintiffs (all Defendants).

481.    These overt acts were interdependent and coordinated and reflect the Defendants' intentional participation in a continuous and unified scheme in which each Defendant played a role in facilitating, advancing, or concealing the fraudulent objectives of the conspiracy.

482.    As a direct and proximate result of Defendants' agreement, overt acts, and intentional participation in the furtherance of the fraudulent scheme, Plaintiffs sustained millions of dollars in damages, including the loss of their Collateral Shares, the proceeds derived therefrom, and the continued concealment and dissipation of those proceeds.

111

**FIFTH CAUSE OF ACTION—ACTUAL FRAUDULENT TRANSFER OF ASSETS/VOIDABLE TRANSFER (N.Y. Debt. & Cred. Law § 273 *et seq.*)**
**All Defendants**

483.    Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through 321, and 366 to 433 as if fully set forth herein.

484.    Plaintiffs are creditors of Val Sklarov, Singh, the Astor Enterprises, and the Singh Enterprises (collectively, "Debtors") in that they have claims for compensatory damages in excess of $450 million against each of them arising from the liquidation of the Collateral Shares, including punitive damages, treble damages, interest, and attorney fees. Plaintiffs have asserted claims against Val Sklarov and the Astor Entities overseas. Plaintiffs are simultaneously asserting these claims against Asher Sklarov, Hannah Sklarov, and Julian Orik in a parallel sister action brought in the Northern District of Illinois.

485.    At the moment Debtors took possession of the Collateral Shares, they incurred contingent obligations to return such Collateral Shares intact, giving rise to a claim against them for at least the value of such property, which exceeded $450 million.

486.    Upon the unauthorized diversion, liquidation, and withholding of Plaintiffs' Collateral Shares and the proceeds thereof, Debtors incurred obligations to pay damages to Plaintiffs and equitable obligations to retain the criminally derived proceeds and return same to Plaintiffs. Specifically, the Singh Enterprises held collectively more than $271 million in funds rightfully belonging to Plaintiffs and which were available to satisfy their debts and the debts of the Debtors.

487.    Plaintiffs held and hold claims against the persons and entities liable on those claims and are creditors within the meaning of N.Y. Debt. & Cred. Law § 273 *et seq*. The persons and entities liable on those claims, and who transferred or caused the transfer of assets traceable

4920-7502-6878 v.1

to Plaintiffs' Collateral Shares and the proceeds thereof, are Debtors within the meaning of the statute, arising, in part, from the underlying fraud.

488.    An English Court already determined that a good and arguable case exists that Defendants' associates, including Val Sklarov, used fake names and a sham corporate pedigree to fraudulently induce Plaintiffs into the SLA through negotiations taking place between March and July 2021 to outline the terms and conditions of that lending agreement. Sklarov admitted his and Aleksei Skachkov's use of fake names in a witness statement to the English Court in negotiating the SLA.

489.    Due to the COVID-19 pandemic, all meetings were remote, over email, video calls, messaging applications, or phone calls, and terms were negotiated both directly with Plaintiffs and through intermediaries with authority to negotiate those terms.

490.    Defendants' associates who perpetrated the underlying fraud, including Sklarov, exchanged term sheets with Plaintiffs' and their intermediaries, including twice in May 2021, first affirming that the Astor Parties would not sell or short sell the Collateral Shares, and subsequently that they would not lend, sell, or short sell the Collateral Shares.

491.    In reliance on Defendants' associates' representations and reassurances, Plaintiffs surrendered the Collateral Shares under the terms of the SLA and related addenda, without knowing that the entire fraud design was eventually for the Astor Group to sell the shares through collaborators, pay most of the loan principal with those stolen proceeds, and immediately send the rest to be laundered through U.S. accounts, the starting point being Singh, Jurist IQ, and Singh Law Firm.

492.    Plaintiffs voiced initial concerns between September and October 2021 based on noncompliance with the lending terms by Weiser, the first custodian appointed under the SLA,

113

and the Astor Group reassured Plaintiffs and their representatives that they remedied the issue, replaced Weiser with Tavira, reiterated the terms outlining the restrictions on accessing the Collateral Shares, and provided Plaintiffs with monthly account statements that falsely confirmed compliance with those restrictions.

493.    Defendants' associates' intent through these ongoing efforts to reassure Plaintiffs was to induce their continued reliance on their fraudulent representations so they could continue to sell the Collateral Shares and scatter the proceeds on a gradual basis and without detection, thus permitting their downstream co-conspirators in the same syndicate, including Defendants, to perfect the dissipation of Plaintiffs' assets.

494.    When Plaintiffs' concerns emerged again in 2024, Defendants' associates strung Plaintiffs' representatives along for weeks under the veneer of legitimate business discussions before contriving a phony default event to "transfer" the entire corpus of the Collateral Shares. In truth, Defendants used the additional time to sell as many of the remaining Collateral Shares and rapidly launder the proceeds.

495.    The immediate harm was unmistakable, forcing Plaintiffs to suspend trading, launch litigation, and face billions in eventual losses for the resulting market shock, all while facing the loss of over $400 million in their common stock.

496.    Plaintiffs were immediately the "creditor" and Defendants and their associates the "debtors." The application of those terms are hardly esoteric, by October of 2024, an English Court held, among other findings, that Sklarov and his "Astor Group" entities, the primary, "upstream" debtors, conceded through an asset disclosure that but for the underlying fraud, he had no assets. Sklarov and his collaborators' scheme to pay the bulk of the Plaintiffs' putative loan principal by

114

selling Plaintiffs' own Collateral Shares further reinforces why the fraud automatically established Plaintiffs as the creditor in this dispute.

497. In late April 2026, a federal grand jury reached a similar result and federal authorities secured an indictment to arrest Sklarov for wire fraud and other offenses arising from the same scheme. The indictment, in the Plaintiffs' opinion, clearly describes Singh's role as Sklarov's co-conspirator, albeit concealing his name.

498. These circumstances unquestionably tainted any downstream proceeds of the syndicate's scheme as immediately voidable as the spoils of an unmistakable fraud.

499. Singh, Singh Law Firm, and Jurist IQ, to say nothing of their likely expanded operational role in the underlying fraud scheme, directly drew funds from the same custodial brokers to serve as the fulcrum for the broader money-laundering operation and enterprise. These defendants methodically cycled the same funds among a nefarious constellation of shells companies and members of the syndicate—themselves, at best, insiders to the scheme. These included every Entity Defendant, who either served to launder, hide, and spend the illicit funds, or to take ownership or operational and legal control over the real estate havens in which the syndicate reposed millions in funds.

500. The JPMC Records, specifically those records for the -5152, -0210, -1608, and Sierra Universal accounts, indicate that these entities, among others, existed for the sole purpose of managing and laundering the illicit proceeds of the syndicate's fraud operation. Their gratuitous benefits for "managing" the fraud's U.S. banking function were without valid consideration. Any transaction processed by, through, and for them is accordingly voidable, and thus to any recipients.

501. While Plaintiffs commenced investigation and then litigation against Sklarov and the other members of the syndicate in July and August 2024, Defendants like Singh laundered tens

115

of millions in illicit funds to himself escape the Plaintiffs as creditors, and to secret millions more on behalf of others in the syndicate. The result was drawing his accounts down to almost nothing, thus rendering Singh Law Firm and Jurist IQ insolvent.

502.    Defendants Backett Wood, Larisa Lane, and ABC LLC exist for the sole purpose of maintaining the Backett Wood Property, Kitty Joe Property (among prior real estate), and the NY Penthouse, respectively. Because each Defendant, through Singh, secured these properties and the means for any related improvements or expenses through the receipt of illicit funds traceable to Plaintiffs' unlawfully liquidated Collateral Shares, these transactions are void but for that unlawful and knowing receipt, accordingly rendering each Defendant also insolvent.

503.    Singh, who reported in 2021 on car loan paperwork that his income was well below enough to earn the $4.5 million Sklarov admitted Singh probably stole—through information apparently supplied by Singh—and let alone the $10–15 million that limited, current records confirm Singh reposed into his American Express accounts, his non-trust firm accounts, Apmex accounts, his 401k, the Foxhall Road, Backett Wood, Trump Tower, and Sheridan Properties, and Defendant PKP Industries, was and is knowingly unable to pay the "debts" owed to Plaintiffs as the unlawful recipient and hidden architect of the money laundering scheme that extracted at least $271 million through Singh's accounts.

504.    Finally, Maia and Sasha Sklarov and their siblings, who were either young professionals or college students during the 2021–2024 period at issue, enjoyed ownership and control over the NY Penthouse, where Maia Sklarov spent over a million in design improvements in increasing speed as creditors closed in, expensive New York City rental properties, and what Sasha Sklarov's Discover account indicates a lifestyle spend exceeding five figures a month for non-essentials like clothing and travel. Under no plausible circumstances were any of the Sklarov

116

Siblings able to sustain their lifestyle and residences without incurring the underlying debt, i.e. the illicit proceeds they knowingly helped launder and spend arising from the underlying fraud.

505.    Maia and Sasha Sklarov each received gratuitous payments through Singh, as noted in the Figures above and in Exhibits C and D counting their domestic accounts alone, which they knowingly laundered and disposed of with clinical discipline.

506.    On information and belief, Debtors also owed obligations to other third-party creditors, including third-party victims of other fraudulent schemes perpetrated by them as described herein.

507.    Debtors nonetheless caused Jurist IQ, Singh Law Firm, and Sierra Universal to transfer all of the at least $271 million in criminally-derived proceeds, pursuant to the money laundering scheme alleged above.

508.    At the time of each of the transfers, Jurist IQ, Singh Law Firm, and Sierra Universal were insolvent as their obligations to Plaintiffs exceeded $1 billion, and their assets available for distribution to creditors were less than $300 million.

509.    Further, under N.Y. Debt. & Cred. Law § 271(c) "Assets under this Section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this Act." All or virtually all of the property in the hands of Debtors Jurist IQ, Singh Law Firm, and Sierra Universal was transferred, concealed, or removed with intent to hinder, delay, or defraud creditors and was transferred in a manner making the transfer voidable, as Jurist IQ and Singh Law Firm also did not provide reasonably equivalent value to the Astor Entities in return for such property.  Accordingly, Debtors Jurist IQ, Singh Law Firm, and Sierra Universal had no or virtually no "assets" for purposes of determining their solvency at the time of each transfer to the

117

Defendants, and such Debtors owed debts to Plaintiffs of an amount at least equal to or exceeding the amount they received from Astor Entities and/or each other as a result of such transfers.

510. As a result of each of the transfers, Jurist IQ, Singh Law Firm, and Sierra Universal were rendered insolvent, as at a minimum they owed obligations to Plaintiffs to return the full amount of criminally derived proceeds within their possession, and after distributing such proceeds, were left with insufficient capital to repay such obligations.

511. Defendant Maia Sklarov is an insider of the Debtors, as she is the daughter of Val Sklarov, who owns and/or controls the Astor Entities.

512. Defendant Sasha Sklarov is an insider of the Debtors, as she is the daughter of Val Sklarov, who owns and/or controls the Astor Entities.

513. PKP Enterprises, named after Singh's wife, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's total control in which to process and keep criminally-derived proceeds.

514. Backett Wood, named after Singh's home, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's total control in which to repose and keep criminally-derived proceeds in real estate investments.

515. ABC LLC, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's control in which to repose and keep criminally-derived proceeds in real estate investments in New York City, such as the NY Penthouse.

516. Larisa Lane, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's control in which to repose and keep criminally-derived proceeds in real estate investments in New York City, such as Hannah Sklarov's prior home at the Woodside Property and current home at the Kitty Joe Property.

118

4920-7502-6878 v.1

517.   Hannah Sklarov is an insider of the Debtors, as she is the daughter of Val Sklarov, who owns and/or controls the Astor Entities.

518.   Asher Sklarov is an insider of the Debtors, as he is the son of Val Sklarov, who owns and/or controls the Astor Entities.

519.   Julian Orik is an insider of the Debtors, as he is an employee of the Astor Entities and one of the principal operators of their fraudulent schemes.

520.   At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred approximately $8,540,975.60 to Defendant Maia Sklarov across 68 transactions. A list of these transfers is attached as Exhibit C.

521.   Maia Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

522.   At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $62,000,000.00 to accounts for sham entities owned or controlled by Defendant Maia Sklarov. A list of these transfers is attached as Exhibit F.

523.   Neither Sasha Sklarov nor her sham entities provided reasonably equivalent value in exchange for any of the transfers.

524.   At the time Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred approximately $8,380,406.73 to Defendant Sasha Sklarov across approximately 64 transactions. A list of these transfers is attached as Exhibit C.

525.   Sasha Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

119

526.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $32,000,000.00 to accounts for sham entities owned or controlled by Defendant Sasha Sklarov. A list of these transfers is attached as Exhibit F.

527.    Neither Sasha Sklarov nor her sham entities provided reasonably equivalent value in exchange for any of the transfers.

528.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred approximately $8,486,315.00 to Hannah Sklarov across 61 transactions. A list of these transfers is attached as Exhibit B.

529.    Hannah Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

530.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $32,000,000.00 to accounts for sham entities owned or controlled by Defendant Hannah Sklarov. A list of these transfers is attached as Exhibit F.

531.    Neither Hannah Sklarov nor her sham entities provided reasonably equivalent value in exchange for any of the transfers.

532.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $7,480,910.99 to Asher Sklarov across 59 transactions. A list of these transfers is attached as Exhibit A.

533.    Asher Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

534.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $32,000,000.00 to accounts for sham entities owned or controlled by Defendant Asher Sklarov. A list of these transfers is attached as Exhibit F.

120

4920-7502-6878 v.1

535.    Neither Asher Sklarov nor his sham entities provided reasonably equivalent value in exchange for any of the transfers.

536.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal . transferred $1,272,119.78 to Julian Orik across 137 transactions. A list of these transfers is attached as Exhibit E.

537.    Julian Orik did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

538.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $116,000.00 to accounts for sham entities owned or controlled by Defendant Julian Orik.  A list of these transfers is attached as Exhibit H.

539.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $10,239,563.81 to Singh's American Express accounts across 113 transactions.

540.    Singh did not provide reasonably equivalent value to the Astor Enterprise debtors in exchange for any of the transfers.

541.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $1,426,068.70 to PKP Industries across 67 transfers.

542.    PKP Industries did not provide reasonably equivalent value to the Singh Entities debtors in exchange for any of the transfers.

543.    On October 27, 2023 and December 15, 2023, Singh Law Firm transferred $95,000 to *At World Properties LLC Escrow* and $1,760,000, to "*Chicago Title And Trust Company Ref: 23Gnd378176Vh/50 S Sheridan, Lake Forest,*" respectively.

4920-7502-6878 v.1

544. At World Properties LLC Escrow and Chicago Title and Trust Company did not provide reasonably equivalent value to the Singh Entities debtors in exchange for either of these transfers.

545. On October 31, 2023, Singh Law Firm transferred $515,000 with the reference including "*Property: 401 N Wabash Ave Unit 81D Chicagobuyer: Sklarov Family* and on November 14, 2023 transfer $103,000 with the reference including "*401 N Wabashave Unit 81D Chicago Sklarov Family Trust*," and on December 6, 2023, Singh wired $1,416,334.75 additional funds with the reference "*401 North Wabash Avenue, #81D*," and another $46,000 payment concerning the same address.

546. The Sklarov Family Trust did not provide reasonably equivalent value to the Singh Entities debtors in exchange for either of these transfers.

547. At the time the Debtors were insolvent, on March 23, 2023, the Singh Law Firm Account wired Backett Wood $1,124,631.79 with the memo line "7402 Backett Woodterr."

548. At the time the Debtors were insolvent, Singh Law Firm transferred at least $608,938.49 to buy the Foxhall Road Property for Singh $2,675,000 on July 29, 2024.

549. The Singh Entities did not provide reasonably equivalent value to the Astor Enterprise debtors in exchange for the these two transfers.

550. At the time the Debtors were insolvent, February 2023, Singh Law Firm transferred $967,500 with "*Gilmartin Poster & Shafto Llp Ref: Deposit For 62 West 62ND Street*" included in the memo, and on May 23, 2023 Singh Law Firm wired a separate $5,543,278.10 payment with the reference including "*Purchase of 62W 62 Street*," including for ABC LLC and Maia Sklarov's benefit, along with over $1.2 million in design and renovation expenses to William Suk Architecture and Dutchman contracting across 13 transactions between 2023 and 2024.

4920-7502-6878 v.1

551.    ABC LLC and Maia Sklarov did not provide reasonably equivalent value to the Singh Entities debtors in exchange for any of the transfers.

552.    At the time the Debtors were insolvent, on October 2022, the Singh Law Firm Account wired $1,062,738.81 to "*First American Title Insurance Comp…File Number 2684947-1534*," for the purchase of the Woodside Drive Property on behalf of Larisa Lane and, upon information and belief, for Hannah Sklarov's ownership and benefit.

553.    Larisa Lane and Hannah Sklarov did not provide reasonably equivalent value to the Singh Entities debtors in exchange for any of the transfers.

554.    Debtors made each of the foregoing transfers with the actual intent to hinder, delay, or defraud creditors, including Plaintiffs.

555.    As above, the Debtors were insolvent at the time of each of the transfers.

556.    As above, the Debtors did not receive reasonably equivalent value in exchange for any of the transfers.

557.    As above, the transfers were made to insiders.

558.    The transfers were made after Debtors were sued or threatened with suit. As alleged above, Val Sklarov and Singh were subjected to multiple lawsuits prior to the transfers to Defendants. Further, Debtors caused Jurist IQ to transfer to Mavus Law Corp. more than $38 million after Debtors faced litigation and later anticipated suit by Plaintiffs for conversion of their Collateral Shares, in return for no reasonably equivalent value.

559.    Debtors Jurist IQ, Singh Law Firm, and Sierra Universal transferred substantially all of their assets as a collective result of the fraudulent transfers made to Defendants and other Sklarov Syndicate conspirators.

123

560.    Debtor Val Sklarov absconded to foreign countries and evaded United States jurisdiction for many years until he was captured and indicted in May 2026.

561.    As alleged above, Debtors removed or concealed assets via a criminal money laundering scheme.

562.    As alleged above, transfers to Defendants were made shortly after Debtors incurred the debts to Plaintiffs, including immediately after the Debtors liquidated the Collateral Shares and created an immediate obligation to pay damages as a result, and within weeks or months after Debtors Jurist IQ, Singh Law Firm, and Sierra Universal received criminal proceeds from the stock based lending scam, and thereby incurred an obligation to pay and/or return such proceeds to Plaintiffs.

563.    Plaintiffs suffered damages as a proximate result of the foregoing fraudulent transfers, as the transfers rendered the Singh Enterprises with inadequate capital to pay the full amount of Plaintiffs' claims.

564.    Singh, Singh Law Firm, and Jurist IQ's notations to characterize certain transfers as "consultancy" fees, including for Singh and his entities themselves, are, at best, attempts at sham consideration that only highlight the total lack of consideration each Defendant exchanged for their receipt of the Traceable Proceeds. The fraudulent nature of the syndicate's operation negates any putative consideration cited by these Defendants.

565.    Additional badges of fraud are present, including, among others: (i) transfers to insiders, including family members and affiliated entities; (ii) the use of attorney trust accounts and controlled entities, including Jurist IQ, Singh Law Firm, and ABC LLC, to route and obscure transactions; (iii) the structuring of transfers across thousands of transactions and multiple financial institutions; (iv) the conversion of liquid proceeds into real property and other assets; and

124

(v) the continued movement and dissipation of funds following the initiation of legal proceedings and injunctive relief.

566. There is no plausible scenario where any Defendant possessed assets that were at all comparable to the underlying collateral. Again, Sklarov's admission that he and his collaborators used the Collateral Shares themselves to fund, at least, the last three tranches of the loan's collateral establishes this point. In other words, Defendants' primary co-conspirators otherwise lacked the assets to otherwise incur the payment obligation they owed. Second, in the event that rehypothecation of Plaintiffs' shares did not fund the distribution of the SLA principal for the first two loan tranches, Plaintiffs reasonably believe that Sklarov—who attested to being insolvent and on the verge of homelessness in 2018—and his collaborators used the proceeds of other fraud schemes like those detailed herein to fund and underwrite these initial tranches. Singh and his firms appear to rely entirely on Sklarov and their joint fraud operation as a sole client and income source. Their subsequent, potentially non-recoverable expenditures will overcome any independent funds or income Singh and his firms can access from other sources.

567. Finally, Defendants Sasha and Maia Sklarov, like their siblings, stepsiblings, parents, and stepparents, would similarly have little to no assets in relation to the debts incurred from the underlying transaction.

568. Stated otherwise, funds in Maia and Sasha Sklarov's possession and their residences are traceable to proceeds from Sklarov and the Syndicate's fraud, at least in part, including after English Action began and other subpoenas issued in Plaintiffs' New York Application, and will exceed any assets they obtained or earned from other sources.

569. Plaintiffs are entitled to avoidance of fraudulent transfers and other relief with respect to assets traceable to such transfers.

**SIXTH CAUSE OF ACTION—CONSTRUCTIVE FRAUDULENT TRANSFER OF ASSETS/VOIDABLE TRANSFER (N.Y. Debt. & Cred. Law § 274 *et seq.*)—**
**All Defendants**

570.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 and 468–569 as if fully set forth herein.

571.    Plaintiffs are creditors of Val Sklarov, Singh, the Astor Enterprises, and the Singh Enterprises (collectively, "Debtors") in that they have claims for compensatory damages in excess of $450 million against each of them arising from the liquidation of the Collateral Shares, including punitive damages, treble damages, interest, and attorney fees. Plaintiffs have asserted claims against Val Sklarov and the Astor Entities overseas. Plaintiffs are simultaneously asserting these claims against Asher Sklarov, Hannah Sklarov, and Julian Orik in a parallel sister action brought in the Northern District of Illinois.

572.    At the moment Debtors took possession of the Collateral Shares, they incurred contingent obligations to return such Collateral Shares intact, giving rise to a claim against them for at least the value of such property, which exceeded $450 million.

573.    Upon the unauthorized diversion, liquidation, and withholding of Plaintiffs' Collateral Shares and the proceeds thereof, Debtors incurred obligations to pay damages to Plaintiffs and equitable obligations to retain the criminally derived proceeds and return same to Plaintiffs. Specifically, the Singh Enterprises held collectively more than $271 million in funds rightfully belonging to Plaintiffs and which were available to satisfy their debts and the debts of the Debtors.

574.    Plaintiffs held and hold claims against the persons and entities liable on those claims and are creditors within the meaning of N.Y. Debt. & Cred. Law § 274 *et seq*. The persons and entities liable on those claims, and who transferred or caused the transfer of assets traceable

126

to Plaintiffs' Collateral Shares and the proceeds thereof, are Debtors within the meaning of the statute.

575.    On information and belief, Debtors also owed obligations to other third party creditors, including third party victims of other fraudulent schemes perpetrated by them as described herein.

576.    Debtors nonetheless caused the Singh Enterprises to transfer all of the at least $271 million in criminally-derived proceeds Sklarov and Singh admit were transferred through the Singh Enterprises, pursuant to the money laundering scheme alleged above.

577.    As a result of each of the transfers, the Singh Enterprises were rendered insolvent, as at a minimum they owed obligations to Plaintiffs to return the full amount of criminally derived proceeds within their possession, and after distributing such proceeds, were left with insufficient capital to repay such obligations.

578.    Further, under N.Y. Debt. & Cred. Law § 271(c) "Assets under this Section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this Act." All or virtually all of the property in the hands of Debtors Jurist IQ, Singh Law Firm, and Sierra Universal was transferred, concealed, or removed with intent to hinder, delay, or defraud creditors and was transferred in a manner making the transfer voidable, as Jurist IQ and Singh Law Firm also did not provide reasonably equivalent value to the Astor Entities in return for such property.  Accordingly, Debtors Jurist IQ, Singh Law Firm, and Sierra Universal had no or virtually no "assets" for purposes of determining their solvency at the time of each transfer to the Defendants, and such Debtors owed debts to Plaintiffs of an amount at least equal to or exceeding the amount they received from Astor Entities and/or each other as a result of such transfers.

127

579.    As a result of each of the transfers, Jurist IQ, Singh Law Firm, and Sierra Universal were rendered insolvent, as at a minimum they owed obligations to Plaintiffs to return the full amount of criminally derived proceeds within their possession, and after distributing such proceeds, were left with insufficient capital to repay such obligations.

580.    Defendant Maia Sklarov is an insider of the Debtors, as she is the daughter of Val Sklarov, who owns and/or controls the Astor Entities.

581.    Defendant Sasha Sklarov is an insider of the Debtors, as she is the daughter of Val Sklarov, who owns and/or controls the Astor Entities.

582.    PKP Enterprises, named after Singh's wife, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's total control in which to process and keep criminally-derived proceeds.

583.    Backett Wood, named after Singh's home, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's total control in which to repose and keep criminally-derived proceeds in real estate investments.

584.    ABC LLC, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's control in which to repose and keep criminally-derived proceeds in real estate investments in New York City, such as the NY Penthouse.

585.    Larisa Lane, is an insider of the Debtors, as it operates as a shell company affiliate under Singh's control in which to repose and keep criminally-derived proceeds in real estate investments in New York City, such as Hannah Sklarov's prior home at the Woodside Property and current home at the Kitty Joe Property.

586.    Hannah Sklarov is an insider of the Debtors, as she is the daughter of Val Sklarov, who owns and/or controls the Astor Entities.

4920-7502-6878 v.1

587.    Asher Sklarov is an insider of the Debtors, as he is the son of Val Sklarov, who owns and/or controls the Astor Entities.

588.    Julian Orik is an insider of the Debtors, as he is an employee of the Astor Entities and one of the principal operators of their fraudulent schemes.

589.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred approximately $8,540,975.60 to Defendant Maia Sklarov across 68 transactions.  A list of these transfers is attached as Exhibit C.

590.    Maia Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

591.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $62,000,000.00 to accounts for sham entities owned or controlled by Defendant Maia Sklarov. A list of these transfers is attached as Exhibit F.

592.    Neither Sasha Sklarov nor her sham entities provided reasonably equivalent value in exchange for any of the transfers.

593.    At the time Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred approximately $8,380,406.73 to Defendant Sasha Sklarov across approximately 64 transactions.  A list of these transfers is attached as Exhibit C.

594.    Sasha Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

595.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $32,000,000.00 to accounts for sham entities owned or controlled by Defendant Sasha Sklarov. A list of these transfers is attached as Exhibit F.

129

596.    Neither Sasha Sklarov nor her sham entities provided reasonably equivalent value in exchange for any of the transfers.

597.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred approximately $8,486,315.00 to Hannah Sklarov across 61 transactions.  A list of these transfers is attached as Exhibit B.

598.    Hannah Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

599.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $32,000,000.00 to accounts for sham entities owned or controlled by Defendant Hannah Sklarov. A list of these transfers is attached as Exhibit F.

600.    Neither Hannah Sklarov nor her sham entities provided reasonably equivalent value in exchange for any of the transfers.

601.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $7,480,910.99 to Asher Sklarov across 59 transactions. A list of these transfers is attached as Exhibit A.

602.    Asher Sklarov did not provide reasonably equivalent value to such Debtors in exchange for any of the transfers.

603.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred $32,000,000.00 to accounts for sham entities owned or controlled by Defendant Asher Sklarov.  A list of these transfers is attached as Exhibit F.

604.    Neither Asher Sklarov nor his sham entities provided reasonably equivalent value in exchange for any of the transfers.

605.    At the time they were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal .

transferred $1,272,119.78 to Julian Orik across 137 transactions. A list of these transfers is

attached as Exhibit E.

606.    Julian Orik did not provide reasonably equivalent value to such Debtors in

exchange for any of the transfers.

607.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra

Universal transferred $116,000.00 to accounts for sham entities owned or controlled by Defendant

Julian Orik.  A list of these transfers is attached as Exhibit H.

608.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra

Universal transferred $116,000.00 to accounts for sham entities owned or controlled by Defendant

Julian Orik.  A list of these transfers is attached as Exhibit H.

609.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra

Universal transferred at least $10,239,563.81 to Singh's American Express accounts across 113

transactions.

610.    Singh did not provide reasonably equivalent value to the Astor Enterprise debtors

in exchange for any of the transfers.

611.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra

Universal transferred at least $1,426,068.70 to PKP Industries across 67 transfers.

612.    PKP Industries did not provide reasonably equivalent value to the Singh Entities

debtors in exchange for any of the transfers.

613.    On October 27, 2023 and December 15, 2023, Singh Law Firm transferred $95,000

to *At World Properties LLC Escrow* and $1,760,000, to "*Chicago Title And Trust Company Ref:*

*23Gnd378176Vh/50 S Sheridan, Lake Forest,*" respectively.

4920-7502-6878 v.1

614.    At World Properties LLC Escrow and Chicago Title And Trust Company did not provide reasonably equivalent value to the Singh Entities debtors in exchange for either of these transfers.

615.    On October 31, 2023, Singh Law Firm transferred $515,000 with the reference including "*Property: 401 N Wabash Ave Unit 81D Chicagobuyer: Sklarov Family* and on November 14, 2023 transfer $103,000 with the reference including "*401 N Wabashave Unit 81D Chicago Sklarov Family Trust*," and on December 6, 2023, Singh wired $1,416,334.75 additional funds with the reference "*401 North Wabash Avenue, #81D*," and another $46,000 payment concerning the same address.

616.    The Sklarov Family Trust did not provide reasonably equivalent value to the Singh Entities debtors in exchange for either of these transfers.

617.    At the time the Debtors were insolvent, on March 23, 2023, the Singh Law Firm Account wired Backett Wood $1,124,631.79 with the memo line "7402 Backett Woodterr."

618.    At the time the Debtors were insolvent, Singh Law Firm transferred at least $608,938.49 to buy the Foxhall Road Property for Singh $2,675,000 on July 29, 2024.

619.    The Singh Entities did not provide reasonably equivalent value to the Astor Enterprise debtors in exchange for these two transfers.

620.    At the time the Debtors were insolvent, Jurist IQ, Singh Law Firm, and Sierra Universal transferred at least $608,938.49 to buy the Foxhall Road Property for $2,675,000 on July 29, 2024.

621.    At the time the Debtors were insolvent, February 2023, Singh Law Firm transferred $967,500 with "*Gilmartin Poster & Shafto Llp Ref: Deposit For 62 West 62ND Street*" included in the memo, and on May 23, 2023 Singh Law Firm wired a separate $5,543,278.10 payment with

4920-7502-6878 v.1

the reference including "*Purchase of 62W 62 Street*," including for ABC LLC and Maia Sklarov's benefit, along with over $1.2 million in design and renovation expenses to William Suk Architecture and Dutchman contracting across 13 transactions between 2023 and 2024.

622.    ABC LLC and Maia Sklarov did not provide reasonably equivalent value to the Singh Entities debtors in exchange for any of the transfers.

623.    At the time the Debtors were insolvent, on October 2022, the Singh Law Firm Account wired $1,062,738.81 to "*First American Title Insurance Comp…File Number 2684947-1534*," for the purchase of the Woodside Drive Property on behalf of Larisa Lane and, upon information and belief, for Hannah Sklarov's ownership and benefit.

624.    Larisa Lane and Hannah Sklarov did not provide reasonably equivalent value to the Singh Entities debtors in exchange for any of the transfers.

625.    Debtors made each of the foregoing transfers with the actual intent to hinder, delay, or defraud creditors, including Plaintiffs.

626.    As above, the Debtors were insolvent at the time of each of the transfers.

627.    As above, the Debtors did not receive reasonably equivalent value in exchange for any of the transfers.

628.    As above, the transfers were made to insiders.

629.    The transfers were made after Debtors were sued or threatened with suit. As alleged above, Val Sklarov and Singh were subjected to multiple lawsuits prior to the transfers to Defendants. Further, Debtors caused Jurist IQ to transfer to Mavus Law Corp. more than $38 million after Debtors anticipated suit by Plaintiffs for conversion of their Collateral Shares, in return for no reasonably equivalent value.

133

630.   Debtors Jurist IQ, Singh Law Firm, and Sierra Universal transferred substantially all of their assets as a collective result of the fraudulent transfers made to Defendants and other Sklarov Syndicate conspirators.

631.   Debtor Val Sklarov absconded to foreign countries and evaded United States jurisdiction for many years until he was captured and indicted in May 2026.

632.   As alleged above, Debtors removed or concealed assets via a criminal money laundering scheme.

633.   As alleged above, transfers to Defendants were made shortly after Debtors incurred the debts to Plaintiffs, including immediately after the Debtors liquidated the Collateral Shares and created an immediate obligation to pay damages as a result, and within weeks or months after Debtors Jurist IQ, Singh Law Firm, and Sierra Universal received criminal proceeds from the stock based lending scam, and thereby incurred an obligation to pay and/or return such proceeds to Plaintiffs.

634.   Plaintiffs suffered damages as a proximate result of the foregoing fraudulent transfers, as the transfers rendered the Singh Enterprises with inadequate capital to pay the full amount of Plaintiffs' claims.

635.   Singh, Singh Law Firm, and Jurist IQ's notations to characterize certain transfers as "consultancy" fees, including for Singh and his entities themselves, are, at best, attempts at sham consideration that only highlight the total lack of consideration each Defendant exchanged for their receipt of the illicit proceeds. The fraudulent nature of the syndicate's operation negates any putative consideration cited by these Defendants.

636.   Additional badges of fraud are present, including, among others: (i) transfers to insiders, including family members and affiliated entities; (ii) the use of attorney trust accounts

134

and controlled entities, including Jurist IQ, Singh Law Firm, and ABC LLC, to route and obscure transactions; (iii) the structuring of transfers across thousands of transactions and multiple financial institutions; (iv) the conversion of liquid proceeds into real property and other assets; and (v) the continued movement and dissipation of funds following the initiation of legal proceedings and injunctive relief.

637.    There is no plausible scenario where any Defendant possessed assets that were at all comparable to the underlying collateral. Again, Sklarov's admission that he and his collaborators used the Collateral Shares themselves to fund, at least, the last three tranches of the loan's collateral establishes this point. In other words, Defendants' primary co-conspirators otherwise lacked the assets to otherwise incur the payment obligation they owed. Second, in the unlikely event that rehypothecation of Plaintiffs' shares did not fund the distribution of the SLA principal for the first two loan tranches, Plaintiffs reasonably believe that Sklarov—who attested to being insolvent and on the verge of homelessness in 2018—and his collaborators used the proceeds of other fraud schemes like those detailed herein to fund and underwrite these initial tranches. Singh and his firms appear to rely entirely on Sklarov and their joint fraud operation as a sole client and income source. Their subsequent, potentially non-recoverable expenditures will overcome any independent funds or income Singh and his firms can access from other sources. By way of example only, in a 2021 application for an auto loan in the JPMC Records, Singh reports an annual income of $400,000. The Entity Defendants each exist for the sole purpose of layering stolen proceeds into Singh and Sklarov family real estate purchases, or in PKP Industries' case, as a separate slush fund for Singh and his family. But for the debts to Plaintiffs that Defendants incurred by processing the immediate and downstream spoils of Sklarov and Singh's fraud operation, these entities' primary assets—all in the millions—would be non-existent.

638.    Finally, Defendants Sasha and Maia Sklarov, like their siblings, stepsiblings, parents, and stepparents, would similarly have little to no assets in relation to the debts incurred from the underlying transaction.

639.    Stated otherwise, funds in Maia and Sasha Sklarov's possession and their residences are traceable to proceeds from Sklarov and the Syndicate's fraud, at least in part, including after English Action began and other subpoenas issued in Plaintiffs' New York Application, and will exceed any assets they obtained or earned from other sources.

640.    Plaintiffs are entitled to avoidance of fraudulent transfers and other relief with respect to assets traceable to such transfers.

641.    Defendants did not possess assets that were at all comparable to the underlying collateral. Again, Sklarov's admission that he and his collaborators used the Collateral Shares themselves to fund, at least, the last three tranches of the loan's collateral establishes this point. In other words, Defendants' primary co-conspirators otherwise lacked the assets to otherwise incur the payment obligation they owed. Singh and his firms appear to rely entirely on Sklarov and their joint fraud operation as a sole client and income source. Their subsequent, potentially non-recoverable expenditures will overcome any independent funds or income Singh and his firms can access from other sources. The Entity Defendants each exist for the sole purpose of layering stolen proceeds into Singh and Sklarov family real estate purchases, or in PKP Industries' case, as a separate slush fund for Singh and his family. But for the debts to Plaintiffs that Defendants incurred by processing the immediate and downstream spoils of Sklarov and Singh's fraud operation, these entities' primary assets—all in the millions—would be non-existent.

136

4920-7502-6878 v.1

642. Finally, Defendants Sasha and Maia Sklarov, like their siblings, stepsiblings, parents, and stepparents, would similarly have little to no assets in relation to the debts incurred from the underlying transaction.

643. Stated otherwise, funds in Maia and Sasha Sklarov's possession and their residences are traceable to proceeds from Sklarov and the Syndicate's fraud, at least in part, including after English Action began and other subpoenas issued in Plaintiffs' New York Action, and will exceed any assets they obtained or earned from other sources.

644. Plaintiffs are entitled to avoidance of fraudulent transfers, including those noted herein and in the Exhibits and other relief with respect to assets traceable to such transfers.

## SEVENTH CAUSE OF ACTION—UNJUST ENRICHMENT
### All Defendants

645. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

646. Defendants have been enriched by receiving, holding, and retaining proceeds derived from the unlawful liquidation of Plaintiffs' Collateral Shares that they received for no consideration.

647. Such enrichment occurred at Plaintiffs' expense, as the funds and assets that Defendants received and retained are intermingled with funds that are directly traceable to Plaintiffs' Collateral Shares and the proceeds of their unauthorized transfer and liquidation.

648. The Defendants currently possess and/or control funds and assets, including cash, accounts, and property, that are traceable to the proceeds of Plaintiffs' Collateral Shares.

649. Singh was unjustly enriched and unjustly enriched himself after he received and controlled illicit proceeds derived from the unlawful liquidation of Plaintiffs' shares.

137

650.    Singh and his co-conspirators received proceeds traceable to the liquidation of the Collateral Shares.  Sklarov admitted to an English Court, following Singh's confirmation, that Singh Law Firm, and by extension Singh himself, collected at least (and on the extreme low end) $4.5 million in proceeds traceable to the Collateral Shares.  Given his role in the overall fraud operation and thus the fraudulent intent of these transfers, that intent negates any dubious consideration for which he received these funds.

651.    Singh's banking records demonstrate significant, one-way transfers from the client trust accounts that his firms used to hold and process proceeds traceable to the Collateral Shares into his other firm accounts. Between December 10, 2021 and September 26, 2024, over 211 transactions, Singh transferred at least $15,366,565.15 from the Jurist IQ and -0210 IOLTA accounts in to the -1608 account, which never credited those funds back. Most of these funds appear traceable to the unlawful liquidation of the Collateral Shares.

652.    Singh also unjustly enriched himself by transfers to shell companies in his control that he incorporated to launder funds and for his personal benefit. PKP, a corporation Singh incorporated in New York that he named after his wife—received and processed at least $1,426,068.70 (over 67 transactions) between July 2, 2021, and September 4, 2024, from the Jurist IQ and -0210 Accounts. PKP never credited these funds back. Most of these funds appear traceable to the unlawful liquidation of the Collateral Shares.

653.    Singh benefited from other shell entities with which he is affiliated. For example, between December 5, 2022 and February 2, 2024, over 36 transactions, Singh ultimately sent or made payments to "Luxfin Group" entities accounts totaling $9,326,792.98. Although these entities was likely a money-laundering vehicle, as it credited $7,630,109.64 back to the Singh

138

accounts, it still retained a $1,696,683.34 balance, thus profiting that entity's beneficiaries, who likely includes Singh

654. Singh moved most funds sent to his non-trust accounts to personal accounts. Between July 13, 2021 and September 27, 2024, over 113 transactions, Singh ultimately sent or made payments to one or more personal American Express accounts totaling $10,239,563.81, in addition to channeling smaller deposits including thousands in funds he placed into Apple Card accounts. Singh and American Express never credited these funds back. Most of these funds appear traceable to the unlawful liquidation of the Collateral Shares.

655. Singh also enriched himself by directing funds to specific investments like precious metals. In November and December 2023, over five transactions from the -0210 Account, Singh wired $1,312,066.62 to Apmex accounts with his name in the transaction reference, all of which were traceable to Plaintiffs' assets.

656. Without consideration and through his central role in the money-laundering and fraud operation, Singh personally benefitted from this enrichment at Plaintiffs' expense, including, but not limited to, paying his student loans, healthcare expenses, home improvements, country club memberships, large parties, luxury vehicles, an expensive watch, and the profits, enjoyment, and income derived from his purchase of the Foxhall Road and Backett Wood properties.

657. To punctuate the inequitable benefits Singh enjoyed by wrongfully possessing and using funds derived from Plaintiff's stolen assets, Singh separately profited by the mere *possession* of stolen funds. For example, as the JPMC and Discover Bank Records confirm and upon information and belief, the interest earned on retaining these funds alone provided the same entities and individuals with a significant windfall. The largest example in the shortest period of time was Singh's payment of $109,968.49 to himself that his $52 million transfer to Mavus Law—

139

performed with what appears to be the specific purpose to launder those funds—earned in only 24 days in that account.

658.    Besides the direct transmission of illicit proceeds, each Entity Defendant received the benefit of significant proceeds to make real estate purchases or remissions of funds managed by Singh, and the occupation, enjoyment, and income derived from the same. Backett Wood, Larisa Lane, and ABC LLC—each managed by Singh and members of his or Sklarov's family— were unjustly enriched through the benefit of illicit proceeds used to purchase and hold millions in luxury real estate, and accordingly received the gratuitous benefit of any appreciation in those properties' value, profits on their sale or rental income, and other improvements.

659.    Singh Law Firm and Jurist IQ were unjustly enriched for processing what Sklarov and Singh admit were at least $271 million in proceeds relating to the unlawful liquidation of Plaintiffs' Collateral Shares, profiting from ongoing interest income derived from these funds, using the same funds to pay business expenses like payroll, office space, and other vendor payments.

660.    Singh Law Firm and Jurist IQ provided no consideration for these gratuitous transfers because they received and processed the funds at issue for fraudulent purposes and fraudulent intent to aid and abet an ongoing fraud against Plaintiffs.

661.    Maia and Sasha Sklarov received millions in illicit proceeds that funded their lifestyles, travel, homes and other luxury residences, tuitions, and other expenditures.

662.    Between July 26, 2021 and August 1, 2024, Maia Sklarov, whose accounts Plaintiffs have yet to request in discovery, received and deposited at least $3.533 million across 64 transactions from the Singh-Affiliated Accounts to personal accounts she appears to hold with Bank of America, Citibank, JPMC, and Schwab. She accepted these funds with knowledge that

140

she provided no services to Singh Law Firm, Sierra Universal, or Jurist IQ, and provided no reasonably equivalent value in exchange.

663.    Beginning on or about March or April 2023, Maia Sklarov took possession of a $6.45 million Manhattan Penthouse, purchased through Singh's -0210 Account and held by the ABC LLC. Between 2023 and 2024, at her likely direction, the Jurist IQ and -0210 accounts wired $1,072,902.73 to Dutchman Contracting and $84,743.11 William Suk Architecture for renovations or other improvements to this address. The Singh Affiliated Accounts paid building fees relating to this home that appear to be over $11,000 per month, which if unchanged, would likely amount to $440,000 spent to date. The JPMC Records indicate numerous other payments to luxury furniture retailers in New York, which were likely related to this home. Maia Sklarov accepted or directed payment of these funds, benefits, and other assets with knowledge that she provided no services to Singh Law Firm, Sierra Universal, Jurist IQ, or anyone else in return for these and provided no reasonably equivalent value in exchange.

664.    Between July 1, 2021 and July 29, 2024, Sasha Sklarov received and deposited at least $3.319 million across 76 transactions from the Singh-Affiliated Accounts to personal accounts she held or appears to hold with Bank of America, Discover Bank, and Schwab. She accepted these funds with knowledge that she provided no services to Singh Law Firm, Sierra Universal, or Jurist IQ, and provided no reasonably equivalent value in exchange.

665.    Sasha Sklarov's Discover Bank checking account reveals that over 3.5 years, she roughly spent, on average, over $10,000 a month on debit card purchases, including personal luxuries, clothing, airfare, and other lifestyle purchases, and averaged over $50,000 in other withdrawals per month, much of which she deposited into payment card accounts.

666.    Sasha Sklarov's Discover bank earned over $181,000 in interest between 2022–2024.

667.    The Singh-Affiliated accounts paid tens of thousands towards Sasha Sklarov's tuition.

668.    Beginning in September 2023, the Singh Accounts began wiring monthly $6350 payments to "The Tang Feng 2013 Family Trust" in Manhasset, NY, with the memo lined "3A 14th St." Upon Plaintiffs' information and belief, these are rent payments for 245 W. 14th St. Apt 3A, New York, NY, 10011, what Plaintiffs believe is and remains Sasha Sklarov's primary residence in New York City, where she now lives to study for an MFA degree. Barring an increase in rent and other related costs, she or others on her behalf affiliated with the syndicate likely spent $209,550 to date on this rental.

669.    Sasha Sklarov accepted or directed payment of these funds, benefits, and other assets with knowledge that she provided no services to Singh Law Firm, Sierra Universal, Jurist IQ, or anyone else in return for these and provided no reasonably equivalent value in exchange.

670.    Defendants were primarily enriched by funds and other assets derived from the unlawful liquidation of Plaintiffs' Collateral Shares that were channeled to them by collaborators in a fraud syndicate where they each took an active and knowing role in laundering and disposing of these funds and assets.

671.    Defendants did not merely receive these funds and benefits, but retained, transferred, and used them for their own purposes, including through asset acquisitions, inter-account transfers, and further layering designed to preserve the benefit of the proceeds for themselves.

142

672.    The benefits retained by the Defendants were mainly paid for with funds directly traceable to Plaintiffs' property and were not provided in exchange for reasonably equivalent value.

673.    Plaintiffs directly suffered millions in losses corresponding to Defendants' unjust enrichment through loss of the use of the underlying funds and Defendants' disposal of the same funds into endpoint expenditures or money-laundering conduits will frustrate Plaintiffs' ability to recover those amounts.

674.    Under the circumstances, equity and good conscience militate against permitting the Defendants to retain these benefits, where those benefits were derived from the unauthorized liquidation of Plaintiffs' Collateral Shares and remain, in whole or in part, within Defendants' possession or control.

675.    Plaintiffs are entitled to restitution, disgorgement, and recovery of all benefits unjustly retained by Defendants, including funds, accounts, and assets traceable to the proceeds of Plaintiffs' Collateral Shares, including, but not limited to, real estate like the NY Penthouse, the Backett Wood Property, the Foxhall Road Property, the Trump Tower Property, the Sheridan Road Property, and any related profits, interest, or proceeds arising from these assets.

## EIGHTH CAUSE OF ACTION—CONSTRUCTIVE TRUST
### All Defendants

676.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

677.    The parties responsible for structuring, administering, and facilitating the stock-backed lending transaction under the SLA, directly and through the Defendant co-conspirators, made express and implied promises that Plaintiffs' Collateral Shares would remain segregated, safeguarded, and not transferred, sold, or otherwise disposed of absent a contractually defined and

143

uncured event of default, and that any proceeds associated with the collateral would be held and used in accordance with the governing agreements.

678.    Plaintiffs relied on those promises in entering into the SLA and transferring approximately 7,204,296 Elektra shares as collateral, thereby relinquishing possession and control of valuable property.

679.    In reliance on these representations, pretenses, promises and the expectation of a fiduciary relationship created between Plaintiffs and the parties initially holding those Collateral Shares, Plaintiffs transferred the shares with the expectation that such shares and any proceeds thereof would be preserved and handled in accordance with the holders' obligations which apply to Defendants.

680.    Instead, those shares were thereafter wrongfully diverted, liquidated for hundreds of millions of dollars, and transferred through a network of accounts and entities controlled by and for the direct benefit of Defendants.

681.    Defendants were unlawfully delivered, and unlawfully obtained and/or retained, possession of funds and assets directly traceable to Plaintiffs' Collateral Shares and the proceeds of their unauthorized liquidation.

682.    Defendants have therefore been unjustly enriched by receiving, holding, and retaining funds and assets directly traceable to Plaintiffs' Collateral Shares and the proceeds of their unauthorized and illegal liquidation. Upon information and belief, Defendants currently possess or control identifiable funds, accounts, and assets—including both cash and real property—acquired with or derived from the proceeds of Plaintiffs' collateral.

4920-7502-6878 v.1

683.    Upon information and belief, these funds were not merely received, but were retained, transferred, and used to acquire assets, including real property, and were commingled with other funds within accounts and entities under Defendants' control.

684.    A portion of these proceeds was used by Defendants to acquire high-value real property, including the Manhattan penthouse located at 62 West 62nd Street, New York, New York 10023 (the "NY Penthouse"), the property located at 7121 Woodside Drive, Argyle, Texas (the "Woodside Drive Property"), the property located at 13658 Kitty Joe Court, Colorado Springs, Colorado 80921 (the "Kitty Joe Property"), the property located at 50 South Sheridan Road, Lake Forest, Illinois 60045 (the "Sheridan Property") the property located at 401 North Wabash Avenue, Unit 81D, Chicago, Illinois 60611, including any related parcel, parking interest, trust interest, or beneficial interest associated with Chicago Title Land Trust Company Trust No. 8002392146 or any other related trust or entity (the "Trump Tower Property"), the property located at or associated with 7402 Backett Wood Terrace, McLean, Virginia 22102 (the "Backett Wood Property"), and the property located at or associated with 1952 Foxhall Road, McLean, Virginia 22101 (the "Foxhall Road Property").

685.    Beyond the mere purchase of the above properties, Defendants made significant payments for continued improvements and renovations using proceeds traceable to Plaintiffs' Collateral Shares. For example, through Singh, Defendants made significant payments to Dutchman Contracting, Inc. for the refurbishment of the NY Penthouse, the value of which equitably remains the property of Plaintiffs.

686.    Likewise, other transactions evidence similar payments in New York for home design-related expenses, including $84,743.11 across five transactions to William Suk

145

Architecture PLLC and Suk Design Group LLP and $1,072,902.73 to Dutchman Contracting, the value of which also remains the equitable property of Plaintiffs.

687.    Defendants functioned as part of the network of entities and persons through which such proceeds were illegally transferred, held, and converted.

688.    Defendants' retention of such funds and assets constitutes unjust enrichment, as those benefits were obtained at Plaintiffs' expense and without the provision of reasonably equivalent value.

689.    The property and assets over which Plaintiffs seek such trust relief include, without limitation, the following assets, to the extent purchased, improved, maintained, preserved, funded, or held with funds obtained from liquidating Plaintiffs' Collateral Shares, proceeds traceable from Collateral Shares or any fraudulent transfers, or proceeds, substitutions, replacements, appreciation, rents, profits, income, equity, or sale proceeds derived from related sale proceeds:

    a.    the Manhattan penthouse located at 62 West 62nd Street, New York, New York 10023, purchased for approximately $6.45 million and held through Defendant ABCPHABW62STXYZ LLC (the "NY Penthouse"), together with all equity, improvements, furnishings, condominium payments, carrying costs, sale proceeds, rents, profits, and other benefits derived from related sale proceeds;

    b.    the property located at 7121 Woodside Drive, Argyle, Texas, purchased by or through Defendant Larisa Lane LLC (the "Woodside Drive Property"), together with all equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

    c.    the property located at 13658 Kitty Joe Court, Colorado Springs, Colorado 80921, purchased by or through Defendant Larisa Lane LLC (the "Kitty Joe Property"),

146

together with all equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

d.  the property located at 50 South Sheridan Road, Lake Forest, Illinois 60045 (the "Sheridan Property"), together with all equity, improvements, landscaping, design expenditures, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

e.  the property located at 401 North Wabash Avenue, Unit 81D, Chicago, Illinois 60611, including any related parcel, parking interest, trust interest, or beneficial interest associated with Chicago Title Land Trust Company Trust No. 8002392146 or any other related trust or entity (the "Trump Tower Property"), together with all equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

f.  the property located at 7402 Backett Wood Terrace, McLean, Virginia 22102, acquired or held by or through Defendant Backett Wood LLC or another Singh-controlled or affiliated entity (the "Backett Wood Property"), together with all equity, improvements, rents, profits, sale proceeds, substitutions, replacements, appreciation, and other benefits derived from related sale proceeds;

g.  the property located at 1952 Foxhall Road, McLean, Virginia 22101, including any escrow deposits, title payments, acquisition proceeds, equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

h.  any funds, proceeds, or assets transferred to or held by French Asset Acquisition LLC, Napoleon Hill Capital Resources, Rising Sun Glory Capital Ltd., Polo Molo

Shmolo Capital Ltd., Oppenheim Limited, Luxfin Asset Group Limited, AC Capital Limited, Credit One Equity Holdings Limited, or any other foreign or domestic entity associated with Defendants, the Singh Entities, the Sklarov siblings, or their co-conspirators;

i.  any funds, proceeds, or assets transferred to, held by, or for the benefit of Defendants Maia Sklarov and Sasha Sklarov. These accounts include, but are not limited to, Maia Sklarov's Bank of America account, Citibank account, JPMC account, and Schwab account, as well as Sasha Sklarov's Bank of America account, Discover Bank accounts ending in -5424 and -8232, Schwab account, and rent and tuition payments made using funds derived from proceeds from the Collateral Shares, as well as any other personal bank accounts, payment-card balances, Apple Card payments, savings accounts, investment accounts, foreign accounts, real estate interests, trust interests, and any sale proceeds, substitutions, replacements, appreciation, income, or other benefits;

j.  any funds, proceeds, or assets transferred to, held by, or for the benefit of Singh, Singh Law Firm, Jurist IQ, PKP Industries, Larisa Lane, Backett Wood, ABC LLC, or any other Singh-controlled or Defendant-controlled account or entity. These accounts include the Jurist IQ account ending in -5152, as well as the accounts ending in -0210, -1608, and -5228, the PKP account, Singh's American Express account, Schwab account, Main Street Bank account, Luxfin account, and any accounts relating to Flatgate Capital, Luxfin Capital, or any other shell entity with which Singh is affiliated or maintains a beneficial interest.

148

4920-7502-6878 v.1

k.  Equity and good conscience require that Defendants not be permitted to retain such benefits, and that the funds and assets traceable to Plaintiffs' property be impressed with a constructive trust for the benefit of Plaintiffs;

l.  to the extent the following are connected to or associated with Singh's investments, any precious metals, coins, bullion, jewelry, watches, diamonds, luxury collectibles, or other high-value personal property purchased from or through Apmex, an online retailer for coins and precious metals, as well as Liberty Coin LLC, and any other similar dealer or vendor with proceeds traceable to the liquidation of the Collateral Shares; and

m.  any accounts, funds, proceeds, substitutions, replacements, appreciation, rents, profits, income, equity, sale proceeds, insurance proceeds, escrow proceeds, trust interests, nominee interests, beneficial interests, or other derivatives of the assets identified above.

690.  Accordingly, Plaintiffs are entitled to the imposition of a constructive trust over all proceeds, funds, accounts, and assets traceable to the unauthorized transfer and liquidation of their Collateral Shares, including without limitation each and every asset identified herein, together with such further equitable relief as the Court deems just and proper.

**NINTH CAUSE OF ACTION—PURCHASE MONEY RESULTING TRUST UNDER N.Y. EPTL § 7-1.3**
**All Defendants**

691.  Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 as if fully set forth herein.

692.  Plaintiffs seek the imposition of a resulting trust under N.Y. EPTL § 7-1.3 for the value of the funds which Defendants used to illegally purchase real and personal property derived

149

from the unauthorized transfer, liquidation, monetization, sale, pledge, redemption, or other disposition of Plaintiffs' Collateral Shares, along with any proceeds, profits, income, or other assets Defendants have since obtained in connection with such properties.

693.    Defendants and their co-conspirators caused property and assets purchased, acquired, improved, maintained, preserved, or otherwise funded with Plaintiffs' Collateral Shares or the proceeds thereof to be placed in the names of Defendants, Defendant-controlled entities, Sklarov family members, Singh-controlled entities, nominees, agents, and other downstream recipients without Plaintiff's knowledge or consent.

694.    Plaintiffs did not authorize any such absolute transfer, did not consent to Defendants taking legal or beneficial title to assets funded with Plaintiffs' property, and did not intend to confer any gift, loan, capital contribution, investment, settlement, fee, distribution, or other voluntary benefit on any Defendant or related recipient.

695.    Defendants and their co-conspirators, in violation of the trust, fiduciary, custodial, contractual, and transaction obligations governing the Collateral Shares, purchased, acquired, improved, maintained, preserved, or otherwise funded assets with Plaintiffs' money or property.

696.    Plaintiffs entrusted the Collateral Shares to Defendants' coconspirators because of the SLA's custodial and transaction structure, including the express restrictions that prohibited the sale, transfer, shorting, liquidation, or other disposition of the shares absent a contractually defined and uncured event of default. Defendants and their co-conspirators violated those obligations by diverting and liquidating the Collateral Shares and then using Plaintiffs' property and proceeds thereof for their own benefit and for the benefit of their family members, entities, nominees, and affiliates.

150

697.    Defendants and their co-conspirators used Plaintiffs' property to purchase or obtain title, possession, control, beneficial enjoyment, improvements, equity, or other interests in assets that Plaintiffs never authorized them to acquire. Under these circumstances, equity requires that the holder of legal title or control not be permitted to retain the beneficial interest in property purchased or funded with another's money in violation of trust-like obligations.

698.    Illicit proceeds from the Collateral Shares supplied, in whole or in part, the consideration used to acquire, title, or fund the assets identified in this Count and throughout this Complaint. Plaintiffs do not rely solely on post-acquisition expenditures to establish relief under N.Y. EPLT § 7-1.3; rather, Plaintiffs allege that their property supplied acquisition consideration at the time those assets were obtained or titled, while later improvements, renovations, carrying costs, condominium fees, insurance payments, furnishing costs, or other post-acquisition expenditures using illicit proceeds independently support constructive trust, equitable lien, tracing, restitution, disgorgement, accounting, and related equitable relief.

699.    Defendants also used illicit proceeds to acquire, improve, maintain, or preserve other assets, including, without limitation, the Woodside Drive Property, the Kitty Joe Property, the Sheridan Property, the Trump Tower Property, the Backett Wood-related property, the Foxhall Road property, other domestic real property, property improvements, condominium fees, carrying costs, high-value personal property, precious metals, coins, luxury vehicles, and other assets identified herein.

700.    Defendants supplied no reasonably equivalent value for the illicit proceeds they received, controlled, transferred, or converted. Instead, Defendants used Plaintiffs' property to enrich themselves, their family members, their controlled entities, and their collaborators, while

151

simultaneously preventing Plaintiffs from recovering the Collateral Shares, the proceeds thereof, or the assets acquired with those proceeds.

701.    The property and assets over which Plaintiffs seek such trust relief include, without limitation, the following assets, to the extent purchased, improved, maintained, preserved, funded, or held with funds obtained from or traceable to liquidating Plaintiffs' Collateral Shares, , or proceeds, substitutions, replacements, appreciation, rents, profits, income, equity, or sale proceeds derived from related sale proceeds:

    a.   the Manhattan penthouse located at 62 West 62nd Street, New York, New York 10023, purchased for approximately $6.45 million and held through Defendant ABCPHABW62STXYZ LLC (the "NY Penthouse"), together with all equity, improvements, furnishings, condominium payments, carrying costs, sale proceeds, rents, profits, and other benefits derived from related sale proceeds;

    b.   the property located at 7121 Woodside Drive, Argyle, Texas, purchased by or through Defendant Larisa Lane LLC (the "Woodside Drive Property"), together with all equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

    c.   the property located at 13658 Kitty Joe Court, Colorado Springs, Colorado 80921, purchased by or through Defendant Larisa Lane LLC (the "Kitty Joe Property"), together with all equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

    d.   the property located at 50 South Sheridan Road, Lake Forest, Illinois 60045 (the "Sheridan Property"), together with all equity, improvements, landscaping, design

152

expenditures, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

e.  the property located at 401 North Wabash Avenue, Unit 81D, Chicago, Illinois 60611, including any related parcel, parking interest, trust interest, or beneficial interest associated with Chicago Title Land Trust Company Trust No. 8002392146 or any other related trust or entity (the "Trump Tower Property"), together with all equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

f.  the property located at 7402 Backett Wood Terrace, McLean, Virginia 22102, acquired or held by or through Defendant Backett Wood LLC or another Singh-controlled or affiliated entity (the "Backett Wood Property"), together with all equity, improvements, rents, profits, sale proceeds, substitutions, replacements, appreciation, and other benefits derived from related sale proceeds;

g.  the property located at 1952 Foxhall Road, McLean, Virginia 22101, including any escrow deposits, title payments, acquisition proceeds, equity, improvements, sale proceeds, substitutions, replacements, appreciation, rents, profits, and other benefits derived from related sale proceeds;

h.  to the extent the following are connected to or associated with Singh's investments, any precious metals, coins, bullion, jewelry, watches, diamonds, luxury collectibles, or other high-value personal property purchased from or through Apmex, Liberty Coin LLC, or any similar dealer or vendor with proceeds traceable to the liquidation of the Collateral Shares; and

153

i.  any accounts, funds, proceeds, substitutions, replacements, appreciation, rents, profits, income, equity, sale proceeds, insurance proceeds, escrow proceeds, trust interests, nominee interests, beneficial interests, or other derivatives of the assets identified above.

702.  Defendants' retention of such funds and assets constitutes unjust enrichment, as those benefits were obtained at Plaintiffs' expense, without the provision of reasonably equivalent value, and in violation of the fiduciary, confidential, custodial, contractual, and trust-like obligations governing the Collateral Shares and proceeds thereof.

703.  The same assets and real properties alleged herein further demonstrate that Defendants used layers of attorney trust accounts, shell entities, family-member accounts, foreign accounts, real estate-holding entities, title companies, design firms, luxury vendors, coin and precious-metals dealers, and related intermediaries to obscure the source and destination of Plaintiffs' property and to place assets beyond Plaintiffs' reach while preserving the benefits of the fraud for Defendants. Indeed, the dubious nature of the Entity Defendants here, Jurist IQ and Singh Law Firm serving as a front and conduit for a money laundering operation, and the other Entity Defendants serving as mere holding companies to obscure ownership of the properties listed herein exemplify the very nature of this attempt to confound Plaintiffs from securing their rights.

704.  Equity and good conscience require that Defendants not be permitted to retain such benefits, and that the funds and assets traceable to Plaintiffs' property be impressed with a resulting trust for Plaintiffs' benefit.

705.  Plaintiffs have no adequate remedy at law because Defendants have transferred, layered, commingled, concealed, and converted proceeds arising from Plaintiffs' Collateral Shares through multiple accounts, jurisdictions, intermediaries, and asset classes, including unique real

154

property and other assets that remain at continuing risk of further transfer, concealment, encumbrance, sale, or dissipation.

706.    Accordingly, Plaintiffs are entitled to the imposition of a purchase money resulting trust under N.Y. EPTL § 7-1.3 for the referenced real and personal property and associated proceeds, funds, and accounts otherwise traceable to the unauthorized transfer and liquidation of their Collateral Shares, including New York-based assets like the NY Penthouse, together with such further equitable relief as the Court deems just and proper.

## TENTH CAUSE OF ACTION—EQUITABLE ACCOUNTING

### Defendants Singh, Singh Law Firm, Jurist IQ

707.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 321 and ___ through ___ as if fully set forth herein.

708.    A fiduciary and/or confidential relationship existed between Plaintiffs and Defendants Singh, Jurist IQ, and Singh Law Firm (collectively, the "Accounting Defendants") by virtue of, among other things, their role in establishing, maintaining, and controlling financial accounts and infrastructure used to receive, hold, and transfer funds derived from Plaintiffs' collateral and the proceeds thereof.

709.    Plaintiffs entrusted funds, assets, and proceeds of substantial value to the Accounting Defendants, including through accounts and financial mechanisms established and controlled by Singh, Jurist IQ, and Singh Law Firm, which were used to receive, route, and disburse proceeds derived from the unlawful liquidation of Plaintiffs' Collateral Shares, in addition to Singh and Sklarov directly inserting other Singh entities into the SLA itself, including Sierra Universal.

155

710.    Upon information and belief, the Accounting Defendants exercised exclusive or superior control over such funds, accounts, and transactions, including attorney trust (IOLTA) and related accounts through which substantial proceeds were transferred, commingled, and distributed.

711.    The Accounting Defendants possess or control books, records, and information necessary to determine the full scope of funds received, transferred, retained, or disbursed in connection with Plaintiffs' collateral and the proceeds thereof.

712.    Plaintiffs have demanded, or are entitled to demand, a full and complete accounting of such funds, transactions, and assets, including the identity of recipients, the amounts transferred, and the disposition of proceeds derived from Plaintiffs' collateral.

713.    The Accounting Defendants have failed and refused to provide a full and complete accounting of these funds and transactions.

714.    Plaintiffs lack an adequate remedy at law because the relevant financial information, records, and transactional details are uniquely within the possession and control of the Accounting Defendants and cannot be ascertained without an equitable accounting.

715.    As a result of the foregoing, Plaintiffs are entitled to an equitable accounting requiring the Accounting Defendants to account for all funds, proceeds, accounts, transfers, and assets derived from or traceable to Plaintiffs' collateral, together with such further relief as the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION—INJUNCTIVE RELIEF
### All defendants

716.    Plaintiffs repeat and reallege the allegations of 1 through 321, and 482 through 714 as if fully set forth herein.

4920-7502-6878 v.1

717.    Plaintiffs do not seek merely a future money judgment. Plaintiffs seek to recover specific, identifiable property and proceeds traceable to the unauthorized liquidation of their Collateral Shares, funds, accounts, and real estate that Defendants received, retained, transferred, or acquired without providing any reasonably equivalent value in exchange. Absent an order preserving those assets, the property to which Plaintiffs' equitable claims attach will be transferred, encumbered, or moved beyond this Court's reach before Plaintiffs' claims can be adjudicated.

### The Specific Property and Proceeds Subject to Plaintiffs' Equitable Claims

718.    The property at issue is identified, not abstract. Sklarov admitted that the Syndicate sold Plaintiffs' Collateral Shares and generated approximately $359.4 million in proceeds, and that the remaining value of the Collateral Shares was reduced to $16.5 million. Sklarov further admitted that $271,685,472 of those proceeds "was transferred from Tavira to client accounts controlled by JT Singh through his international law practice, Jurist IQ, or his US practice, Singh Law Firm." Approximately 75% of the admitted illicit proceeds were consolidated within the Singh-Affiliated Accounts before being layered outward.

719.    From the Singh-Affiliated Accounts, Defendants converted the proceeds into identifiable real property that is the *res* of Plaintiffs' equitable claims, including without limitation:

    a.  the 62nd Street Penthouse, acquired for the occupation and benefit of Maia Sklarov through a $967,500 deposit in February 2023 and a $5,543,278.10 purchase payment the following month, and titled through ABC LLC; the Singh-Affiliated Accounts thereafter transferred over $1 million to renovate and furnish the penthouse and paid over $10,000 per month in condominium fees;

b. the home at 7402 Backett Wood Terrace acquired through Defendant Backett Wood LLC, which the Singh Law Firm Account funded with a $1,124,631.79 wire on or about March 23, 2023, and which Backett Wood, through Singh, continues to own and operate as a rental;

c. the Foxhall Road Property purchased for $2,675,000, which Singh funded by wiring $100,000 on July 15, 2024 and $608,938.49 on July 24, 2024 to KVS Title;

d. the real estate acquired and held through Larisa Lane, including the Woodside Drive Property (purchased for approximately $1.3 million) and, following its sale, the Kitty Joe Property (purchased for approximately $1.2 million);

e. the Sheridan Property, purchased for $1.9 million on November 29, 2023 through a Chicago trust whose care-of address is a Singh Law Firm address, funded by Singh Law Firm wires including $95,000 on October 27, 2023 and $1,760,000 on December 15, 2023; and

f. the Trump Tower Property purchased for $2,060,000 on November 13, 2023 through a Chicago Title Land Trust, funded by Singh-Affiliated Account transfers including $515,000 on October 31, 2023 and $1,416,334.75 on December 6, 2023.

720. Other examples also demonstrate the scale of the risk involved and the need for equitable relief. Defendants also routed the proceeds into cash and personal assets held by or for the relevant Defendants, including: transfers of at least $1,426,068.70 to PKP Industries across at least 67 transactions for which no value was received in exchange; more than $20 million diverted to Singh's personal use, including $10,239,563.81 wired to a personal American Express account

158

4920-7502-6878 v.1

over 113 transactions between July 13, 2021 and September 27, 2024, and $1,312,066.62 in precious-metals purchases through Apmex in November and December 2023.

721.    Each of the individual Defendants received large amounts of illicit proceeds without providing reasonably equivalent value. The Singh-Affiliated Accounts transferred an aggregate of $8,540,975.60 to Maia Sklarov (across approximately 82 transfers) and $8,380,406.73 to Sasha Sklarov (across approximately 64 transfers).

722.    Plaintiffs' claims for fraudulent transfer seek to avoid Defendants and their collaborator's further disposal of stolen funds, given their conduct to date, including through the alienation or other disposal of non-monetary assets.

### Defendants Have Repeatedly Dissipated and Concealed the Traceable Proceeds and Will Continue to Do So

723.    The risk of dissipation is not hypothetical. Defendants demonstrated repeatedly that they will work to frustrate any judgment and evade possible creditors, consistent with the syndicate's general practice for fraud and evasion.

724.    As Plaintiffs' investigation and litigation intensified, Singh worked to evacuate nearly all funds from the JPMC accounts he managed between May and September 2024. Through Mavus, Singh cycled approximately $52 million through outside accounts before he promptly sent $60 million on July 22, 2024 from the -0210 account to four Tavira accounts held by shell companies, and scattered nearly $2 million more, nearly exhausting the account. Those Tavira recipients included entities beneficially owned by the individual Defendants and their siblings.

725.    Singh simultaneously opened new accounts to evade disclosure, opening a Main Street Bank account for the Singh Law Firm on July 31, 2024 and amending the -0210 account to reflect a Miami, Florida address on August 1, 2024, the same day Plaintiffs filed the English Action. After the August 2, 2024 Freezing Order, Singh scattered more than $2 million between

159

August 1 and August 30, 2024 (including $600,000 to law firms) and more than $1 million in September 2024. As late as September 24, 2024, after being served with Plaintiffs' subpoenas, Singh deposited $150,000 more to external accounts.

726.　The individual Defendants have continued the same conduct. For example, in January 2025, after Plaintiffs filed the Georgia Application to investigate her accounts, Sasha Sklarov transferred approximately $2 million out of her Discover Bank accounts. On April 17, 2025, Maia, Sasha, Hannah, and Asher Sklarov appeared as intervenors in the Monaco proceedings, together with affiliated shell companies, seeking to unfreeze foreign accounts tied to the larger scheme.

727.　The risk of irreparable harm is real and ongoing given Defendants' ongoing efforts to secret assets and frustrate a potential judgment.

728.　The balance of the harms not only weighs heavily in Plaintiffs' favor—it is lopsided. Defendants visibly luxuriate in the gratuitous spoils of proceeds traceable back to Plaintiffs' stolen assets, being active participants in the broader fraud syndicate, without any other consideration. Their conduct undermines the commercial lending system, offending and harming the public interest. Weighing the equities here is a simple inquiry, and preliminary and permanent injunctive relief are justified and necessary.

**Monetary Damages Alone Cannot Remedy Plaintiffs' Irreparable Harm**

729.　A damages judgment would not make Plaintiffs whole because Defendants' entire course of conduct is designed to place the traceable proceeds beyond the reach of any creditor. Defendants received and dispersed the proceeds through a network of shell entities, attorney trust accounts, foreign custodians, and family nominees created and used to conceal and layer the illicit source of the funds.

160

730.   Plaintiffs' claims run to specific identifiable property: the 62nd Street Penthouse, the Backett Wood, Foxhall Road, Sheridan, Trump Tower, and Larisa Lane Properties, and the accounts and holdings acquired with other illicit proceeds. If that property is sold, encumbered, transferred to the foreign shell accounts through which Defendants already routed tens of millions of dollars, or converted into less traceable forms, the specific res to which Plaintiffs' equitable remedies attach will be lost.

731.   The inadequacy of a legal remedy is compounded by the recipients' lack of independent means. The individual Defendants received millions of dollars in proceeds without providing any value in exchange. A money judgment against parties who received gratuitous transfers and have hidden and dissipated the funds is no adequate remedy.

Plaintiffs hereby demand trial by jury for all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully demand judgment against Defendants as follows:

a.   For compensatory and treble damages in an amount to be determined at trial, including for the loss of Plaintiffs' Collateral Shares and the proceeds thereof;

b.   For restitution, disgorgement, and recovery of all assets and proceeds traceable to the unlawful liquidation of Plaintiffs' Collateral Shares;

c.   For avoidance of fraudulent transfers and such relief as is necessary to recover or preserve assets transferred in furtherance of the scheme;

d.   For imposition of constructive trusts over accounts, assets, and property traceable to Plaintiffs' collateral and the proceeds thereof;

161

4920-7502-6878 v.1

e.  For imposition of a purchase money resulting trust over accounts, assets, and property traceable to Plaintiffs' collateral and the proceeds thereof;

f.  For preliminary and permanent injunctive relief restraining further transfers, dissipation, or concealment of assets traceable to the underlying fraud;

g.  For costs, disbursements, and attorneys' fees to the fullest extent permitted by law; and

h.  For such other and further relief as the Court deems just and proper.


Date: July 16, 2026                    NELSON MULLINS RILEY & SCARBOROUGH LLP

                                       By:  /s/ *P. John Veysey*
                                            P. John Veysey (No. #5364708)
                                            john.veysey@nelsonmullins.com
                                            One Financial Center, Suite 3500
                                            Boston, MA 02111
                                            Tel: 617.217.4645 Fax: 617.217.4710

                                            *pro hac vice applications forthcoming*

                                            Mark F. Raymond (FL Bar No. #373397)
                                            mark.raymond@nelsonmullins.com
                                            2 South Biscayne Blvd., 21st Floor
                                            Miami, FL 33131
                                            Tel: 305.373-9425 Fax: 305.373.9443

                                            David J. Ogles (Illinois Bar No. #6309823)
                                            Miriam J. Wayne (Illinois Bar No. #6330609)
                                            david.ogles@nelsonmullins.com
                                            miriam.wayne@nelsonmullins.com
                                            123 N. Wacker Drive, Suite 2100
                                            Chicago, IL 60606
                                            Tel: 312.376.1023

                                            *Attorneys for Ricardo Benjamin Salinas Pliego and Corporación RBS S.A. C.V.*

4920-7502-6878 v.1